# EXHIBIT A

Westlaw.

1995 WL 86716                                                    Page 1
1995 WL 86716 (N.D.Ill.)
**(Cite as: 1995 WL 86716 (N.D.Ill.))**

**H**
Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois, Eastern Division.

William J. **PEREZ**, an individual, and U.S. Paper Products, Inc., an Illinois corporation, Plaintiffs,
v.
**ABBOTT** LABORATORIES, an Illinois corporation, and W. Drew Schramm, an individual, Defendants.

**94 C 4127.**

Feb. 27, 1995.

*MEMORANDUM OPINION AND ORDER*

MAROVICH, District Judge.

**\*1** In this motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), Defendants Abbott Laboratories ("Abbott") and W. Drew Schramm ("Schramm") move to dismiss three counts set forth by Plaintiffs William J. Perez ("Perez") and U.S. Paper Products, Inc. ("U.S. Paper") in their entirety as well as one count as to Perez and one count as to Abbott. Plaintiffs allege both Defendants violated 42 U.S.C. § 1981 (Counts I and II), claim Abbott breached a contract (Count III), claim promissory estoppel against Abbott (Count IV), seek relief for misrepresentation against Abbott (Count V) and seek recovery from both Defendants for tortious interference with a business relationship (Count VI) and for intentional infliction of emotional distress (Count VII). For the following reasons, the Court will grant Defendants' motion to dismiss in part and will deny it in part.

*BACKGROUND*

Plaintiff William J. Perez is the president and sole shareholder of Plaintiff U.S. Paper, an Illinois corporation, which has its principal place of business in Lake County, Illinois. Perez is a U.S. citizen, a resident of the state of Illinois, and is of Hispanic (Mexican) racial and/or ethnic identity. U.S. Paper is in the business of supplying office, laser, industrial and computer supplies to various companies. Defendant Abbott is an Illinois corporation with its corporate headquarters in Abbott Park, Illinois. Defendant Schramm is Abbott's Manager of Purchasing in Abbott Park, Illinois. Schramm is a U.S. citizen, a resident of the state of Illinois, and is a white, non-Hispanic individual.

Abbott has a corporate purchasing program dedicated to seeking and utilizing minority suppliers which are at least 51 percent owned and controlled by minority group members, including individuals of Hispanic racial and/or ethnic identity. Plaintiffs began to do business as a minority supplier with Abbott in 1982 or 1983. From the time they began to do business until approximately September 1993, Abbott expanded its purchasing programs with Plaintiffs. By approximately 1991, Abbott was ordering roughly $1 million worth of supplies from Plaintiffs annually. In 1991, and for some time before that time, Plaintiffs' main contact at Abbott was John Tournis ("Tournis"), an Abbott Purchasing Agent. Tournis is a white, non-Hispanic individual. Perez met with Tournis almost daily, and was a frequent visitor to Abbott's offices.

Some time after the relationship between Tournis and Plaintiffs began, Schramm became the Manager of Purchasing. As such, Schramm had the power to exercise a great deal of influence and control over the awarding of contracts to minority enterprises. In addition, Schramm approves purchasing contracts, whether written or oral. In the summer of 1992, Perez met with Sarah Catterson ("Catterson"), Abbott's Director of Purchasing, who advised Perez that Abbott was reducing the number of vendors it used, and would have a specific vendor handle a specific product or products. Catterson told Perez that U.S. Paper was the one vendor for computer supplies, and other items such as paper and industrial items, that U.S. Paper would be accorded "partner" status by Abbott, and that Abbott would triple, and possibly quadruple the business it did with U.S. Paper. Catterson informed Perez that the increase would be gradual, but that Plaintiffs and Abbott needed to get everything in place by early 1993. Catterson also said that U.S. Paper would have a written contract for computer supplies and that this program would be part of Abbott's continuing long-term relationship with Plaintiffs. Catterson's racial and/or ethnic identity is white, non-Hispanic. At this

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

1995 WL 86716                                                                                              Page 2
1995 WL 86716 (N.D.Ill.)
**(Cite as: 1995 WL 86716 (N.D.Ill.))**

time, Perez informed Catterson that this program was quite important to Plaintiffs because U.S. Paper was losing its second largest customer, the federal military base at Fort Sheridan, due to the base closing. Both Schramm and Tournis were aware that U.S. Paper was losing its second largest customer.

*2 Based on Perez' conversation with Catterson, U.S. Paper projected sales for 1994 in excess of $4 million. Tournis and Perez began to meet regularly to discuss the expansion of Plaintiffs' Abbott business. During these meetings Tournis and Perez discussed numerous items including Abbott's need to increase its minority purchasing, Abbott's desire that U.S. Paper be Abbott's main minority supplier, and Abbott's commitment to U.S. Paper due to U.S. Paper's performance record and location. In addition, the parties discussed U.S. Paper taking over the distribution of the products for Abbott's J-28 Warehouse, Abbott expanding its purchase of computer and laser printing supplies from Plaintiffs and Abbott's continuing, long-term relationship with Plaintiffs, involving a five to ten year commitment between the parties.

In early 1993, Tournis began to negotiate a contract with U.S. Paper for Abbott to purchase exclusively from U.S. Paper 4,800 products previously purchased from other vendors, as well as other products needed for the J-28 Warehouse. Tournis estimated the sales volume to U.S. Paper range between $1.5 million to $2 million, at a gross profit of twenty percent (20%). Tournis also estimated yearly volume increases.

In approximately April 1993, Tournis and Schramm advised Perez that Abbott would no longer honor its "commitment" to Plaintiffs and that another vendor, BAT, would split distribution with Plaintiffs at the J-28 Warehouse. They also said that if Plaintiffs would continue their relationship with Abbott, Plaintiffs would see a substantial increase in Abbott business for U.S. Paper. On May 17, 1993, Tournis left his Abbott position in purchasing for another Abbott position, and his responsibilities were assumed by Schramm, James Frederick ("Frederick") and Helene Bottos ("Bottos"). On May 18, 1993, as Perez walked by Schramm's office, Schramm hollered at Perez and said "Well, I guess you're all mine now." Schramm explained, "Well, John's [Tournis] gone now, you're all mine now. You're gonna deal with me now." Perez discussed this exchange with Will Stewart ("Stewart"), an African-American who is Abbott's Manager of Corporate MBE/WBE Business Development. Stewart failed

to take appropriate action.

In 1993, sales to Abbott represented approximately ninety percent (90%) of U.S. Paper's entire business. On July 12, 1993, Schramm telephoned Perez and advised him that he needed to conduct an emergency meeting with him immediately. At this meeting Schramm told Perez that his racial identity was a problem for Schramm, and that as a result of Perez' race, Abbott's users thought Perez lied, cheated and stole. He also informed Perez that Schramm could not personally deal with nor was he comfortable with racial minorities, that he dreaded telephone calls from Perez because he knew there was always a problem, that Perez should never call him and that Perez should never come to Abbott's offices unless he had a specific appointment to do so or Schramm called him.

*3 Perez met with Stewart shortly thereafter and informed Stewart about his meeting with Schramm. Stewart informed Perez that he was aware that Schramm disliked racial minorities, that he was aware that Schramm planned to have the conversation with Perez and that Stewart had advised Schramm against having the conversation. Stewart took no action despite the fact that he was aware of Schramm's conduct.

In August and September 1993, U.S. Paper observed a 71.2% increase in product orders from Abbott as compared to the preceding month. On September 24, 1993, Perez met with Schramm, Frederick and Bottos. In the meeting, Schramm informed Perez that due to a "glitch" in the Mercury system, the computerized purchasing system at Abbott, Abbott would only use one vendor, BAT, to distribute for the J-28 Warehouse. In addition, Schramm told Perez that Abbott would purchase the 4,800 products from BAT that it had "agreed" to purchase exclusively from U.S. Paper.

Plaintiffs claim the purported "glitch" in the Mercury system was a pretext for racial and/or ethnic discrimination. Perez complained to those present regarding this treatment, stating that it was unfair, and a breach of agreements between Abbott and U.S. Paper. Perez offered to absorb a portion of the cost to fix the glitch. Schramm refused, but asked Perez to prepare a proposal discussing how Plaintiff's business might be salvaged.

On October 4, 1993, Perez met with representatives of Abbott to discuss the proposal. Schramm refused to hear about the proposal stating that his decision to

reduce U.S. Paper's business was final. Schramm also informed the parties present that he had awarded BAT a written five year, no competitive bid contract for office and computer supplies.

