# Exhibit A

Westlaw.

93 Fed.Appx. 244 Page 1
93 Fed.Appx. 244, 2004 WL 626736 (1st Cir.(Puerto Rico)), 93 A.F.T.R.2d 2004-1571
(Cite as: 93 Fed.Appx. 244, 2004 WL 626736 (1st Cir.(Puerto Rico)))

**H**
This case was not selected for publication in the Federal Reporter.

NOT FOR PUBLICATION NOT TO BE CITED AS PRECEDENT

Please use FIND to look at the applicable circuit court rule before citing this opinion. First Circuit Rule 36(b). (FIND CTA1 Rule 36.)

United States Court of Appeals,
First Circuit.

Angel RUIZ-RIVERA, et al., Plaintiffs, Appellants,
v.
INTERNAL REVENUE SERVICE, Defendant, Appellee.

No. 03-1083.

March 30, 2004.

**Background:** Major shareholder of real-estate holding company brought claims against Internal Revenue Service (IRS) for disclosing information when questioned by potential real property lessee regarding tax lien on company's property. The United States District Court for the District of Puerto Rico, Jay A. García-Gregory, J., 226 F.Supp.2d 345, granted summary judgment for IRS, and shareholder appealed.

**Holdings:** The Court of Appeals held that:
(1) reinstatement of company as plaintiff was not required by interests of justice, and
(2) shareholder was not entitled to file amended complaint after expiration of scheduling order deadline.
Affirmed.

West Headnotes
[1] United States 125(34)
393k125(34) Most Cited Cases
Constitutional claims against the Internal Revenue Service (IRS), a federal agency, are barred by sovereign immunity.
[2] United States 78(5.1)
393k78(5.1) Most Cited Cases
Any tort claims against the Internal Revenue Service (IRS) must be brought under the Federal Tort Claims Act, which waives the sovereign immunity of the United States to suits in tort. 28 U.S.C.A. §§ 1346, 2671 et seq.
[3] Federal Civil Procedure 1840
170Ak1840 Most Cited Cases
Reinstatement of corporation as plaintiff in action against Internal Revenue Service (IRS), following dismissal of corporation from action due to its failure to timely secure counsel, was not required by interests of justice, in view of corporation's awareness of court orders directing it to obtain counsel.
[4] Federal Civil Procedure 840
170Ak840 Most Cited Cases
[4] Federal Civil Procedure 1938.1
170Ak1938.1 Most Cited Cases
Plaintiff was not entitled to file amended complaint after expiration of scheduling order deadline for such amendments absent any explanation for why counsel missed the deadline; that motion, filed almost three years after original deadline, was filed only 30 days after plaintiff's new attorney appeared in the case was not dispositive, especially where plaintiff failed to show exercise of due diligence to secure counsel after withdrawal of original attorneys.

*245 Appeal from the United States District Court for the District of Puerto Rico, Jay A. García-Gregory, U.S. District Judge.

Angel Ruiz-Rivera on brief pro se.

Julio Morillo Limardo on brief for appellants.

Curtis C. Pett and John A. Dudeck Jr., Tax Division, Department of Justice, and Eileen J. O'Connor, Assistant Attorney General.

Before HOWARD, Circuit Judge, CAMPBELL and CYR, Senior Circuit Judges.

PER CURIAM.

**\*\*1** Appellants Angel Ruiz-Rivera and Compania de Inversiones Urayoan, Inc. (CIU) appeal from the district court's grant of the motion for summary judgment filed by the Internal Revenue Service (IRS). Appellants also appeal from the district court's (1) denial of their motion for reconsideration of that

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

93 Fed.Appx. 244                                                                                                                 Page 2
93 Fed.Appx. 244, 2004 WL 626736 (1st Cir.(Puerto Rico)), 93 A.F.T.R.2d 2004-1571
**(Cite as: 93 Fed.Appx. 244, 2004 WL 626736 (1st Cir.(Puerto Rico)))**

court's dismissal of CIU from the case due to CIU's failure to timely secure counsel to represent it and (2) denial of Ruiz Rivera's motion to file an amended complaint. We affirm the district court in all respects.

[1][2] As for the merits, we affirm the district court's grant of summary judgment to the IRS for essentially the reasons stated in that court's Opinion and Order. See *Ruiz Rivera v. I.R.S.*, 226 F.Supp.2d 345 (D.P.R.2002). We only add two comments. *246 First, constitutional claims against the IRS, a federal agency, plainly are barred. See FDIC v. Meyer, 510 U.S. 471, 484-86, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994) (refusing to imply a *Bivens*-type cause of action directly against a federal agency). Second, any tort claims against the IRS must be brought under the Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671-2680, which "waives the sovereign immunity of the United States to suits in tort." See *Santiago-Ramirez v. Secretary of Dep't of Defense*, 984 F.2d 16, 18 (1st Cir.1993). However, such a suit would be barred here under the exceptions to sovereign immunity contained in § 2680(c) (barring "[a]ny claim arising in respect of the assessment or collection of any tax") and (h) (barring "[a]ny claim arising out of ... libel, slander, misrepresentation, deceit, or interference with contract rights").

[3] In relation to the failure of CIU to retain counsel, the district court gave CIU over *two years* to secure legal representation, and CIU missed all of the deadlines the court had set for an attorney to appear on CIU's behalf. Indeed, an attorney did not file an appearance for CIU until *after* the court had dismissed CIU from the case. To be entitled to reconsideration of this dismissal, which was not a "final" order, appellants would have to show that the interests of justice required CIU's reinstatement as a plaintiff. See *Greene v. Union Mutual Life Ins. Co.*, 764 F.2d 19, 22-23 (1st Cir.1985). We review a district court's denial of an interlocutory motion for reconsideration for abuse of discretion. *Douglas v. York County*, 360 F.3d 286, 290 (1st Cir.2004).

We simply do not see how the interests of justice required the reinstatement of CIU, given the circumstances surrounding appellants' failure to timely secure counsel to represent CIU. First, appellants do not claim that they were unaware of the court orders directing CIU to obtain counsel or that they somehow misunderstood the orders or the deadlines contained in the orders. Rather, appellants, *knowing* of their obligations, simply did not comply with the district court's orders until two years had elapsed and until CIU had been dismissed from the case. Compare *Douglas*, 360 F.3d 286, 290 (where the district court injected a *new* issue into the case without notifying the parties, it was an abuse of discretion to deny a promptly-filed motion for reconsideration).