Perez complained to Catterson and James Farlander on December 15, 1993. At that meeting, they informed Perez that the elimination of Plaintiff's business was due to Abbott's decision to use one supplier, and not due to a glitch in the Mercury system. Plaintiffs claim this second purported reason for eliminating Plaintiffs' business was a pretext for racial and/or ethnic discrimination.

In January 1994, Abbott committed in writing to purchase laser toner cartridges from U.S. Paper. Abbott agreed to encourage its end users to order laser toner cartridges from U.S. Paper. However, Abbott has not fulfilled its commitment because Abbott has delayed orders to its user, resulting in user displeasure towards U.S. Paper, and a drop in orders. Abbott also asked Plaintiffs to reduce their prices in contravention of the original agreement, and Abbott has not encouraged users to purchase laser toner cartridges from U.S. Paper. In addition, Abbott refused to put U.S. Paper's price increases into effect on March 15, 1994, but decided instead that they would be effective April 15, 1994.

As a result of the alleged actions by Abbott, U.S. Paper's business continues to decline, and their business with other customers is extremely insignificant because of the great deal of attention Plaintiffs provided to Abbott. Perez was forced to terminate three employees. Two other employees quit because of the poor outlook of U.S. Paper. Perez is now forced to handle all major business operations himself. Plaintiffs claims Defendants' conduct towards them is the result of Schramm's stated dislike for Hispanic, non-white individuals, and his use of his authority to reduce Plaintiffs' business. Plaintiffs allege that they relied to their detriment on Abbott's representations causing Plaintiffs to hire additional employees, increase their inventory substantially, reveal costs to BAT, one of U.S. Paper's major competitors, increase warehouse space and sacrifice and abandon other business opportunities.

## DISCUSSION

*4 As we begin to determine whether Defendants' motion should be granted, we remind the reader of the familiar standards that guide our discussion. A complaint should not be dismissed under Rule 12(b)(6) "unless it appears beyond doubt that the

plaintiff can prove no set of facts in support of his claim which would entitle him to relief." _Conley v. Gibson_, 355 U.S. 41, 45-46 (1957). The court naturally accepts as true all factual allegations and the reasonable inferences that can be drawn from them. _Trevino v. Union P.R. Co._, 916 F.2d 1230, 1234 (7th Cir.1990); _Gray v. Dane County_, 854 F.2d 179, 182 (7th Cir.1988). Ambiguities in the complaint are resolved in favor of plaintiff. _Early v. Bankers Life & Cas. Co._, 959 F.2d 75, 79 (7th Cir.1992); _Heller Int'l Corp. v. Sharp_, 839 F.Supp. 1297, 1301-02 (N.D.Ill.1993). Keeping these standards in mind, we proceed to address the issues raised by Defendants' motion to dismiss.

*Shareholder Standing Under § 1981*

Defendants first claim that Count I should be dismissed as to Perez. Count I is essentially a claim that Abbott broke several promises that would have had the effect of dramatically increasing U.S. Paper's Abbott business. Plaintiffs contend Abbott failed to honor these "commitments" and instead reduced U.S. Paper's business because Perez is Hispanic. Defendants argue that, as a shareholder of U.S. Paper, Perez lacks standing to seek redress for alleged violations of U.S. Paper's rights to contract with Abbott without discrimination. Neither party cited a case from this District or the Seventh Circuit addressing this issue directly.

Plaintiffs rely on the position expressed in two cases from the District Court of Colorado. In both cases, the president/sole shareholder of a corporation alleged that the defendant corporation failed to award the parties a contract because of the race of the president/sole shareholder. _Great American Tool and Mfg. Co. v. Adolph Coors Co._, 780 F.Supp. 1354 (D.Colo.1992); _Rosales v. AT & T Information Systems, Inc._, 702 F.Supp. 1489 (D.Colo.1988). In _Great American Tool_, the court followed the holding of _Rosales_ in stating that "the corporation could assert a § 1981 claim because the president and sole shareholder's race stamped it with a 'minority racial identity.'" _Great American Tool_, 780 F.Supp. at 1356; _Rosales_, 702 F.Supp. at 1497. The courts in _Rosales_ and _Great American Tool_ then reasoned that "if [the corporation] has a racial identity based on [the shareholder plaintiff's] race then [the shareholder plaintiff's] § 1981 claim would effectively merge with [the corporation's] § 1981 claim." _Great American Tool_, 780 F.Supp. at 1356 (quoting _Rosales_, 702 F.Supp. at 1497-98). Under this analysis, these courts concluded that the president/sole shareholder had standing to assert a

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

race discrimination claim. *Great American Tool,* 780 F.Supp. at 1356; *Rosales,* 702 F.Supp. at 1498.

*5 To bolster their claim, Plaintiffs also assert that Perez suffered injuries in his capacity as an individual associated with U.S. Paper. Plaintiffs claim that as the president and an employee of U.S. Paper, Perez has suffered injuries for which U.S. Paper cannot properly seek relief such as emotional and physical distress, including increased workplace duties. As Defendants point out, Perez seeks damages personally in a separate count, Count VII, for intentional infliction of emotional distress based on the same facts as those alleged in Count I. Plaintiffs argument on this score begs the question.

Defendants rely on the basic proposition that a corporation is a separate legal entity from its stockholders. Therefore, with limited exceptions, a stockholder (even a sole stockholder) is without standing to assert the rights of the corporation or seek recovery for wrongs suffered by the corporation. *Gersman v. Group Health Ass'n, Inc.,* 931 F.2d 1565, 1569 (D.C.Cir.1991), *vacated,* 112 S.Ct. 960 (1992), *adhered to, on remand,* 975 F.2d 886 (D.C.Cir.1992), *cert. denied,* 114 S.Ct. 1642 (1994); *Gregory v. Mitchell,* 634 F.2d 199, 202 (5th Cir.1981); *Erlich v. Glasner,* 418 F.2d 226, 228 (9th Cir.1969); *see also Kush v. American States Ins. Co.,* 853 F.2d 1380, 1383 (7th Cir.1988) (applying Illinois rule that even a sole shareholder is distinct from the corporation and shareholder may not sue unless directly injured by a defendant's actions). The Seventh Circuit has not directly addressed the issue of a shareholder's standing to assert a § 1981 claim. As a result, this Court will return to basic standing principles and the language of § 1981 to answer this question.

As part of the Civil Rights Act of 1866, § 1981 protects the rights of all persons to make and enforce contracts without discrimination on the basis of race. As amended in response to *Patterson v. McLean Credit Union,* 491 U.S. 164 (1989), § 1981(b) states that "the term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." Section 1981 protects the contractual rights and opportunities of "all persons." That focus and the plain language of § 1981, however, make it clear that the person seeking relief must be a person who claims to have been discriminated against as he sought to "make or enforce" a contract as defined in § 1981.

Viewed with this understanding and with due regard for both constitutional and prudential standing doctrines, we find that Plaintiff Perez lacks standing to assert a claim for relief under § 1981. As the Complaint alleges, the contractual relationship at issue in this case is the relationship between U.S. Paper and Abbott. Perez plays an integral role in this relationship but the allegations do not indicate any contractual relationship existed or was ever contemplated between Abbott and Perez as an individual. Although Perez may suffer greatly as the sole shareholder of U.S. Paper, his injuries are a result of his role as sole shareholder and do not provide him an independent basis for a § 1981 claim. As such, this Court will follow those cases finding that a shareholder lacks standing to assert civil rights claims where the corporation, rather than the individual shareholders, suffered the alleged injuries. *See, e.g., Gersman,* 931 F.2d at 1569 (individual shareholder has no standing to assert § 1981 claim for injury suffered by corporation); *Searcy v. Houston Lighting & Power Co.,* 907 F.2d 562, 565 (5th Cir.) (same), *cert. denied,* 498 U.S. 970 (1990); *Gregory,* 634 F.2d at 202 (same holding as to shareholders' § 1983 claim); *Des Vergnes v. Seekonk Water Dist.,* 601 F.2d 9, 16 (1st Cir.1979) (same, § 1981 claim), *cert. denied,* 454 U.S. 898 (1981); *Erlich,* 418 F.2d at 228 (same, § 1983 claim); *Triad Associates, Inc. v. Chicago Housing Authority,* No. 87 C 5096, 1992 WL 349655, at *6 (N.D.Ill. Nov. 13, 1992) (Anderson, J.) (same), *aff'd,* 10 F.3d 492 (7th Cir.1993). In light of these decisions, we find the reasoning of the Colorado District Court opinions unpersuasive. [FN1]

*6 Although the Seventh Circuit has not expressly addressed the issue presented in this case, it has addressed the issue of a shareholder's standing to maintain a civil rights action under 42 U.S.C. § 1983. In *Flynn v. Merrick,* 881 F.2d 446, 450 (7th Cir.1989), the Seventh Circuit ruled that "a plaintiff-shareholder cannot maintain a civil rights action for damages suffered by the corporation." The Seventh Circuit reasoned that "[f]iling suit under 42 U.S.C. § 1983 does not diminish the requirement that the shareholder suffer some individual, direct injury." *Id.* Applying the same logic in this § 1981 action, this Court concludes that Perez lacks standing and he will be dismissed as a Plaintiff to Counts I and II.