**2 [4] Finally, the district court did not abuse its discretion in denying Ruiz-Rivera's motion to amend the complaint. In this regard, it is undisputed that both Ruiz-Rivera and CIU were represented by counsel when the district court, in its scheduling order, set August 31, 1999 as the deadline for filing amended pleadings. Similarly, it is undisputed that appellants were represented by these same attorneys when the August 31 deadline passed. Appellants' counsel did not request an extension of time to file an amended complaint at this point, but rather waited until the conference held on November 22, 1999 to announce that they would be filing an amended complaint on or before January 3, 2000. Significantly, counsel also missed this deadline.

"We review the denial of a motion to amend the pleadings for an abuse of discretion and will affirm if any adequate reason for the denial is apparent from the record." *O'Connell v. Hyatt Hotels of Puerto Rico*, 357 F.3d 152, 154 (1st Cir.2004). Where a responsive pleading has been filed and the district court has entered a scheduling order, as here, Fed.R.Civ.P. 16(b) supplies the standard for obtaining an extension of time. Thus, Ruiz-Rivera was required to show "good cause" for missing the deadline. *Id.*

*247 Here, Ruiz-Rivera did not file a motion to amend the complaint until August 13, 2002, which was almost *three years* after the expiration of the scheduling order deadline of August 31, 1999. In attempting to excuse this length of time, appellants focus on the fact that the motion to amend was filed only 30 days after attorney Morillo appeared in the case. This period of time, however, is not determinative.

Rather, the focus of the "good cause" inquiry must be on the reasons for the failure of appellants' *original* attorneys to meet the scheduling order deadline, as well as on the reasons for the failure of these attorneys to meet their own deadline of January 3, 2000 for the filing of an amended complaint. Appellants, however, do not present *any* arguments concerning these attorneys nor do they address these early deadlines. Plainly, then, appellants have failed to show either "good cause" for missing the earlier

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

93 Fed.Appx. 244                                                                Page 3
93 Fed.Appx. 244, 2004 WL 626736 (1st Cir.(Puerto Rico)), 93 A.F.T.R.2d 2004-1571
**(Cite as: 93 Fed.Appx. 244, 2004 WL 626736 (1st Cir.(Puerto Rico)))**

deadline or "diligence" in pursing an extension of time to file an amended complaint. *See* Rule 16(b).

Moreover, there is no evidence that appellants exercised any diligence during the year and four months that expired between the date their original attorneys were permitted to withdraw--March 26, 2001--and the date they finally filed the motion to amend--August 13, 2002. That they were without an attorney during this time cannot pardon the delay where, as discussed *supra,* they failed to show excusable neglect for the length of time it took them to secure counsel. We therefore cannot see that the district court abused its discretion in denying permission to file an amended complaint.

The judgment of the district court is *affirmed.*

93 Fed.Appx. 244, 2004 WL 626736 (1st Cir.(Puerto Rico)), 93 A.F.T.R.2d 2004-1571

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit B

Westlaw.

Not Reported in F.Supp.2d
2002 WL 1012929 (D.N.H.), 2002 DNH 100
(Cite as: 2002 WL 1012929 (D.N.H.))

Page 1

**Motions, Pleadings and Filings**

NOT FOR PUBLICATION

United States District Court, D. New Hampshire.

Eileen GWYN, as Executor of the Estate of Howard Gwyn, Eileen Gwyn, on her own
behalf, and Margaret Do
v.
LOON MOUNTAIN CORPORATION d/b/a Loon Mountain Ski Area

No. 01-00214-B.

May 15, 2002.

MEMORANDUM AND ORDER

BARBADORO, Chief J.

*1 This diversity case arises out of a tragic skiing accident that resulted in two fatalities. In their first amended complaint, plaintiffs Eileen Gwyn (individually and on behalf of her late husband's estate) and Margaret Do (Gwyn's daughter) seek to hold defendant Loon Mountain Corporation liable for damages they suffered as a result of the accident. Presently pending are two motions to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) filed by defendant, as well as a motion for leave to amend the first amended complaint and a motion for leave to reply to defendant's objection thereto filed by plaintiffs. For the reasons that follow, I grant in part and deny in part one of defendant's motions to dismiss, grant the second motion to dismiss, grant plaintiffs' motion for leave to reply to defendant's objection to the motion for leave to amend, but deny plaintiffs' motion for leave to amend.

I.

In addressing defendant's Rule 12(b)(6) motions, I accept all the factual allegations in the first amended complaint and draw all reasonable inferences from those allegations in plaintiffs' favor. See *Alternative Energy, Inc. v. St. Paul Fire & Marine Ins. Co.,* 267 F.3d 30, 33 (1st Cir.2001).

On January 25, 1999, Howard and Eileen Gwyn; their daughter, Margaret Do; and their daughter's fiancé, Mark Goss, were skiing at Loon Mountain Ski Area in Lincoln, New Hampshire. At about 11:15 a.m., Howard Gwyn, Do, and Goss rode the chairlift to the top of the Big Dipper ski trail, while Eileen Gwyn remained at the base of the mountain. The four planned to meet for lunch at 11:30 a.m. at the Governor Adams Base Lodge.

After exiting the chair lift, Howard Gwyn (an expert skier), Do, and Goss skied down the upper part of the Big Dipper trail to the area where it adjoins the Triple Trouble trail. The Triple Trouble trail was closed at the time. Gwyn, skiing in control and with due care, was the first to approach the junction of the two trails. As Gwyn reached the area adjacent to the junction, he attempted to stop. Unbeknownst to him, the area was covered by ice. Gwyn fell and began to slide. Loon had placed a single rope across the pathway by which skiers access the Triple Trouble trail from the Big Dipper trail, but Gwyn slid beneath the rope and some 900 additional feet down the mountain.

Do and Goss witnessed Gwyn's involuntary slide under the rope and unintended entry onto the Triple Trouble trail. Recognizing the seriousness of the situation, Do and Goss removed their skis, placed them near the intersection of the two trails, and attempted to rescue Gwyn by walking down the slope towards him. But Do and Goss both slipped and plummeted down the icy trail as well.