*Count II--"Retaliation" under § 1981*

In Count II, Plaintiffs seek damages for alleged retaliation against them by Abbott in violation 42 U.S.C. § 1981. Plaintiffs claim that Defendants'

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

1995 WL 86716                                                      Page 5
1995 WL 86716 (N.D.Ill.)
**(Cite as: 1995 WL 86716 (N.D.Ill.))**

conduct of continuing to reduce Plaintiffs business was done in retaliation for Perez' complaints about Defendants' treatment of U.S. Paper. Defendants seek to dismiss Count II in its entirety based on their reliance on *Patterson v. McLean Credit Union,* 491 U.S. 164, 177-178 (1989), in which the Supreme Court held that a cause of action for retaliation under § 1981 only lies where the retaliation impairs a party's ability to enforce his or her established contract rights through the legal process. Defendants claim that because Plaintiffs make no allegation that Defendants' retaliatory actions against them impaired their ability to enforce their contract rights in court or through nonjudicial methods of adjudication, this cause of action must be dismissed.

In *Patterson,* the Supreme Court held that "the right to enforce contracts does not ... extend beyond conduct by an employer which impairs an employee's ability to enforce through legal process his or her established contract rights." *Id.* In *McKnight v. General Motors Corporation,* 908 F.2d 104, 111 (7th Cir.1990), *cert. denied,* 499 U.S. 919 (1991), the Seventh Circuit, relying on *Patterson,* stated that "[b]ecause section 1981 confers a right to enforce contracts as well as to make them, it punishes 'efforts to impede access to the courts or obstruct nonjudicial methods of adjudicating disputes about the force of binding obligations, as well as discrimination by private entities, such as labor unions, in enforcing the terms of a contract.' " *Id.* The Court noted that "if ... General Motors had, because of McKnight's race, obstructed his efforts to enforce his contractual entitlements, for example by retaliating against him for bringing suit to enforce his contract of employment with General Motors, the company might be guilty of violating section 1981." *Id.* at 111-112. However, the court noted that "General Motors did not interfere with *contractual* entitlements ... [and] [McKnight's] complaints ... were not concerned with enforcing any contractual rights." *Id.* Therefore, the Plaintiff's claim of retaliation was not actionable under § 1981. *Id.* at 112; *see also Daniels v. Pipefitters Ass'n Local Union No. 597,* 945 F.2d 906, 915-19 (7th Cir.1991) (detailing the Seventh Circuit's holdings on the viability of retaliation claims post-*Patterson* ), *cert. denied,* 112 S.Ct. 1514 (1992).

\*7 Here, Plaintiffs allege that Perez complained to Abbott officials regarding Defendants' discriminatory treatment, and that, as a result, Defendants retaliated by continually reducing the amount of business Abbott gave to Plaintiffs. Plaintiffs do not allege that they were retaliated against for attempting to

enforce their contract rights in court or in a non-judicial forum. Nor do Plaintiffs allege that Defendants hindered or blocked Plaintiffs from enforcing a contractual right in a legal or other grievance proceeding. Therefore, according to *Patterson,* Plaintiffs' claim in Count II would not be actionable under § 1981.

However, Plaintiffs assert that the Civil Rights Act of 1991 overturned *Patterson* and "restored" the broad reach of 42 U.S.C. § 1981. Section 101(2) of the Civil Rights Act of 1991 amended § 1981 by adding subsection (b):

For purposes of this section, the term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

Plaintiffs rely on a section of an Interpretive Memorandum which states that the Civil Rights Act of 1991 was designed to:

fill the gap in the broad statutory protection against intentional racial and ethnic discrimination covered by section 1981 ... that was created by the Supreme Court decision in *Patterson v. Mclean Credit Union,* 491 U.S. 164 (1989). [Section 101(2) ] reinstates the prohibition of discrimination during the performance of the contract.... The list set forth in subsection (b) is illustrative only, and should be given broad construction to allow a remedy for any act of intentional discrimination committed in the making or the performing of a contract. [Section 101(2) ] also overturns *Patterson* in contractual relationships other than employment, and nothing in the amended language should be construed to limit it to the employment context.

137 Cong.Rec. S15,483 (daily ed. Oct. 30, 1991) (Interpretive Memorandum placed into the record without objection by Sen. Danforth). *But see Rivers v. Roadway Express, Inc.,* 114 S.Ct. 1510, 1517 (1994) (discussing conflicting and ambiguous legislative history about whether § 101 would "restore" or "enlarge" the original scope of § 1981). Accordingly, Plaintiffs assert that "allegations that defendants retaliated against plaintiffs by further reducing the flow of business given to plaintiffs following complaints of discriminatory treatment fall clearly within § 1981's protection against the discriminatory 'performance' of contracts." (Pl.Mem. at 6).

Although it is clear that this portion of the Civil

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

1995 WL 86716                                                                              Page 6
1995 WL 86716 (N.D.Ill.)
**(Cite as: 1995 WL 86716 (N.D.Ill.))**

Rights Act of 1991 was enacted in response to *Patterson's* exclusion of post-formation conduct from coverage under § 1981, the question is whether the 1991 Act altered the holdings of *Patterson* and its progeny with respect to claims based on allegations of retaliation as related to § 1981 protection for a person's efforts to "enforce" a contractual right. Having reviewed the arguments of the parties and the relevant authorities, we find nothing in the language or the history of the 1991 Act that would lead us to define the meaning of "enforce" contrary to the meaning given to the term in *Patterson* and its progeny here in the Seventh Circuit.    Although Plaintiff has argued that Count II states a claim for discriminatory retaliation that interfered with U.S. Paper's ability to "enforce" contractual rights, the above-quoted statement from Plaintiffs' brief indicates the real nature of Count II is an attempt to state a claim for discrimination during the performance of a contract.

**\*8** If Plaintiffs' argument is that the 1991 Act defines "make and enforce" to encompass a claim for discrimination in the making, performance or modification of a contract, then they are correct. The problem, however, is that Count I adequately encompasses such a claim and Count II is mere surplusage.    As currently alleged, Count II adds one allegation to the allegations of Count I.    Plaintiffs allege that "Defendants' conduct of continuing to reduce plaintiffs' business was done in retaliation for Perez' complaints about defendants' treatment of plaintiffs."    This conclusory allegation adds little to the substance of the claim previously alleged in Count I.       Count I encompasses claims of discrimination in the making, performance, and possible modification or termination of various unspecified agreements between Abbott and U.S. Paper.    [FN2]    The Court does not find that the additional allegation states a separate claim for interference on the basis of race with U.S. Paper's right to enforce a contract through judicial or non-judicial methods of dispute resolution.    Accordingly, Count II is dismissed.

*Count III--Breach of Contract*

Abbott moves to dismiss Count III, a claim for breach of contract, on the ground that U.S. Paper has failed to allege the elements of contract between Abbott and U.S. Paper.    Plaintiffs claim that oral agreements covering various aspects of a vendor/purchaser relationship were formed in the numerous discussions between Perez and Abbott employees.    In addition to challenging whether the

parties ever reached any agreements, Defendants claim that Plaintiffs do not allege that U.S. Paper gave consideration in exchange for Abbott's alleged promises of expanded business.    Therefore, Defendants maintain the Complaint does not contain allegations sufficient to support the existence of a contract.