Eileen Gwyn became concerned when her family did not arrive for lunch at the agreed-upon time. At some point between 12:15 p.m. and 12:30 p.m., Gwyn approached a Loon employee at an information booth or ski school area inside the lodge, told the employee that her family was unusually late, and asked if the employee had heard about any skiers being injured. The employee replied that she had not heard about any injured skiers and that Gwyn should not worry. At approximately 1:00 p.m., Gwyn approached the same employee, expressed concern about the safety of her family, and stated that she needed help finding them. The employee told Gwyn not to worry and took no further action. At approximately 1:50 p.m., Gwyn approached the employee yet again, stated that her family had been missing since 11:30 a.m., and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

informed the employee that she needed help in locating them. The employee replied that she did not have a phone and that there was nothing she could do to help.

*2 At approximately 2:50 p.m., Gwyn pleaded with the employee for help in finding her family. The employee responded by telling Gwyn that she could check the first aid station, which was approximately one-half mile away. The employee did not offer to use a telephone to call for help. At approximately 3:50 p.m., as the ski area was beginning to shut down, Gwyn approached the employee and again begged for help. The employee once again replied that she could not assist Gwyn and that Gwyn should "go see one of the guys in the black and red jackets"-- i.e., the ski patrol. Gwyn subsequently located a ski patrol member and informed him that her family had been missing since 11:30 a.m. The ski patrol member called the first aid station.

At approximately 4:10 p.m., the Loon ski patrol discovered the skis Do and Goss had left near the intersection of the Triple Trouble and Big Dipper trails. Shortly thereafter, the patrol discovered Howard Gwyn, Do, and Goss. Howard Gwyn was badly injured and unconscious; Do was badly injured and frostbitten; and Goss was dead. The ski patrol transported the three skiers by stokes litter to the base of the mountain. Eileen Gwyn experienced near hysteria at the shock of seeing her husband and daughter bloodied and near death. Do survived her injuries, but required extensive medical treatment and therapy. Howard Gwyn died from his injuries two days after the accident.

In January 2001, plaintiffs initiated this action in Grafton County Superior Court. Defendant removed the case to this court on the basis of diversity jurisdiction, and plaintiffs subsequently filed a first amended complaint. The first amended complaint sets forth five causes of action. Count I asserts that plaintiffs were injured by defendant's failure to maintain certain signs and designations allegedly required by N.H. Rev. tat. Ann. § 225-A:23; [FN1] Count II, which sounds in negligence, asserts that plaintiffs were injured by defendant's breach of a number of duties owed to plaintiffs because their fulfillment is essential to the safe operation of a ski area and/or because defendant "voluntarily assumed" them and thus obliged itself to perform them with due care under the principle set forth in *Restatement (Second) of Torts § 323* (endorsing recovery, in certain circumstances, for persons victimized by another's negligent performance of an undertaking to render services) ("negligent performance of an undertaking doctrine"); Count III asserts that plaintiffs were injured by defendant's negligent infliction of emotional distress; Count IV asserts that plaintiffs were injured by defendant's knowing and willful violation of the New Hampshire Consumer Protection Act ("CPA"), N.H.Rev.Stat. Ann. § 358-A, in the course of advertising and marketing itself as a safe ski area; and Count V asserts that defendant is liable to plaintiffs under the doctrine of *respondeat superior*.

> FN1. Count I asserts that defendant (1) "failed to provide critically important information ... on a trail board at the base of the mountain pursuant to RSA 225-A:23 to indicate that the Triple Trouble Trail and its access points were closed, dangerous, extra hazardous, or potentially life threatening"; (2) "failed to mark the beginning of each ski trail or slope with the appropriate symbol for that particular trail's or slope's degree of difficulty pursuant to RSA 225-A:23 to warn ... of the dangerous, extra hazardous, and life threatening conditions leading up to and on the Triple Trouble Trail"; and (3) "failed to mark the beginning of, and designated access points to, the Triple Trouble Trail with a closed sign pursuant to RSA 225-A:23 to warn ... of the dangerous, extra hazardous, and potentially life threatening conditions then existing."
> As detailed *infra,* N.H.Rev.Stat. Ann. § 225-A:23 does require ski areas to post certain information on their trail boards and at the beginnings of their ski trails and slopes. The statute also obliges ski areas to notify skiers, at the beginnings of their ski trails and slopes and at designated access points, if a trail is closed. But as defendant points out, the statute does not require ski areas to warn skiers if their trails or slopes are dangerous, extra hazardous, and/or potentially life threatening. Mindful that I am evaluating a Fed.R.Civ.P. 12(b)(6) motion, I will disregard these surplus allegations and construe Count I as alleging that defendant failed to fulfill its statutory obligations to post certain signs and designations on its trail board, at the beginning of the Big Dipper and Triple Trouble trails, and at the access point to the Triple Trouble trail where the falls underlying this lawsuit took place. Of course, if I am construing the vaguely

worded Count I too generously, defendant may challenge the statutory claims which survive its motion to dismiss, *see infra,* in a properly supported motion for summary judgment.

II.

As noted above, defendant has filed two motions to dismiss. The first motion seeks dismissal of Counts I-III, and V as precluded as a matter of law by the New Hampshire's Skiers, Ski Area, and Passenger Tramway Safety Act ("Ski Statute"), N.H.Rev.Stat. Ann. § 225-A. The second motion seeks dismissal of Count IV for failure to state a viable cause of action. Plaintiffs have filed objections to these motions. Plaintiffs also have moved for leave to amend their first amended complaint and to reply to defendant's objection to their motion for leave to amend.

A. *Motion to Dismiss Based on the Ski Statute*

*3 Defendant argues that the allegations in Counts I and II do not state claims under which relief can be granted because (1) the Ski Statute specifies the few duties defendant owed to plaintiffs; (2) the Ski Statute immunizes defendant from liability for injuries caused by the inherent risks, dangers, or hazards of skiing; and (3) plaintiffs' allegations make clear that their injuries were not caused by defendant's violation of a statutory duty, but by the inherent risks, dangers, or hazards of skiing. Defendant further asserts that Counts III and V fail to state claims on which relief can be granted because they are derivative of Counts I and II. Finally, defendant presses an alternative argument that, irrespective of its other deficiencies, Count III is inadequately pleaded. I largely, but not entirely, agree with these arguments.