To determine whether Plaintiffs state a claim for breach of contract, it is necessary initially to determine whether the Plaintiffs have sufficiently alleged the existence of an agreement under Illinois law.    Illinois courts hold that an enforceable contract is one where the essential terms are definite and certain.    *Midland Hotel Corp. v. Reuben H. Donnelley Corp.*, 515 N.E.2d 61, 65 (Ill.1987).    The requirement of definiteness applies with equal or greater force to oral contracts.    *Vandevier v. Mulay Plastics, Inc.*, 482 N.E.2d 377, 380 (Ill.App.Ct.1985) (holding that "in order for an oral contract to be binding and enforceable, its terms must be definite and certain").    "Where it appears that the language used or the terms proposed are understood differently by the parties, there is no meeting of the minds and no contract exists between the parties."    *Vandevier*, 482 N.E.2d at 380.       As in all cases where the existence of a contract is at issue, the party seeking to enforce an alleged agreement has the burden to plead and prove an offer, acceptance and consideration.    *Serpe v. Williams*, 776 F.Supp. 1285, 1287-88 (N.D.Ill.1991).    Defendants focus their attack on Plaintiffs' allegations, or lack of allegations, regarding these crucial elements of contract formation.

**\*9** While these principles are well-understood in Illinois law, this Court has noticed some problems not confronted by either party.    First, Abbott has not addressed the potential application of the Uniform Commercial Code and the Statute of Frauds to the contract claim filed by U.S. Paper.    Even a cursory review of the allegations indicates that the purported agreements discussed in the Complaint cover the sale of goods in amounts that would have to exceed the value of $500.    Perhaps the alleged discussions also involve the provision of services which fall outside the U.C.C. as adopted in Illinois, but these arguments are not raised.       In addition, there are several mentions of the alleged agreements requiring performance several years in the future--yet another indication that the Statute of Frauds might apply. Although the Court finds the absence of these arguments somewhat surprising, we will proceed on the battlefield selected by the parties.    *Cf. Parrillo v. Safeway Ins. Co.*, No. 93 C 7281, 1994 WL 380625

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

1995 WL 86716                                                                                      Page 7
1995 WL 86716 (N.D.Ill.)
**(Cite as: 1995 WL 86716 (N.D.Ill.))**

(N.D.Ill. July 18, 1994) (dismissing complaint on the basis of the Statute of Frauds, 740 ILCS 80/1).

As stated above, Defendants claim that in this case no contracts were formed because the conversations Perez had with Abbott employees lacked certainty and did not include essential terms, such as duration, prices, descriptions of goods or the nature of the services to be provided. Defendants maintain that the Complaint alleges a series of negotiations rather than the formation of a contract. In large part, this Court agrees.

While it is true that on a motion to dismiss the Court interprets ambiguities in favor of the Plaintiff, it is also true that a Plaintiff can plead himself out of court. _Early v. Bankers Life and Cas. Co., 959 F.2d 75, 79 (7th Cir.1992)._ "If he alleges facts that show he isn't entitled to a judgment, he's out of luck." _Id._ The discussion that follows shows just how far U.S. Paper has gone toward being out of luck.

The Complaint generally sets out the continuing relationship of vendor/purchaser that existed between U.S. Paper and Abbott beginning in 1982 or 1983. There is no indication that a written agreement governed this relationship. [FN3] In fact, the Complaint fails to specify how Abbott purchased goods from U.S. Paper. For present purposes, we will ignore this deficiency and shift our focus to the summer of 1992. In the summer of 1992 at a restaurant in Lake Forest, Perez met with Sarah Catterson, Abbott's Director of Purchasing, who advised Perez that Abbott was reducing the number of vendors it used, and would have a specific vendor handle a specific product or products. Catterson told Perez that U.S. Paper was the one vendor for computer supplies, and other items such as paper and industrial items, that U.S. Paper would be accorded "partner" status by Abbott, and that Abbott would triple, and possibly quadruple the business it did with U.S. Paper. Catterson informed Perez that the increase would be gradual, but that Plaintiffs and Abbott needed to get everything in place by early 1993. In addition, Defendants point out that Catterson informed Perez that U.S. Paper would have a written contract for computer supplies as the other "sole" vendors for other products already had written contracts. The parties never entered into this written contract.

*10 Even the most liberal view of the Complaint could not raise this discussion of future possibilities to the level of a contractual agreement. The conclusion that this preliminary discussion created no

contract is bolstered by Plaintiffs' own allegations. After describing the Catterson meeting, Plaintiffs allege that Perez "began to meet regularly, almost on a daily basis, with Tournis [an Abbott purchasing agent] concerning the essential and material terms of the agreements in connection with ... the expansion U.S. Paper's Abbott business." Plaintiffs then describe several general material terms allegedly discussed by Perez and Tournis. Significantly, Plaintiffs fail to allege that these discussions ever reached a conclusion and we do not find that the Complaint can be fairly read to state the existence of a contract at this stage of the negotiations.

According to the Plaintiffs, in late 1992, Tournis began to negotiate a contract with U.S. Paper under which U.S. Paper would take over distribution at the J-28 warehouse. Tournis indicated that this program would involve a ten year commitment by Abbott and U.S. Paper. Plaintiffs fail to allege that the beginning negotiations of this arrangement ever proceeded to an agreement and the Complaint does not contain any reference to the materials terms of this alleged agreement. Once again, the Court is compelled to conclude that U.S. Paper has failed to allege the existence of a contract to "take over distribution" at the J-28 warehouse.

As the Complaint continues, in early 1993, Tournis "began to negotiate" a contract with U.S. Paper under which Abbott agreed to purchase exclusively from U.S. Paper 4,800 products previously purchased by Abbott from BAT, another vendor. Once again, Plaintiffs do not allege that this exclusive purchasing arrangement was finalized and we do not find the allegations sufficient to state the existence of a contract when the only allegations are that negotiations had begun and sales projections were disclosed.

A clear example that negotiations do not always result in a binding contract is provided by Plaintiffs' own allegations. Having alleged that various negotiations had begun in 1992 and 1993, Plaintiff then alleges that in April 1993, Tournis and Schramm, an Abbott purchasing manger, informed Perez that BAT would split distribution with U.S. Paper at the J-28 warehouse. Perhaps in this allegation that U.S. Paper would have a role in distribution of computer supplies at the J-28 warehouse, there is the hint of an offer. Perhaps it was accepted by performance, but the Complaint is not clear and we need not strain to make this inference in Plaintiffs' favor. Of course, it might be difficult to allege a breach of this agreement where

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

1995 WL 86716                                                                                      Page 8
1995 WL 86716 (N.D.Ill.)
**(Cite as: 1995 WL 86716 (N.D.Ill.))**

there is no apparent provision barring termination at the will of Abbott.

U.S. Paper did experience a dramatic increase of orders for the J-28 warehouse in September 1993. Then, in October 1993, Schramm advised U.S. Paper that Abbott would only be using one vendor, BAT, for the J-28 warehouse. In addition, Abbott would purchase the 4,800 products from BAT, not from U.S. Paper, as previously discussed.

*11 Thus far, the Court cannot find the allegations sufficient to allow U.S. Paper to prove the existence of a contract. On the contrary, U.S. Paper's own allegations show that numerous negotiations took place but no agreements were finalized. Up to this point, U.S. Paper has failed to properly allege the formation or existence of an agreement, including the basic material terms of these purported agreements.

The Court does find that U.S. Paper has adequately plead the existence of a contract for Abbott to purchase laser printer toner cartridges from U.S. Paper. The Complaint alleges that in January 1994, Abbott committed in writing to purchase such cartridges from U.S. Paper. In exchange, U.S. Paper agreed to deliver orders within 48 hours, service collection bins on a frequent basis, and furnish four free laser printing cleaning services to each Abbott department with the purchase of one new laser toner cartridge. Abbott does not directly address these allegations and neither party has submitted the alleged written agreement. Nonetheless, U.S. Paper has stated a claim for breach of this agreement due to Abbott's alleged failure to use its best efforts to promote orders and its failure to promptly deliver orders to end users, thereby frustrating U.S. Paper's performance.

Having thoroughly discussed the allegations of Count III, the Court need only briefly address Plaintiffs' arguments in support of the contract claim. Plaintiffs claim that a subjective understanding of the terms of the alleged contract is not required for there to be a meeting of the minds. _Steinberg v. Chicago Medical School,_ 371 N.E.2d 634, 630 (1977). The court in _Steinberg_ stated that "it suffices that the conduct of the contracting parties indicates an agreement to the terms of the alleged contract." _Id._ In addition, Plaintiffs also rely on _Prince v. Packer Mfg. Co.,_ 419 F.2d 34, 37 (7th Cir.1969), in which the Seventh Circuit held that where there is evidence that parties, by their own conduct, placed a practical construction upon an unwritten agreement which was reasonable and given at a time when the parties were

not in dispute, that practical construction will be adopted by the court. _Id._ This Court has no disagreement with these propositions of law. The Court, however, does not find that they aid Plaintiffs in this case.