1. *Counts I and II*

Defendant's first argument is built upon an accurate depiction of New Hampshire law. In its first section, titled "Declaration of Policy," the Ski Statute states:
> [I]t shall be the policy of the state of New Hampshire to define the primary areas of responsibility of skiers and other private users of alpine (downhill) and nordic (cross country and ski jumps) areas, recognizing that the sport of skiing and other ski area activities involve risks and hazards which must be assumed as a matter of law by those engaging in such activities, regardless of all safety measures taken by the ski area operators. N.H.Rev.Stat. Ann. § 225-A:1. To this end, the legislature has specified the responsibilities of ski area operators in N.H.Rev.Stat. Ann. § 225-A:23, and the responsibilities of skiers and passengers on ski area tramways in N.H.Rev.Stat. Ann. § 225-A:24.

In relevant part, N.H.Rev.Stat. Ann. § 225-A:23 requires ski area operators (1) to mark the beginning of each ski trail or slope with a designated symbol designed to notify skiers of the degree of difficulty of the trail or slope, *see* N.H.Rev.Stat. Ann. § 225-A:23, I(a)-(d), III(a); (2) to mark the beginning of, and designated access points to, each alpine trail that is closed with a designated symbol notifying skiers of the closure, N.H.Rev.Stat. Ann. § 225-A:23, I(e), III(b); and (3) to maintain a base area trail board which lists the area's network of ski trails and slopes, notifies skiers of the degree of difficulty of each trail or slope through use of the aforementioned symbols, and notifies skiers which trails or slopes are closed through use of a designated symbol, *see* N.H.Rev.Stat. Ann. § 225- A:23, I(a)-(e), II(a). The relevant portion of N.H.Rev.Stat. Ann. § 225-A:24 states:
> It is hereby recognized that, regardless of all safety measures which may be taken by the ski area operator, skiing as a sport and the use of passenger tramways associated therewith may be hazardous to the skiers or passengers. Therefore ... [e]ach person who participates in the sport of skiing accepts as a matter of law[ ] the dangers inherent in the sport, and to that extent may not maintain an action against the operator for any injuries which result from such inherent risks, dangers, or hazards. The categories of such risks, hazards or dangers which the skier or passenger assumes as a matter of law include but are not limited to the following: variations in terrain, surface or subsurface snow or ice conditions; bare spots; rock, trees, stumps and other forms of forest growth or debris; lift towers and components thereof (all of the foregoing whether above or below snow surface); pole lines and plainly marked or visible snow making equipment; collisions with other skiers or other persons or with any of the categories included in this paragraph.

*4 N.H.Rev.Stat. Ann. § 225-A:24, I.

The New Hampshire Supreme Court has interpreted the interplay of these provisions as codifying the primary assumption of the risk doctrine with respect to the inherent risks of skiing. *See Rayeski v. Gunstock Area/Gunstock Area Comm'n*, 776 A.2d 1265, 1268 (N.H.2001); *Nutbrown v. Mount Cranmore, Inc.*, 140 N.H. 675, 680 (1996). As

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

applied in this context, the doctrine relieves ski area operators from any duty to protect skiers from the inherent risks of skiing. *See Nutbrown,* 140 N.H. at 680 ("To the extent that a skier's injury is caused by an inherent risk of skiing, the skier may not recover from the ski area operator."). But the doctrine does not relieve ski area operators of liability for injuries caused by a violation of their statutory duties under N.H.Rev.Stat. Ann. § 225-A:23. *See Nutbrown,* 140 N.H. at 683 (regarding as viable the plaintiff's claim that his injuries were caused by the defendant's failure to mark properly the beginning of the trail on which he was injured).

By virtue of N.H.Rev.Stat. Ann. 225-A:24, I, Howard Gwyn's, Do's, and Goss's encounters with ice near the intersection of the Big Dipper and Triple Trouble trails were, as a matter of law, legally assumed risks, dangers, or hazards inherent in the sport of skiing. *See id.* (identifying accidents caused by "surface or subsurface snow or ice conditions" as "risks, hazards or dangers" which the skier assumes as a matter of law). So too were their subsequent slides down the ice-covered Triple Trouble trail. *See id.* [FN2] Consequently, because these events were clearly causative (at least factually) of plaintiffs' injuries, defendant is entitled to dismissal of plaintiffs' claims unless plaintiffs can identify some act or omission of defendant that both could have been an additional factual cause of the skiers' injuries and is outside the scope of conduct immunized from liability under the New Hampshire Supreme Court's construction of N.H.Rev.Stat. Ann. § 225-A.

> FN2. Plaintiffs argue that one cannot assume a risk of which s/he is unaware, and that Howard Gwyn was unaware of the dangerous patch of hidden ice which led to his fall. Plaintiffs also make the closely related argument that encountering hidden dangers is not an inherent risk of skiing. These arguments fail because the statute effectively charged Gwyn with knowledge that, while skiing, he might encounter a dangerous and hidden, indeed life-threatening, patch of ice which could cause him to fall.

I start with plaintiffs' negligence theories. Plaintiffs' primary argument is that injuries caused by an inherent risk of skiing can also be caused by ski area operator carelessness, and that the acts and omissions identified in Count II as having played a causal role in plaintiffs' injuries--defendant's failure to warn against, ameliorate, and/or close the icy area where Howard Gwyn and Do slipped and fell and subsequent failure to rescue the injured skiers in a timely manner--are actionable at common law notwithstanding the Ski Statute. There is ambiguous language in *Nutbrown* which, when read out of context, can be construed to support this argument by negative implication. *See* 140 N.H. at 680 ("An injury *entirely* caused by an inherent risk of skiing is not actionable.") (emphasis supplied); *see also id.* (generally acknowledging that the Ski Statute does not bar actions based on "injuries caused by the [ski area] operator's own negligent or intentional acts"). But last year's *Rayeski* opinion forecloses this argument:

> *5 We also reject the plaintiff's argument that his claim falls within the category of "injuries caused by the [ski area] operator's own negligent or intentional acts" that we noted in *Nutbrown* were not barred by [the Ski Statute] .... The categories of injuries caused by an inherent risk of skiing and injuries caused by negligence are mutually exclusive .... [A]n injury caused by an inherent risk cannot have been negligently caused because there is no duty to protect against such risks. Having determined that the plaintiff's injuries were caused by an inherent risk of skiing, we necessarily conclude that they were not caused by the defendant's negligence.

776 A.2d at 1269-70. This passage can only mean that, irrespective of its knowledge of dangerous conditions and/or ability to take prophylactic measures, a ski area operator does not owe skiers a common law duty to protect them from injuries sustained as a result of hitting ice on a trail or slope, which the New Hampshire legislature views as an inherent risk of skiing. *See* N.H.Rev.Stat. Ann. 225-A:24, I. The Ski Statute thus immunizes the acts and omissions complained of in Count II from liability under traditional negligence principles.