In this case, with little exception, the Complaint does not allege the basic elements of contract formation in terms of offer, acceptance, and consideration. The Court does not read any of the allegations as sufficient to indicate the parties, by their performance, placed a practical construction upon an unwritten agreement. With the exception of the agreement regarding laser toner cartridges, Count III contains allegations amounting to a series of negotiations and discussions that did not culminate in binding contractual obligations. Because Count III does contain at least one viable contract claim, the Court denies the motion to dismiss as to this aspect of the contract claim. No other claim for breach of contract is properly alleged and these other claims are dismissed.

### Count V--Intentional Misrepresentation--Fraud

*12 Defendant Abbott next moves to dismiss Count V, a claim of misrepresentation or fraud. Plaintiffs claim that the representations made by Abbott concerning the expansion of Plaintiffs' Abbott business were intentional misrepresentations. Defendants argue that in Illinois, in order to constitute actionable fraud, misrepresentations must pertain to present or pre-existing facts, rather than to future or contingent events, expectations or probabilities. _Murray v. ABT Assocs. Inc.,_ 18 F.3d 1376, 1379 (7th Cir.1994); _Parker v. Arthur Murray, Inc.,_ 295 N.E.2d 487, 490 (Ill.App.Ct.1973). In addition, we note that Illinois law "does not permit recovery under the banner of fraud for promises to negotiate a contract." _Murray,_ 18 F.3d at 1376; _Beraha v. Baxter Health Care Corp,_ 956 F.2d 1436, 1445-46 (7th Cir.1992). Defendants maintain that Plaintiffs only allege that Abbott made statements of future expectations, not present or pre-existing facts.

Plaintiffs admit that they allege only that Abbott made statements of future expectations rather than present or pre-existing facts. However, Plaintiffs point to an exception to the general rule regarding statements of future facts. Specifically, "an intentional misrepresentation of future conduct [is sufficient] when the false promise is alleged to be the scheme employed to accomplish the fraud, and defendant made the promise with no intention of keeping it." _Plant Process Equipment, Inc. v._

1995 WL 86716                                                                                      Page 9
1995 WL 86716 (N.D.Ill.)
**(Cite as: 1995 WL 86716 (N.D.Ill.))**

*Continental Carbonic Products, Inc.*, 668 F.Supp. 1191, 1193-1194 (N.D.Ill.1987). In *Plant*, the court found that Continental's allegation that Plant Process Equipment promised to provide Continental with a fully operational dry ice processing plant, and that it had no intention of ever performing its obligations under the agreement, was sufficient to place Continental's claim within the exception.

In this action, Plaintiffs claim that given Schramm's alleged animus toward racial and ethnic minorities, the Court can infer that Abbott had no intention of keeping its various promises to Plaintiffs at the time the promises were made. Plaintiffs argue that Abbott made false promises to Plaintiffs as part of an overall scheme to defraud Plaintiffs. Specifically, Plaintiffs point out that after Schramm took over as Manager of Purchasing, Tournis began to negotiate contracts with Perez regarding U.S. Paper taking over distribution for Abbott's J-28 Warehouse and Abbott purchasing 4,800 products exclusively from U.S. Paper. Shortly thereafter, Tournis and Schramm allegedly advised Perez that Abbott would not honor its purported "commitment" to Plaintiffs. Eventually, Schramm took over Tournis' duties and informed Perez that his racial/ethnic identity was a problem.

The Court declines to make the inference suggested by Plaintiffs. U.S. Paper has alleged various discussions regarding future events, almost all involving aspects of expansion of U.S. Paper's Abbott business. As our discussion of the contract claim indicates, we have difficulty discerning statements that could be construed as promises by Abbott when U.S. Paper has persistently characterized many of these allegations as "discussions" and referred to them in terms of beginning negotiations. In any event, U.S. Paper fails to adequately allege that Abbott did not intend to keep these alleged promises of business expansion at the time the statements were made and that these statements were part and parcel of a scheme to defraud U.S. Paper. Rule 9(b) requires that fraud be pleaded with particularity and the current claim does not set forth sufficiently detailed allegations to warrant application of the exception permitting cases of promissory fraud to proceed. Because the Court is not yet certain that U.S. Paper cannot remedy the defects in this pleading, the Court will allow U.S. Paper to amend this Count to comply with the pleading requirements of Rule 9(b) and the applicable cases applying the limited exception for promissory fraud.

*Count VI--Intentional Interference with Contract*

**\*13** Finally, Defendants move to dismiss Count VI, a claim for tortious interference with business relationships. Plaintiffs claim that Defendants knew or should have known that their conduct would damage and/or destroy Plaintiffs' business relationship with Abbott. In addition, Plaintiffs also claim that as a result of Defendants' conduct they suffered destruction and worsening of relationships with existing vendors and suppliers.

Defendants claim that "a party cannot be liable in tort for interfering with its own business relationship," and; therefore, this claim should be dismissed, at least as to Abbott. *F.E.L. Publications, Ltd. v. Catholic Bishop of Chicago*, 754 F.2d 216, 221 (7th Cir.1985); *Singh v. Curry*, 667 F.Supp. 603, 606 (N.D.Ill.1987). Despite the allegations of Count VI, Plaintiffs now concede that they do not seek recovery for interference with U.S. Paper's relationship with Abbott. Plaintiffs argue that they seek relief for Defendants' interference with their relationships with other entities.

Under generally recognized principles of Illinois law, to state a claim for tortious interference with contract, U.S. Paper must plead that (1) it had an enforceable contract with another party; (2) that Defendants were aware of the contract; (3) that Defendants induced the other party to breach that contract; (4) the party did breach the contract; and (5) U.S. Paper suffered damages as a result. *HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc.*, 545 N.E.2d 672, 676 (Ill.1989) (recognizing these elements of the tort); *Roy v. Coyne*, 630 N.E.2d 1024, 1030-31 (Ill.App.Ct.1994); *see also Dresser Industries, Inc. v. Pyrrhus AG*, 936 F.2d 921, 934 (7th Cir.1991). In an abundance of caution, the Court has also considered whether U.S. Paper may have attempted to state a claim for interference with prospective economic advantage.

The Illinois Supreme Court has not set out the elements of the tort of intentional interference with prospective economic advantage. In *Fellhauer v. Geneva*, 568 N.E.2d 870, 878 (Ill.1991), the Illinois Supreme Court acknowledged this fact and noted that the generally recognized elements require the plaintiff to prove:

(1) [its] reasonable expectation of entering into a valid business relationship; (2) the defendant's knowledge of the plaintiff's expectancy; (3) purposeful interference by the defendant that prevents the plaintiff's legitimate expectancy from ripening into a valid business relationship; and (4) damages to the plaintiff resulting from such

1995 WL 86716                                                                 Page 10
1995 WL 86716 (N.D.Ill.)
**(Cite as: 1995 WL 86716 (N.D.Ill.))**

interference.

The Illinois Appellate Court decisions vary in their statements of the elements of these two torts, a situation producing a great deal of confusion commented on in *Roy v. Coyne.* For our purposes, these statements of the applicable elements will suffice.

When compared to the required elements, U.S. Paper clearly has failed to state a claim under either of the intentional interference torts. Both torts require intentional conduct on Defendants' part that interferes with an existing or prospective business relationship but the Complaint contains no such allegations. U.S. Paper appears to mistake these torts as providing for recovery when Abbott's conduct toward U.S. Paper incidentally results in damage to U.S. Paper's relationship with other clients. For example, U.S. Paper complains that Abbott's alleged promises caused it to spend the bulk of its time and resources on the Abbott business to the detriment of its relationships with other clients. Such allegations are insufficient and do not support a claim for tortious interference against Abbott or Defendant Schramm. Under the alleged facts, the Court does not see how U.S. Paper can state a cognizable claim for tortious interference with contract or prospective economic advantage. Accordingly, the motion to dismiss is granted and no leave to amend need be granted. [FN4]

*CONCLUSION*

**\*14** For the reasons set forth above, Defendants' motion to dismiss Counts I as to Perez is granted. Defendants' motion to dismiss Counts II and VI is granted. Defendants' motion to dismiss Count V is granted but Plaintiffs will be allowed file an amendment to this Count within 2 weeks. Defendants' motion to dismiss Count III is denied in part and granted in part.