Plaintiffs have a fallback position. Relying on the negligent performance of an undertaking doctrine set forth in *Restatement (Second) of Torts* § 323, plaintiffs contend that, because defendant voluntarily undertook a number of safety-related initiatives beyond those required by statute, [FN3] it made itself liable for any harm that it caused in negligently performing the undertakings. In *Rayeski,* the New Hampshire Supreme Court declined to say whether the negligent performance of an undertaking doctrine might give rise to liability where an injury might reasonably be thought to have been caused by both an inherent risk of skiing and a ski area operator's carelessness in performing some undertaking not required by the Ski Statute. *See* 776 A.2d at 1269

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d  
2002 WL 1012929 (D.N.H.), 2002 DNH 100  
(Cite as: 2002 WL 1012929 (D.N.H.))

Page 5

(rejecting plaintiff's so-called "voluntarily assumed duty" theory, drawn from *Restatement (Second) of Torts* § 323, on grounds of forfeiture). But if applicable at all in this context, [FN4] the doctrine would only apply where a plaintiff has pleaded facts sufficient to permit a reasonable inference that defendant's undertaking(s) either (a) increased the risk that plaintiff would suffer harm, or (b) caused the harm because of plaintiff's reliance upon defendant's undertaking(s). *See Restatement (Second) of Torts* § 323.

> FN3. In its Objection to Defendant's Motion to Dismiss First Amended Complaint Based on Ski Statute, plaintiffs specify the following as voluntary undertakings giving rise to liability under § 323: defendant's failure to locate a rope closing off the Triple Trouble trail at a safe enough distance to avoid the harm that occurred; defendant's failure to assess the need for safety measures; and defendant's failure to adequately close off the icy area where the accident occurred by "using standard safety devices used by a reasonably prudent ski operation"--e.g., fencing, netting, and "slide for life" warnings. *Id.* at 20.

> FN4. Defendant makes a powerful argument that applying the doctrine in cases such as this would be bad public policy because it would give ski area operators an economic incentive not to engage in safety measures beyond those required by the Ski Statute.

Here, the first amended complaint is devoid of allegations suggesting that defendant's failure to exercise reasonable care to perform the identified undertakings, *see supra* note 3, created the icy area where the falls took place, exacerbated an already dangerous situation, caused Howard Gwyn and Do to enter an area they would not have entered absent the undertakings, or caused Howard Gwyn and Do to suffer worse injuries than they would have suffered absent the undertakings. In short, plaintiffs have provided me with no basis for inferring that defendant put plaintiffs in a worse position than they would have been in had defendant indulged its prerogative not to engage in any safety-related undertakings beyond those mandated in the Ski Statute. Consequently, the negligent performance of an undertaking doctrine does not supply plaintiffs with a viable negligence claim under Count II.

*6 Much of Count I also lacks viability. Two of the omissions identified in Count I as giving rise to liability under N.H.Rev.Stat. Ann. § 225-A:23 (when stripped of their non-textual surplusage, *see supra* note 1) simply could not have caused plaintiffs' injuries. Even if defendant failed to mark the beginning of the Big Dipper trail with the designation appropriate to the trail's degree of difficulty, there is no suggestion in the first amended complaint that Howard Gwyn, Do, or Goss was misled or induced to ski down a trail that was beyond his or her skiing competency. And even if defendant failed to mark with an appropriate "closed" sign the beginning of the Triple Trouble trail, there is no suggestion that the absence of such a sign induced Howard Gwyn, and then Do and Goss, to enter the trail under the misapprehension that it was open. Indeed, it is undisputed that Howard Gwyn inadvertently entered the Triple Trouble trail from the open Big Dipper trail, and that Do and Goss intentionally entered the Triple Trouble trail (which they knew to be closed and dangerous) in an unsuccessful attempt to assist Howard Gwyn.

Nonetheless, reading the first amended complaint in the light most favorable to plaintiffs and drawing all reasonable inferences in their favor, *see Alternative Energy, Inc.,* 267 F.3d at 33, plaintiffs have stated two viable statutory claims. If plaintiffs can establish that defendant failed to designate the Triple Trouble trail as closed on its base area trail board (as the first amended complaint can be generously construed to allege, *see supra* note 1) and that Howard Gwyn would have avoided the icy area where he fell but for this statutory violation, a jury reasonably might conclude that the statutory violation caused his fatal injuries. Similarly, if plaintiffs can establish that defendant failed to place a closed sign on the Triple Trouble trail's designated access point from the Big Dipper trail, *see supra* note 1, and that Howard Gwyn would have approached the trail junction differently-- e.g., less aggressively or at a different angle--but for this statutory violation, a jury reasonably might conclude that the statutory violation caused his fatal injuries. Thus, in these respects, the estate's direct statutory claim and Eileen Gwyn's and Do's derivative claims [FN5] survive defendant's motion to dismiss. But in all other respects, I grant the motion to dismiss with respect to Counts I and II.

> FN5. Eileen Gwyn's Count I claim is derivative because she was not directly injured by defendant's alleged breach of its statutory duty with respect to the trail board. Rather, she is seeking damages caused by

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

her lack of consortium with her late husband, whose fatal injuries were allegedly caused by defendant's breach of this duty. Do's statutory claim is also derivative because she does not, and cannot, claim that the absence of a closed sign on the trail board induced her to enter the icy area where she slipped. Instead, she claims that she entered the icy area where she slipped in order to attempt a rescue of her father.

In permitting Do to proceed on this "rescue doctrine" claim, I reject defendant's argument for dismissal thereof because Do did not plead the rescue doctrine as a theory of liability. For purposes of Fed.R.Civ.P. 12(b)(6), it is sufficient that the estate has a viable statutory claim and that the pleaded facts support an award to Do under the doctrine. See Blackstone Realty LLC v. FDIC, 244 F.3d 193, 197 (1st Cir.2001) (dismissal under Rule 12(b)(6) appropriate only if relief unobtainable under "any viable theory" suggested by the facts) (citation and internal quotation marks omitted); cf. Connecticut General Life Ins. Co. v. Universal Ins. Co., 838 F.2d 612, 622 (1st Cir.1988) (directing that a judgment be entered under a legal theory that was not pleaded but was implicated by the established facts of the case).