FN1. In the earlier *Rosales* opinion, the court notes that it agreed "that [a shareholder] cannot assert a claim under § 1981 against [a defendant] solely on the ground that he, as a ... shareholder, was financially harmed by [the defendant's] alleged discrimination against [the corporation]." 702 F.Supp. at 1497. While stating a holding in accord with the one we reach today, the *Rosales* court nonetheless continued its discussion and ultimately allowed the shareholder to proceed with a §

1981 claim. In addition to this apparent about-face, we also find the discussion of the racial identity of the corporation and the "merger" of the shareholder and corporate claims unhelpful as to whether the shareholder actually has alleged a sufficient direct injury to warrant granting him standing to pursue a § 1981 claim. *See Gersman*, 931 F.2d at 1569 (noting difficulty of determining corporate racial identity and holding that corporate "identity" not dispositive).

FN2. The Court considers whether Plaintiffs have adequately alleged the existence of any contracts below. As § 1981(b) makes clear, a person is protected from discrimination in the "making" of contracts, as well as, in the performance and enforcement of contracts already made. Thus, whether a binding agreement exists between parties is not dispositive of a § 1981 action.

FN3. It is probable, though not mentioned in the Complaint, that Abbott may have placed orders by way of purchase orders, with each order representing a contract. In any event, Plaintiffs' focus appears to be on broader contractual agreements which would greatly expand U.S. Paper's Abbott business.

FN4. Although Defendants technically only sought dismissal of Count VI on behalf of Abbott and not Defendant Schramm, the Court finds the fatal defects in Count VI render dismissal appropriate as to both Defendants.

1995 WL 86716 (N.D.Ill.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT B

Westlaw.

1980 WL 296                                                    Page 1
1980 WL 296 (D.Mass.), 25 Empl. Prac. Dec. P 31,484
**(Cite as: 1980 WL 296 (D.Mass.))**

United States District Court; D. Massachusetts.

**Candee Ballantine,** Plaintiff
v.
**Children's Hospital,** Defendant.

**Civil Action No. 77-3411-MC**

October 9, 1980

MC NAUGHT, D.J.

**\*1** This matter came on to be heard on defendant
Children's Hospital Medical Center's (Children's
Hospital) motion to dismiss. In this action the
plaintiff Candee Ballantine alleges that defendant
hospital, her former employer, discriminated against
her on the grounds of race, color, and sex in violation
of Title VII of the Civil Rights Act of 1964, as
amended, 42 U.S.C. § 2000e-5(f)(1) and in violation
of the Civil Rights Act of 1866, 42 U.S.C. § 1981.

*[Title VII Claims]*

With respect to plaintiff's Title VII claims,
Children's Hospital has moved to dismiss on the
grounds that: (1) this court lacks subject matter
jurisdiction over alleged acts of discrimination other
than plaintiff's discharge because they are outside the
scope of the plaintiff's Equal Employment
Opportunities Commission (EEOC) charge and
investigation; and (2) plaintiff's allegations
concerning discrimination in the conditions of her
employment lack specificity in terms of their nature
and the date when they occurred, and could have
taken place before the 300-day time limit for filing a
complaint with the EEOC as provided in § 2000e-
5(e). Defendant seeks dismissal of plaintiff's claims
under 42 U.S.C. 6 1981, on the grounds that (1) sex
discrimination is not actionable under this statute,
and (2) plaintiff's claim of racial discrimination is
barred by the applicable limitations period. [FN1]

> FN1 At the hearing on this motion,
> defendant waived its previous argument of
> insufficiency of process and service of
> process as grounds for dismissal.

The court finds no basis at present for dismissing

plaintiff's Title VII allegations. We disagree with
defendant's characterization of plaintiff's charges
filed with the Massachusetts Commission Against
Discrimination (MCAD) and the EEOC as limited in
scope to her discharge. A review of the plaintiff's
EEOC Charge of Discrimination and the findings of
the MCAD taken into account by the EEOC, as stated
in its Determination Letter, suggests that the charge
was viewed and investigated not only in relation to
plaintiff's termination by Children's Hospital, but also
in relation to defendant's evaluation procedures,
supervision, and response to plaintiff's interest in
other job opportunities. Furthermore, while plaintiff
did not check the box next to "sex" as the cause of
discrimination on the EEOC form, her statement in
the charge reads: "I feel that I am being
discriminated against because I am a black female."
A sufficient basis exists, therefore, for this court's
assuming jurisdiction of plaintiff's claim of sex
discrimination under Title VII.

Any lack of specificity in the plaintiff's Title VII
allegations might be cured if Children's Hospital were
to move for a more definite statement pursuant to
F.R.Civ.P. 12(e) or through discovery. Thereafter, if
it appears to Children's Hospital that the complaint
encompasses allegations outside the scope of the
EEOC investigation or is otherwise defective, the
way is open for the defendant to renew its motion to
dismiss or to seek other appropriate relief.

*[1866 Act Claims]*

**\*2** Title 42 U.S.C. § 1981 proscribes only racial
discrimination. *Runyon v. McCrary,* 427 U.S. 160,
168-72 (1976); *Melanson v. Rantoul,* 421 F. Supp.
492, 499-500 (D. R.I. 1976); *League of Academic
Women v. Regents of the University of California* [4
EPD P 7878], 343 F. Supp. 636, 638-640 (N.D. Cal.
1972). Plaintiff's allegations of sex discrimination
are not actionable under *42 U.S.C. § 1981* and are
hereby dismissed.

Since there is no federal statute of limitations
applicable to 42 U.S.C. § 1981 actions, a federal
court must adopt the state limitations period
applicable to the most closely analogous state cause
of action. *Johnson v. Railway Express Agency, Inc.*
[9 EPD P 10,149], 421 U.S. 454, 462 (1975); *Burns
v. Sullivan,* No. 79-1424, slip op. at 10 (1st Cir., Mar.
31, 1980). M.G.L. c.151B, § § 1 *et seq.,* barring

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

racial discrimination in employment, has been viewed as the most closely analogous to the federal civil rights statutes. *Burns v. Sullivan, supra* (§ 1983 suit); *Currington v. Polaroid Corp.,* 457 F. Supp. 922, 923 (D. Mass. 1978) (§ 1981 suit). Two limitations periods appear in Chapter 151B. Section 5 provides that a complaint alleging an unlawful act of discrimination must be filed with the MCAD within six months of the alleged unlawful act. Section 9 provides that a party who has filed a complaint with the MCAD may file an action in state court within two years of the alleged unlawful act. Both sections apply to actions against a private or public employer. M.G.L. c.151B, § 1(5).

In *Currington v. Polaroid Corp., supra,* the court held that the two-year limitations period appearing in M.G.L. c.151B, § 9 applied in an action brought under 42 U.S.C. § 1981. More recently the Court of Appeals for this Circuit has held that the six-month period for filing a complaint with the MCAD under M.G.L. c.151B, § 5 applied where the plaintiff alleged discrimination in public employment under 42 U.S.C. § 1983. *Burns v. Sullivan, supra.* The court stated: "This rule gives a plaintiff six months from either the date of the alleged act of discrimination or final state administrative adjudiciation of the claim of discrimination to seek relief pursuant to Section 1983." *Id.* at p. 15.

In the present case application of the two-year limitations period would require dismissal of the plaintiff's action under 42 U.S.C. § 1981, as her employment was terminated on October 10, 1975, and this action was not commenced until November 17, 1977. If the plaintiff is allowed six months from the date of the final state administrative adjudication of her claim of discrimination, as provided in *Burns v. Sullivan, supra,* for actions under Section 1983, her action would be considered timely since the MCAD's finding of lack of probable cause was issued on May 26, 1977, and this action was commenced within six months of that determination.