I also note that defendant has hinted at, but failed to develop, an argument that the New Hampshire Supreme Court would not apply the rescue doctrine under the circumstances of this case. I express no opinion on this issue, which has not been fully joined.

2. *Counts III and V*

As noted above, defendant's primary argument for dismissal of these counts is that they are derivative of Counts I and II--i.e., their viability depends necessarily on a finding that defendant breached some other statutory and/or common law duty to plaintiffs--and thus fail to the extent that Counts I and II lack viability. This argument is built from a sound premise and is persuasive as far as it goes; because plaintiffs rely on the same breaches of duties alleged in Counts I and II in framing Counts III (for negligent infliction of emotional distress) and V (for *respondeat superior* ), Counts III and V cannot provide a basis for recovery unless plaintiffs prevail on one or more of the theories advanced in Counts I and II. [FN6] As a result, defendant's potential liability is limited at the threshold to whatever emotional distress it might have negligently inflicted upon Eileen Gwyn or Do [FN7] in connection with the two viable breach of statutory duty theories identified in the previous section of this memorandum and order.

> FN6. In fact, Count V does not set forth a distinct cause of action at all; it merely contains an assertion that defendant is responsible for any duty-breaching acts or omissions of its agents, employees, and representatives. Defendant does not take issue with the merits of this proposition, so I will assume its correctness and say nothing more about Count V.

> FN7. Although Count III purports to state a negligent infliction of emotional distress claims on behalf of all plaintiffs, subsequent submissions make clear that only Eileen Gwyn and Do are seeking to state such a claim. See Plaintiffs' Objection to Defendant's Motion to Dismiss First Amended Complaint Based on Ski Statute, at 23; Plaintiffs' Motion for Leave to Amend Complaint, at 3.

*7 Settled New Hampshire law makes it clear that Eileen Gwyn, whose own claims under Counts I and II are derivative loss of consortium claims, *see supra* note 5, lacks a viable negligent infliction of emotional distress claim based on her exposure to the injuries suffered by her husband and daughter because she did not contemporaneously perceive the accidents giving rise to her family members' injuries. See Nutter v. Frisbie Memorial Hosp., 124 N.H. 791, 795-96 (1984); see also Wilder v. City of Keene, 131 N.H. 599, 603 (1989) ("we focus our analysis on whether the plaintiffs observed or perceived the accident when it occurred not on whether they observed or perceived the injuries their child sustained"). I therefore grant defendant's motion with respect to Eileen Gwyn's claim under Count III. Do, on the other hand, has viable negligent infliction of emotional distress claims under Count III because she was allegedly both a victim of a breach of statutory duty (by operation of the rescue doctrine, *see supra* note 5) that might reasonably be thought to have caused her a painful mental experience with lasting physical effects, see Thorpe v. State, 133 N.H. 299, 303-04 (1990), and a contemporaneous perceiver of the others' accidents, which were allegedly caused by defendant's breach of a statutory duty and might reasonably be thought to have caused her a painful mental experience with lasting physical effects, *see*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2002 WL 1012929 (D.N.H.), 2002 DNH 100
(Cite as: 2002 WL 1012929 (D.N.H.))

Page 7

Corso v. Merrill, 119 N.H. 647, 657-58 (1979). [FN8] I therefore deny defendant's motion with respect to Do's Count III claims (to the extent that they are tied to the viable breach of statutory duty claims imbedded within Count I).

> FN8. In so ruling, I reject defendant's alternative argument that Do's negligent infliction of emotional distress claim should be dismissed because plaintiffs have failed to allege that Do suffered physical manifestations of her emotional distress. The first amended complaint alleges that Do "sustained past and future severe and painful injuries, severe mental and emotional distress, fear, anxiety, ... permanent impairments, loss of enjoyment of life, past and future medical care and expenses, and other losses and damages." First Amended Complaint, at ¶ 56. This allegation, in combination with the underlying factual allegations detailing Do's horrific experience, is sufficient for purposes of Fed.R.Civ.P. 12(b)(6) to constitute an allegation that a lasting physical injury resulted from Do's emotional distress. See Thorpe, 133 N.H. at 304.

B. *Motion to Dismiss Count IV*

Defendant moves to dismiss Count IV, which sets forth a claim that defendant
> knowingly and willfully violated [the New Hampshire CPA] by explicitly and impliedly representing that its goods or services had sponsorship approval, characteristics, uses, benefits, or qualities that they did not have. In particular, Defendant represented that its ski slopes and trails would be safe for non-threatening skiing on its open slopes, that skiers would be properly warned of unexpected, dangerous extra hazardous, or life threatening trails, that dangerous, life threatening trails would be adequately closed off and monitored, and that ski operations including operations to find missing skiers would be implemented in a timely, adequate and safe fashion.

First Amended Complaint, ¶ 70. Defendant contends, *inter alia*, that plaintiffs have inadequately pleaded the misrepresentation theory underlying their unfair or deceptive trade practice claim. I agree.

By basing its CPA claim upon alleged misrepresentations and further asserting that the misrepresentations constituted a knowing and willful violation of the CPA, plaintiffs have in essence accused defendant of fraud. Where an allegation of fraud lies at the core of a cause of action, the heightened pleading standards of Fed.R.Civ.P. 9(b) apply. See Hayduk v. Lanna, 775 F.2d 441, 443 (1st Cir.1985) (applying Rule 9(b) to a claim for conspiracy to defraud); see also FDIC v. Bathgate, 27 F.3d 850, 876 (3d Cir.1994) (applying Rule 9(b) to a claimed violation of the New Jersey Consumer Fraud Act); Frith v. Guardian Life Ins. Co. of America, 9 F.Supp.2d 734, 742 (S.D.Tex.1998) (applying Rule 9(b) to a fraud-based claim that defendant violated the Texas CPA). Rule 9(b) requires "specification of the time, place and content of an alleged false representation." Hayduk, 775 F.2d at 444 (citation and internal quotation marks omitted).

*8 The first amended complaint does not detail when defendant made the false representations underlying its CPA claim. Nor does it specify either where the representations were made or the contents of what defendant said. Accordingly, defendant is entitled to dismissal of Count IV. But the dismissal is without prejudice to plaintiffs' seeking leave to file an amended complaint which complies with the requirements of Fed.R.Civ.P. 9(b).