The question presented by this case is whether it would be appropriate under federal law to view the two-year limit provided in M.G.L. c.151B, § 9 as an outside limit in cases where an aggrieved party has first resorted to state administrative proceedings. [FN2] On this issue, the court notes that a party who has filed a complaint alleging racial discrimination in employment with the EEOC under 42 U.S.C. § 2000e is permitted 180 days from receipt of a notice of the right to sue to commence an action, without reference to the time when the alleged act of

discrimination occurred. Additionally, since the state has set a six-month limit on the time within which a complaint with the MCAD must be filed, an employer who has such timely notice of a claim of discrimination which is later the basis for a federal action under Section 1981 cannot complain that permitting a plaintiff six months from the date of the MCAD's determination works a great hardship or is inconsistent with the aims of the federal statute. This court is of the opinion that the rule established for Section 1983 actions, in *Burns v. Sullivan, supra,* as derived from M.G.L. c.151B, § 5, is equally applicable in actions under 42 U.S.C. § 1981, without regard to the two-year limit appearing in M.G.L. c.151B, § 9. Accordingly, defendant's motion to dismiss plaintiff's claim of racial discrimination under Section 1981 is hereby denied.

FN2 No such issue was presented in *Burns v. Sullivan,* as the aggrieved party did not initiate proceedings before the MCAD.

1980 WL 296 (D.Mass.), 25 Empl. Prac. Dec. P 31,484

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT C

1994 WL 421103                                                      Page 1
1994 WL 421103 (D.N.H.)
**(Cite as: 1994 WL 421103 (D.N.H.))**

**H**
Only the Westlaw citation is currently available.


United States District Court, D. New Hampshire.

BEVERLY C.
v.
HAMPSTEAD OUTLOOK, INC., et al.

**No. # C-93-307-L.**

Aug. 11, 1994.


LOUGHLIN.

THE UNITED STATES DISTRICT COURT FOR
THE
DISTRICT OF NEW HAMPSHIRE
ORDER

*1 Before the Court are two motions: Motion to Dismiss case against HCA Health Services of New Hampshire, Inc. d/b/a Portsmouth Pavilion ("HCA") (doc. # 59) and Motion to Dismiss case against Dr. Donna C. Orvin ("Dr. Orvin") (doc # 62). For the reasons stated below both Motions to Dismiss are granted in part and denied in part.

*Background*

On June 10, 1990, plaintiff Beverly C. took an overdose of Imipramine, an anti-depressant drug, in a suicide attempt. The plaintiff was subsequently transported to defendant HCA. Defendant Dr. Orvin, who was employed as a physician by HCA, performed a mental status examination and thereafter ordered the plaintiff's involuntary emergency admission to the New Hampshire Hospital pursuant to N.H.Rev.Stat. Ann. § 135-C.

Plaintiff has alleged that while at HCA, defendants confined her in a holding room and refused to let her use the telephone or the bathroom. She further alleges that before she was transferred from HCA by two Rockingham County Sheriff's Deputies, she was handcuffed and strapped in a harsh and brutal manner and that employee(s) of HCA were in a position to direct and control the actions of the Deputies, but did not.

The plaintiff claims that defendants HCA and Dr. Orvin violated plaintiff's constitutional and civil rights under 42 U.S.C. § 1983 during the involuntary emergency admission process. Plaintiff also has plead New Hampshire state law claims against both HCA and Dr. Orvin.

*Discussion*

A motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) is one of limited inquiry, focusing not on "whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974). Accordingly, the court must take the factual averments contained in the complaint as true, "indulging every reasonable inference helpful to the plaintiff's cause." *Garita Hotel Ltd. Partnership v. Ponce Federal Bank, F.S.B.,* 958 F.2d 15,17 (1st Cir.1992). In the end, the court may grant a motion to dismiss under Rule 12(b)(6) "only if it clearly appears, according to the facts alleged, that plaintiff cannot recover on any viable theory." *Garita,* 958 F.2d at 17.

I. *The Civil Rights Claims*

In order to state a claim under 42 U.S.C. § 1983, a plaintiff must show: (1) the existence of a federal constitutional or statutory right, and (2) a deprivation of that right by a person acting under color of state law. *Watterson v. Page,* 987 F.2d 1, 7 (1st Cir.1993) (citing *Willhauk v. Halpin,* 953 F.2d 689, 703 (1st Cir.1991)). Defendants HCA and Dr. Orvin have moved to dismiss the civil rights claims against them on the grounds that they did not act under color of state law.

In determining whether a defendant has acted under color of state law for section 1983 purposes, the First Circuit has used the three-test analysis articulated in *Rockwell v. Cape Cod Hospital,* No. 93-1581, slip op. at 7 (1st. Cir. June 16, 1994). This court has applied this test to other defendants in this action. *See Order* (July 13, 1994). In applying the three-test analysis to the other defendants, a private physician and a private hospital, this court found that they did not act under color of state law and dismissed the civil rights claims against them. *Id.* Applying the

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

same analysis to defendants HCA and Dr. Orvin mandates the same result: that they did not act under color of state law for purposes of 42 U.S.C. § 1983 liability.

**\*2** Under the first test, the state compulsion test, state action exists if the statute at issue either compels or encourages involuntary commitment. *Id.* Plaintiff claims that her civil rights were violated by the actions of HCA and Dr. Orvin pursuant to N.H.Rev.Stat. Ann. § 135-C.

In this court's order of July 13, 1994 it found that a private physician or a private hospital do not act under color of state law for purposes of section 1983 merely by complying with N.H.Rev.Stat. Ann. § 135-C. *Order* at 4. Likewise, the Court finds that the New Hampshire statute does not compel or encourage involuntary commitment so as to transform HCA and Dr. Orvin into state actors under the state compulsion test.

The next test is the nexus/joint action test. In order for a defendant to be considered a state actor under the nexus/joint action test the statute at issue must create a sufficiently close nexus between the state and the hospital or private physician. *Rockwell,* slip op. at 9. The nexus/joint action test involves situations where the government has so far insinuated itself into a position of interdependence with the private party that it was a joint participant in the enterprise. *Harvey v. Harvey* 949 F.2d 1127, 1131 (11th Cir.1992). The First Circuit has noted that even extensive governmental regulation and the receipt of federal funds, such as Medicare or Medicaid, are insufficient to establish that a hospital or other entity acted under color of state law. *Rockwell,* slip op. at 9-10.

Plaintiff has alleged that HCA is a corporation duly organized under the laws of New Hampshire. She has also alleged that Dr. Orvin and other employees or agents of the hospital are licensed by the state of New Hampshire. As noted in the July 13, 1994 order, such regulation is insufficient to establish that a hospital acted under color of state law. *See Order* at 5.

For purposes of 42 U.S.C. § 1983, the plaintiff must plead in detail, through reference to material facts, the relationship or nature of the conspiracy between the state actor and the private entity. *Harvey,* 949 F.2d at 1133. Plaintiff, with respect to HCA and Dr. Orvin has failed to allege any contacts between the police and the hospital personnel that could show that

they had reached an understanding to violate her rights. Therefore, HCA and Dr. Orvin did not act under color of state law under the nexus/joint action test.

The last test is the public function test. In order to find state action under this test, the plaintiff must show that the private entity assumed powers "traditionally exclusively reserved to the state." *Rockwell,* slip op. at 10. In its July 13, 1944 order, this court found that the treatment of the mentally disabled, as of the sick and infirm generally, has not been traditionally the exclusive prerogative of the state. *Order,* at 5. Accordingly, Dr. Orvin and HCA did not act under color of state law under the public function test.

**\*3** The court concludes that Dr. Orvin did not act under color of state law. The section 1983 liability of HCA alleged involves solely the actions of its employees. It is well settled that a defendant cannot be held liable under 42 U.S.C. § 1983 on a respondeat superior or vicarious liability basis. *Rockwell* at 7. Therefore, under *Rockwell,* HCA cannot be liable under 42 U.S.C. § 1983 for the acts of its employees or agents. Accordingly, the Motions to Dismiss the civil rights claims against Dr. Orvin and HCA are granted.

II. *State Law Claims*

Because the Court has dismissed the civil rights claims against Dr. Orvin and HCA, only state law claims remain against them. In order to exercise supplemental jurisdiction over these state law claims, the court must determine that the state claims and the federal claims arise out of a common nucleus of operative fact and are such that the plaintiff would ordinarily be expected to try them all in one judicial proceeding. *Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 349 (1988).

Indulging every reasonable inference to the plaintiff's cause and taking all factual averments contained in the complaint as true, the court finds that the state law claims against Dr. Orvin and HCA and the remaining 42 U.S.C. § 1983 claims against other defendants to this action do arise out of a common nucleus of operative fact. Some of the alleged facts which comprise the common nucleus are: 1) during the conduct and speech of the Rockingham Deputies, employees of HCA were in a position to direct and control the actions of the Deputies, 2) employees of HCA smiled and did nothing in response to Rockingham Deputies' handcuffing and strapping the

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

1994 WL 421103
1994 WL 421103 (D.N.H.)
**(Cite as: 1994 WL 421103 (D.N.H.))**

Page 3

plaintiff in a harsh and brutal manner, and 3) defendants confined plaintiff in a holding room and refused to let her use the telephone and bathroom.