C. *Motions for Leave to Amend and for Leave to Reply to Defendant's Objection to the Motion for Leave to Amend*

Plaintiffs seek leave to amend the first amended complaint so as to add additional factual allegations and to state a claim for negligent misrepresentation, and leave to reply to defendant's objection to this motion. I grant plaintiffs' motion for leave to reply to the objection but deny the motion for leave to amend.

Neither the motion for leave to amend, which was filed more than two months after the Fed.R.Civ.P. 16(b)(1) deadline for amending the pleadings and well after defendant had fully briefed its arguments in support of dismissal of the first amended complaint, nor the reply to defendant's objection makes any effort whatsoever to establish that "good cause" exists for modifying the agreed-upon Rule 16(b) deadline for amending the pleadings. See Hernandez-Loring v. Universidad Metropolitana, 233 F.3d 49, 51 (1st Cir.2000) (applying the good cause standard); cf. Riofrio Anda v. Ralston Purina, Co., 959 F.2d 1149, 1154-55 (1st Cir.1992) (noting that "undue delay" and "undue prejudice to the opposing party" provide bases for denying a motion to amend and observing that allowance of an amendment two

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d  
2002 WL 1012929 (D.N.H.), 2002 DNH 100  
**(Cite as: 2002 WL 1012929 (D.N.H.))**

Page 8

months after the deadline established by the Rule 16(b) scheduling order "would have nullified the purpose of rule 16(b)(1)"). Moreover, plaintiffs' motion fails to comply with Local Rule 15(a)'s requirement that parties seeking to amend their pleadings both attach the proposed amended filing and explain why the new allegations and claims were not included in the original filing. I would have to ignore the requirements of the federal and local rules entirely in order to grant plaintiffs' motion.

### III.

For the reasons stated and to the extent described above, I grant in part and deny in part defendant's motion to dismiss the first amended complaint based on the Ski Statute [document no. 11], grant defendant's motion to dismiss Count IV of the first amended complaint [document no. 12], deny plaintiffs' motion for leave to amend the first amended complaint [document no. 19], and grant plaintiffs' motion for leave to reply to defendant's objection to the motion for leave to amend [document no. 21].

SO ORDERED.

2002 WL 1012929 (D.N.H.), 2002 DNH 100

**Motions, Pleadings and Filings (Back to top)**
• 1:01CV00214        (Docket) (Jun. 05, 2001)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit C

Westlaw.

1995 WL 708660                                                                                                Page 1
1995 WL 708660 (D.Mass.)
(Cite as: 1995 WL 708660 (D.Mass.))

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, D. Massachusetts.

Richard HUMISTON, Plaintiff,
v.
ATOTECH USA, INC., Defendant.

Civ. A. No. 94-40002-NMG.

Nov. 28, 1995.

MEMORANDUM AND ORDER

GORTON, District Judge.

*1 Plaintiff Richard Humiston ("Humiston") brought this action against defendant Atotech USA, Inc. alleging two counts of breach of contract and one count of defamation. Pending before this Court is defendant's motion for summary judgment on all three counts. For the reasons stated below, defendant's motion will be allowed.

I. BACKGROUND

In 1990, plaintiff Humiston was hired by Chemcut Corporation, an American subsidiary of a foreign corporation, Schering AG, as a regional manager in Chemcut's chemistry sales and service department.

In or about August, 1992, Schering announced that Elf Atochem would be acquiring Chemcut and other Schering affiliated divisions. Notice of the merger was provided to Chemcut employees, including Humiston, and two days later, on August 21, 1992, a Purchase and Sale Agreement ("P & S Agreement") between Schering and Elf Atochem was signed. The P & S Agreement contained the following language in Article ("Art.") 24:

(b) The relevant Buyers will pursue the policy of promoting stable and long-term employment opportunities for Transferred Employees Abroad and subject to local law and practices. Buyers will respect local standards and practices of employment protection. For a period of six months from Closing, Buyers may under no circumstances institute operational dismissals affecting the Transferred Employees Abroad.

The acquisition was completed in February, 1993. Soon thereafter, Chemcut Corporation changed its name to Atotech USA, Inc. ("Atotech").

One month after the closing, in March, 1993, Humiston was terminated by Atotech for "insubordination." Humiston alleges in Counts I and II, respectively, that his termination constituted a breach of his employment contract and the P & S Agreement between Schering and Elf Atochem. Humiston further alleges in Count III that Atotech published defamatory statements relating to his termination that caused injury to his reputation and standing in his professional community.

In response to Count I, defendant Atotech maintains that Humiston was, at all times, an at-will employee and could be terminated at any time, with or without cause. With respect to Count II, Atotech argues that Humiston was not an intended beneficiary of the P & S Agreement between Schering and Elf Atochem and thus was not entitled to contractual protection under the Agreement. Atotech further argues that Humiston's defamation claim in Count III is unfounded because Humiston failed to present admissible evidence to support his defamation claim and employers enjoy a conditional privilege to speak to prospective employers about former employees.

II. DISCUSSION

A. Summary Judgment Standard

Summary Judgment shall be rendered where the pleadings, discovery on file and affidavits, if any, show "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The Court must view the entire record in the light most favorable to Humiston, the nonmoving party, and indulge all reasonable inferences in his favor. _O'Connor v. Steeves, 994 F.2d 905, 907 (1st Cir.1993)._

*2 With respect to a motion for summary judgment, the burden is on the moving party to show that "there is an absence of evidence to support the non-moving

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1995 WL 708660
1995 WL 708660 (D.Mass.)
(Cite as: 1995 WL 708660 (D.Mass.))

Page 2

party's case." *FDIC v. Municipality of Ponce,* 904 F.2d 740, 742 (1st Cir.1990), *quoting Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If the movant satisfies that burden, it shifts to the non-moving party to establish the existence of a genuine material issue. *Id.* In deciding whether a factual dispute is genuine, this Court must determine whether "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Andersen v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986); *accord Aponte-Santiago v. Lopez-Rivera,* 957 F.2d 40, 41 (1st Cir.1992) (*citing Andersen* ). The nonmovant's assertion of mere allegation or denial of the pleadings is insufficient on its own to establish a genuine issue of material fact. Fed.R.Civ.P. 56(e). The nonmovant must set forth specific facts showing that there is a genuine issue for trial. The Court must view the entire record in the light most hospitable to the non-moving party and indulge all reasonable inferences in its favor. *O'Connor,* 994 F.2d at 907.