With this finding, the court denies the Motions to dismiss the state law claims against HCA and Dr. Orvin for want of supplemental jurisdiction. The court wishes to point out that it is of the opinion that plaintiff's state law claims border on frivolity.

*Conclusion*

The civil rights claims (Counts I, II, III, IV, and V) against Dr. Orvin and HCA are dismissed. Defendant's Motions to Dismiss plaintiff's state law claims (Counts VI, VII, VIII, and Count IX) remain. Accordingly, the Motions to Dismiss (doc. # 59 and doc. # 62) are hereby granted in part and denied in part.

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT D

Westlaw.

84 Fed.Appx. 814                                                        Page 1
84 Fed.Appx. 814, 2003 WL 22977094 (9th Cir.(Wash.))
**(Cite as: 84 Fed.Appx. 814, 2003 WL 22977094 (9th Cir.(Wash.)))**

**Briefs and Other Related Documents**

This case was not selected for publication in the Federal Reporter.

Please use FIND to look at the applicable circuit court rule before citing this opinion. (FIND CTA9 Rule 36-3.)

United States Court of Appeals,
Ninth Circuit.

Robert HALL, Plaintiff--Appellant,
v.
Robert S. MUELLER, Director, FBI; et al.,
Defendants--Appellees.

No. 03-35413.

Submitted Dec. 8, 2003. [FN*]

FN* The panel unanimously finds this case suitable for decision without oral argument. See Fed. R.App. P. 34(a)(2).

Decided Dec. 16, 2003.

**Background:** Suit was brought against Director of Federal Bureau of Investigation (FBI) and other federal defendants alleging violations of Fourteenth Amendment, section 1983, Federal Tort Claims Act (FTCA), the Freedom of Information Act (FOIA), and the Privacy Act. The United States District Court for the Western District of Washington, Thomas S. Zilly, J., entered judgment in favor of defendants, and plaintiff appealed.

**Holdings:** The Court of Appeals held that:
(1) FBI was immune from suit;
(2) Fourteenth Amendment and section 1983 did not apply to individual federal government actors;
(3) complaint failed to state FTCA claim since it did not allege negligent actions on the part of the federal defendants; and
(4) plaintiff failed to establish Freedom of Information Act (FOIA), and Privacy Act claims.
Affirmed.

West Headnotes

**[1] United States** ⚖125(28.1)
393k125(28.1) Most Cited Cases
Federal Bureau of Investigation (FBI) was immune from suit for violations of the Fourteenth Amendment, § 1983, Federal Tort Claims Act (FTCA), the Freedom of Information Act (FOIA), and the Privacy Act. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. § 1983; 28 U.S.C.A. § 1346; 5 U.S.C.A. § 552.

**[2] Civil Rights** ⚖1364
78k1364 Most Cited Cases

**[2] Constitutional Law** ⚖82(5)
92k82(5) Most Cited Cases
Fourteenth Amendment and § 1983 did not apply to individual federal government actors. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. § 1983.

**[3] Federal Civil Procedure** ⚖2546
170Ak2546 Most Cited Cases
Conclusory allegations are insufficient to create a genuine issue of material defeating a summary judgment motion.

**[4] United States** ⚖50.5(1)
393k50.5(1) Most Cited Cases
The only proper defendant for Federal Tort Claims Act (FTCA) claim against a federal employee for actions taken within the scope of employment is the United States. 28 U.S.C.A. § 1346.

**[5] United States** ⚖140
393k140 Most Cited Cases
Complaint failed to state Federal Tort Claims Act (FTCA) claim since it did not allege negligent actions on the part of the federal defendants. 28 U.S.C.A. § 1346(b)(1).

**[6] Records** ⚖62
326k62 Most Cited Cases
Plaintiff failed to establish Freedom of Information Act (FOIA), and Privacy Act claims where plaintiff's submissions showed that the FBI provided him with most of the documents he requested and plaintiff failed to raise a genuine issue of fact as to whether the FBI improperly withheld certain documents pursuant to various statutory exemptions. 5 U.S.C.A. § 552.

**\*815** Appeal from the United States District Court for the Western District of Washington, Thomas S. Zilly, District Judge, Presiding. D.C. No. CV-02-02239-TSZ.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

84 Fed.Appx. 814                                                                                                                    Page 2
84 Fed.Appx. 814, 2003 WL 22977094 (9th Cir.(Wash.))
**(Cite as: 84 Fed.Appx. 814, 2003 WL 22977094 (9th Cir.(Wash.)))**

Robert Hall, pro se, Seattle, WA, for Plaintiff-Appellant.

Robert Patrick Brouillard, Esq., USSE-Office of the U.S. Attorney, Seattle, WA, for Defendant-Appellee.

Before: GOODWIN, WALLACE and TROTT, Circuit Judges.

MEMORANDUM [FN**]

FN** This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3.

**\*1** Robert L. Hall appeals pro se the district court's judgment in favor of defendants in his action alleging violations of the Fourteenth Amendment, section 1983, the Federal Tort Claims Act ("FTCA"), the Freedom of Information Act ("FOIA"), and the Privacy Act of 1974. We have jurisdiction pursuant to 28 U.S.C. § 1291. We review de novo the district court's dismissal and summary judgment. *See Barnett v. Centoni,* 31 F.3d 813, 815- 16 (9th Cir.1994) (per curiam). We affirm.

[1] The district court properly dismissed Hall's claims against the FBI because the FBI is immune from suit. *See Gerritsen v. Consulado General De Mexico,* 989 F.2d 340, 343 (9th Cir.1993).

[2] Likewise, the district court properly dismissed Hall's Fourteenth Amendment and section 1983 claims against the individual defendants because these provisions do not apply to federal government actors. *See \*816San Francisco Arts & Athletics, Inc. v. U.S. Olympic Comm.,* 483 U.S. 522, 543 n. 21, 107 S.Ct. 2971, 97 L.Ed.2d 427 (1987) ("The Fourteenth Amendment applies to actions by a State."); *Morse v. North Coast Opportunities, Inc.,* 118 F.3d 1338, 1343 (9th Cir.1997) ("[B]y its very terms, § 1983 precludes liability in federal government actors.").

[3] As the district court noted, Hall's allegations would also not give rise to a viable *Bivens* claim against the defendants in their official capacity. *See Daly-Murphy v. Winston,* 837 F.2d 348, 355 (9th Cir.1987) (holding that a *Bivens* action can only be maintained against a defendant in his individual capacity). A *Bivens* claim against defendants in their individual capacity would also fail because Hall's conclusory allegations are insufficient to create a

genuine issue of material fact. *See Arpin v. Santa Clara Valley Transp. Agency,* 261 F.3d 912, 922 (9th Cir.2001) (stating that conclusory allegations unsupported by factual data are insufficient to defeat a summary judgment motion).

[4][5] Hall's FTCA claims against the individual defendants fail because the only proper defendant for an FTCA claim against a federal employee for actions taken within the scope of employment is the United States. *See Ward v. Gordon,* 999 F.2d 1399, 1401 (9th Cir.1993) (stating that remedy under FTCA against the United States is exclusive of any other civil action). If properly asserted against the United States, Hall's FTCA claims would fail because Hall did not allege negligent actions on the part of the defendants. *See* 28 U.S.C. § 1346(b)(1).

[6] The district court properly granted the defendants summary judgment on Hall's FOIA and Privacy Act claims because Hall's submissions showed that the FBI provided Hall with most of the documents he requested and Hall failed to raise a genuine issue of fact as to whether the FBI improperly withheld certain documents pursuant to various statutory exemptions. *See* 5 U.S.C. § 552(b)(1), (b)(2), (b)(7)(C).

**AFFIRMED.**

84 Fed.Appx. 814, 2003 WL 22977094 (9th Cir.(Wash.))

**Briefs and Other Related Documents (Back to top)**

• 2003 WL 22724412 (Appellate Brief) Brief for Defendant/Appellee (Aug. 22, 2003)Original Image of this Document (PDF)

•                    03-35413                    (Docket) (May. 15, 2003)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.