B. Analysis

1. Count I--Breach of Employment Contract

Count I of Humiston's complaint alleges that Atotech breached its employment contract with Humiston by terminating Humiston for "gross insubordination." Plaintiff has admitted in his deposition, however, that he was an at-will employee of Atotech (Vol. II, p. 103-5; Vol. III, p. 133). Under Massachusetts law, "[t]he general rule is that an employment at-will contract can be terminated at any time for any reason or for no reason at all." *Folmsbee v. Tech Tool Grinding & Supply, Inc.,* 417 Mass. 388, 394 (1994); *see also Fortune v. National Cash Register Co.,* 373 Mass. 96, 100-01 (1977); *Fenton v. Federal St. Bldg. Trust,* 310 Mass. 609, 612 (1942). According to the general rule and plaintiff's own admission, then, Atotech was free to terminate Humiston with or without cause.

Massachusetts courts have recognized narrow exceptions to that general rule. Employers may be held liable for terminating at-will employees in violation of a clearly established public policy. *See Hobson v. McLean Hosp. Corp.,* 402 Mass. 413, 416 (1988); *Smith-Pfeffer v. Superintendent of the Walter E. Fernald State Sch.,* 404 Mass. 145, 149-50 (1989). Terminating an employee for "gross insubordination", however, is not contrary to any public policy recognized by Massachusetts courts as an exception to the at-will employment rule.

In some at-will terminations, Massachusetts courts have implied a covenant of good faith and fair dealing to impose liability on the employer. *Fortune,* 373 Mass. at 100-05. Massachusetts courts have narrowly construed this exception, however, holding that the discharge of an at-will employee without cause is not, by itself, a violation of an employer's obligation of good faith and fair dealing. *Gram v. Liberty Mutual,* 384 Mass 659, 671 (1981). Because plaintiff has failed to present evidence that even suggests improper motive or bad faith by Atotech in its discharge of Humiston, the Court finds that this narrow exception is not applicable.

*3 Defendant's motion for summary judgment on Count I, therefore, will be allowed.

2. Count II--Breach of Contract

Humiston further alleges that he was an intended beneficiary of the P & S Agreement between Schering and Elf Atochem and, as such, claims that he can enforce the contractual provision in Art. 24 of the P & S Agreement forbidding dismissals within the first six months of Elf Atochem's acquisition of Schering and its subsidiaries. Under Massachusetts law, it is the contracting parties' intent that determines whether a third party is an intended or incidental beneficiary. *Markel Service Ins. Agency, Inc. v. Tifco, Inc.,* 403 Mass. 401, 405 (1988).

In support of his claim that he was an intended beneficiary, Humiston points to specific language in Art. 24(b), which states: "For a period of six months from Closing, Buyers may under no circumstances institute operational dismissals affecting the Transferred Employees Abroad." Based on that language, Humiston argues that there exists a genuine issue of material fact as to whether he was an intended or incidental beneficiary of the P & S Agreement.

Atotech maintains that Art. 24(b) was intended "to prevent the immediate post-acquisition dismantling of the Schering divisions or the wholesale lay-off of that entity's former employees." Atotech has submitted an affidavit from the Vice President/General Counsel of Elf Atochem, who reiterates that this was the intent of the parties in negotiating the P & S Agreement and states that the contract was not intended to shield individual employees from adverse employment decisions. Furthermore, Art. 24 clearly states that previous employees would continue to be governed by "local standards and practices" in effect prior to the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1995 WL 708660
1995 WL 708660 (D.Mass.)
**(Cite as: 1995 WL 708660 (D.Mass.))**

Page 3

acquisition. If Humiston was an at-will employee prior to the acquisition by Atotech, his at-will employment continued after the acquisition by Atotech.

In viewing the record in the light most favorable to plaintiff, the only evidence this Court has located in support of Humiston's claim that he was an intended beneficiary is the second to last paragraph of the notice allegedly sent to all Schering employees on August 19, 1992. That notice states that "Elf Atochem will not be allowed to give notice to employees during the first 6 months after their transfer." A reasonable jury could not, however, return a verdict for Humiston on the basis of the August 19, 1992 memo by itself. The preceding paragraph of the notice clearly states that "Atochem accepts the present local personnel and social policies of Schering's subsidiaries ..." Furthermore, pursuant to Fed.R.Civ.P. 56(e), Humiston "may not rest upon the mere allegations or denials of the [defendant's] pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." The Court concludes that plaintiff has failed to establish a genuine issue of material fact as to whether he was an intended beneficiary of the P & S Agreement. Because plaintiff has failed to do so, defendant's motion for summary judgment on Count II will be allowed.

3. Count III--Defamation

*4 Count III alleges that an Atotech representative made defamatory statements to Humiston's subsequent employer, LeaRonal, in response to an inquiry from LeaRonal.

In his deposition, Humiston refers to statements made to him by a Mr. Schaefer at LeaRonal (Vol. I, p. 37-46). These statements, in turn, were relayed to Mr. Schaefer by a Mr. Kessler, based on phone conversations that Mr. Kessler had with a Mr. Hanlon, an executive vice-president at Atotech. This is the only evidence that plaintiff has presented concerning the nature or content of the allegedly defamatory statement. This evidence, however, is double hearsay and inadmissible at trial. On that basis alone, Humiston fails to show the existence of a genuine issue of material fact on his defamation claim.

Furthermore, regardless of the content of Mr. Hanlon's statements to representatives at LeaRonal and the truth or falsity of such statements, Mr. Hanlon had a conditional privilege as an official of Atotech to disclose defamatory information concerning an employee in the employment context as long as he did not abuse his privilege or act with actual malice, recklessness or ill will. *Burns v. Barry*, 353 Mass. 115, 119 (1967). Plaintiff bears the burden of proving that Mr. Hanlon abused his privilege or acted maliciously. *Foley v. Polaroid Corp.*, 400 Mass. 82, 95 (1987). There has been no such showing by plaintiff in this case.

Defendant's motion for summary judgment on Count III, therefore, will be allowed.

ORDER

For the foregoing reasons, the motion of defendant for summary judgment on Counts I, II and III is ALLOWED.

So Ordered.

1995 WL 708660 (D.Mass.)

**Motions, Pleadings and Filings (Back to top)**

• 4:94CV40002 (Docket) (Jan. 06, 1994)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.