# Exhibit D

Westlaw.

1997 WL 136249                                                                                          Page 1
1997 WL 136249 (D.Mass.)
**(Cite as: 1997 WL 136249 (D.Mass.))**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.


United States District Court, D. Massachusetts.

Robert M. ENGLER, Plaintiff,
v.
C.R. BARD, INC., and Davol, Inc., Defendants,
v.
SOLCO BASEL AG and Solco Hospital Products
Group, Inc., Third-Party Defendants.

**No. 94-10602-RCL.**

March 6, 1997.

James B. Conroy, Donnelly, Conroy & Gelhaar,
Boston, MA, Jeffery L. Liddle, Ethan A. Brecher,
Liddle, Robinson & Shoemaker, New York, NY for
Plaintiff.

Kevin J. Fitzgerald, David B. Ellis, Amy B.G. Katz,
Foley, Hoag & Eliot, Michael R. Gottfried, Burns &
Levinson, Boston, MA, for Defendants and Third-
Party Defendants.


LINDSAY, Judge.

*1 Report and Recommendation ACCEPTED.

*REPORT AND RECOMMENDATION REGARDING
DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT
(DOCKET nO. 48) AND THIRD-PARTY
DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT,
ETC. (DOCKET NO. 44)*


KAROL, United States Magistrate Judge.

November 20, 1996

In March 1993, after nine months of discussion and
negotiation, C.R. Bard, Inc., through its wholly-
owned subsidiary, Davol, Inc. (collectively, "Bard" or
"defendants"), purchased substantially all the assets
of third-party defendant Solco Hospital Products
Group, Inc. ("Solco HPG"). Immediately before the

closing of the acquisition, plaintiff, Robert M. Engler
("Engler"), was one of four senior managers
employed by Solco HPG. Immediately following the
closing, Bard informed Engler that it would not be
hiring him. Engler responded by filing this lawsuit
against Bard, alleging misrepresentation, promissory
estoppel, breach of implied contract, and age
discrimination. Bard, in turn, filed a third-party
complaint against Solco HPG and its parent
corporation, Solco Basel AG ("Solco AG")
(collectively, "Solco"), seeking contractual
indemnification. Following discovery, Bard moved
for summary judgment against Engler, and Solco
moved for summary judgment against Bard. For
reasons stated below, I recommend: (1) that Bard's
motion be DENIED with respect to Engler's
misrepresentation claim, to the extent such claim
seeks reliance (also known as "out-of-pocket")
damages, but that it otherwise be ALLOWED; and,
(2) that Solco's motion be DENIED.

*I. BARD'S MOTION AGAINST ENGLER*

*A. The Summary Judgment Record*

When a court is presented with a motion for
summary judgment, its first task is ordinarily to
review the summary judgment record to determine
which facts are genuinely in dispute. This is often a
straightforward task, but it is not so here. To
understand why, some background is in order.

Summary judgment records, like the one here, can be
voluminous. Local Rule 56.1 was adopted to assist
courts in determining relatively quickly which facts
are genuinely in dispute, so that the court may turn to
the usually more difficult task of determining
whether the disputed issues are material. The Rule
accomplishes its objective by requiring that the
motion "include a concise statement of the material
facts of record as to which the moving party contends
there is no genuine issue to be tried," with citations to
the record, and that the opposition "include a concise
statement of the material facts of record as to which it
is contended that there exists a genuine issue to be
tried," also with citations to the record.
D.Mass.Local R. 56.1. To give the Rule some bite,
its drafters provided it with sharp teeth. Failure by
the moving party to include the required statement
"constitutes grounds for denial of the motion." *Id.*
On the other hand, if the moving party includes the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 136249
1997 WL 136249 (D.Mass.)
(Cite as: 1997 WL 136249 (D.Mass.))

Page 2

required statement, any material facts of record set forth within it "will be deemed for purposes of the motion to be admitted ... unless controverted by the statement required to be served by opposing parties." *Id.*

Defendants complied with Local Rule 56.1, but plaintiff did not. Engler initially sought leave to file a 52-page memorandum in opposition to defendants' motion for summary judgment. *See* Local Rule 7.1(B)(4) (requiring leave of court to file memorandum in excess of 20 pages). Leave was denied, but he was permitted to file a 30-page memorandum. (Docket No. 53.) With the click of a computer mouse, plaintiff deleted most of what had been the statement of fact section from his proposed, 52-page memorandum. He then refiled that memorandum, (Pl's.Mem.Law Opp.Defs.' Mot.Summ.J., Docket No. 63), which contained no statement of disputed facts (concise or otherwise) and no statement that purported to controvert the facts set forth in Bard's statement of undisputed facts. He simultaneously filed a new, 28-page "Affidavit," (Engler Aff., Docket No. 64), that was nearly identical to the statement of fact section that he had deleted from his original memorandum. The purported "Affidavit" consisted primarily of plaintiff's argumentative summary of deposition testimony and exhibits, interspersed with plaintiff's editorial comments about the significance of the referenced materials.

*2 Plaintiff's transparent attempt to repackage the fact section from his original, 52-page memorandum as an "Affidavit" not only violated the spirit and, arguably, the letter of the court's order, but it also violated the requirement that affidavits supporting or opposing motions for summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed.R.Civ.P. 56(e). [FN1] Of more immediate concern, plaintiff's rambling and argumentative "Affidavit," like his memorandum, contains no concise statement of facts that are genuinely disputed, nor a statement that purports to controvert the facts that Bard contends are undisputed. Under these circumstances, as required by Local Rule 56.1, I will deem the facts set forth in the section of Bard's memorandum entitled "STATEMENT OF UNDISPUTED FACTS" ("FS") to be admitted for purposes of Bard's motion. (Defs.' Mem.Law Supp.Mot.Summ.J. at 2-10, Docket No. 73) [FN2]

FN1. Paragraph 19 is illustrative. It states, in part:
As of December 15, 1992, Dr. von Wattenwyl [Solco AG's Chief Executive Officer] wanted to conceal from Solco HPG's "key" managers his perception of our value in the transaction. Bard prepared a "letter of intent" on December 9, 1992 regarding the transaction and its intention to proceed with the acquisition.... Bard had inserted a provision in the letter detailing that it wanted to enter into employment contracts with certain Solco HPG employees, which Dr. von Wattenwyl understood to be Solco HPG's "key" managers. Dr. von Wattenwyl and Bard had a common understanding that it was "essential" for Solco HPG's "key" managers to remain at Solco HPG throughout the due diligence process. He also believed Bard would continue the employment of all the "key" managers after the acquisition, because he believed it was also a common understanding between himself and Bard that only the "key" management could run the company. Indeed, Bard told Dr. von Wattenwyl that in order for the deal to work, it was important that the entire "key" management team remain in place.
(Engler Aff. ¶ 19.) The paragraph continues, but this excerpt is sufficient to give the flavor of the "Affidavit" and demonstrate Engler's gross violation of Fed.R.Civ.P. 56(e).

FN2. I will also take into account the specific statements allegedly made by individuals at Bard that Engler, according to Bard's understanding, purported to rely upon, which statements are set forth at p. 11 of Bard's memorandum. Although these statements are not contained within the section of Bard's memorandum entitled "STATEMENT OF UNDISPUTED FACTS," Engler cannot complain about my taking them into account, because, without them, he has no claim at all.

The facts that are deemed undisputed establish that, in 1992, Solco HPG was a small company in Hingham, Massachusetts, in the business of manufacturing and selling medical devices, primarily a blood processor unit called the "Solcotrans." Although it was a wholly-owned subsidiary of Solco AG, a Swiss corporation, its day-to-day operations

1997 WL 136249
1997 WL 136249 (D.Mass.)
**(Cite as: 1997 WL 136249 (D.Mass.))**

Page 3

were the responsibility of four local managers: Robert Cotter, President ("Cotter"); David Iglehart, Vice President of Sales ("Iglehart"); Robert Cunningham, Product Director ("Cunningham"); and Engler, Vice President of Operations, with additional responsibility for financial matters. Because Solco HPG was failing financially, Solco AG decided to put it up for sale. Bard expressed interest.

In the summer of 1992, representatives of Bard, including C.R. Bard, Inc. Vice President William Tumber ("Tumber") and Davol, Inc. President Edward Kelly ("Kelly"), had meetings with the Solco HPG management team, including Engler, to explore the possibility of an acquisition. Engler alleges that, at one such meeting at Solco HPG's offices on August 21, 1992, Cotter asked the Bard representatives "[h]ow it would work if Bard and Solco did a deal and Solco wound up being part of Bard." (Engler Dep., Vol. 2 at 42.) [FN3] Tumber allegedly replied that Solco would initially report to C.R. Bard, Inc. through Davol, Inc., but that, when it became large enough, it would operate as a stand-alone company and report directly to C.R. Bard, Inc. He also allegedly said that "the management team that had built the company [i.e., Solco HPG] to its present level of sales would stay together as a management team and continue to run the company." (*Id.* at 44.)

> FN3. Engler's deposition appears at Exhibit A to the appendix accompanying Defs.' Mem. of Law Supp.Summ.J. ("Defs.' Appendix") and at Exhibit 3 to the appendix accompanying Pl.'s Mem. of Law Opp.Defs.' Mot.Summ.J. ("Pls.' Appendix").

Engler had no further direct communication with Bard until December 1992. In October 1992, however, Kelly had a chance encounter with Cotter and Iglehart at a convention in New Orleans. Engler alleges that Iglehart later reported to him that, during their brief encounter, Kelly told Cotter and Iglehart that "the management team of Solco would be well taken care of" if Bard acquired Solco. (*Id.* at 80-81.) Then, at a meeting at Solco HPG in mid-December 1992, again according to Engler, Kelly said, in the presence of Engler and others, that "he wanted the management team that had been running Solco to continue running Solco and that if and when Bard acquired Solco, we would all be measured by our performance." (*Id.* at 102.) At this time, it was still far from clear that the acquisition would ever take place.

*3 One particularly significant development appears to have occurred during the period between the meetings of August and December 1992. In November 1992, Engler discussed alternative employment opportunities with Mr. Durmus Koch ("Koch"), the owner and President of a company called Bipore, Inc. ("Bipore"). The discussion covered such things as what Engler's annual salary and potential bonus would be if he accepted a position with Bipore. It is unclear whether Koch ever made a specific offer of employment to Engler or whether he would have done so if Engler had expressed a greater interest than he did in pursuing such a possibility. Engler alleges that, in reliance on Bard's representations through mid-December 1992 that the Solco HPG management team would be retained following the proposed acquisition and that its members would be evaluated on the basis of their performance, he advised Koch toward the end of 1992 that he was not interested in pursuing a position with Bipore.

From mid-December 1992 until March 1993, the terms of the acquisition by Bard of Solco HPG's assets were finalized and Bard conducted its due diligence. During the due diligence period, Davol Inc.'s Vice President and Controller, William Lancellotta ("Lancellotta") and Human Resources Director, Richard Daigle ("Daigle"), who were both in frequent contact with Engler as part of Bard's due diligence effort, "independently concluded that Engler was not as knowledgeable as he should have been given his position at Solco HPG." (FS at 7.) Nevertheless, according to Engler, Kelly addressed the Solco HPG management team, including Engler, at a meeting in January 1993 and said, "I look forward to working with you." (Engler Dep., Vol. 2 at 144.) He allegedly went on to say, "We at Bard feel that we are buying far more than just a product line, we are buying a company and the people to manage it." (*Id.*) Engler further alleges that Solco AG's Chief Executive Officer, Andre von Wattenwyl ("von Wattenwyl"), told him in January 1993 that Kelly had said in a private conversation between Kelly and von Wattenwyl that "all of the management people at Solco would be taken care of." (Engler Dep., Vol. 3 at 25-26.) [FN4]

> FN4. Bard representatives allegedly made other comments from time to time that led Engler to believe that he would have post-acquisition employment with Bard. Some of those comments are considered in Part II, dealing with Bard's claims against Solco, but they add nothing of substance to the analysis

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 136249
1997 WL 136249 (D.Mass.)
(Cite as: 1997 WL 136249 (D.Mass.))

here of Engler's claims against Bard.

On March 31, 1993, Bard's acquisition of Solco HPG's assets closed. Iglehart and Cunningham, along with all of their subordinates, were given positions with Bard. Cotter was offered, but turned down, a consulting arrangement. Engler, who was then 60 years old, was told for the first time that he was not going to be hired because Bard had decided to assign financial responsibility for the acquired product line to one of its own managers. (*Id.* at 67-68; Kelly Dep., Vol. 2 at 138, Defs.' Appendix, Ex. C.) This was consistent with Bard's "strong practice," never before disclosed to Engler or anyone else at Solco, to install an existing Bard employee--one who was already familiar with Bard's financial control system--in the position of chief financial officer of each company it acquired. (Tumber Dep., Vol. 2 at 146-48, Pls.' Appendix, Ex. 5.) Engler was offered, and he accepted, one month's severance pay.

*4 Other facts and allegations will be discussed below as necessary.

*B. Discussion*

*(a) Overview*

Engler asserts common law claims for promissory estoppel, breach of implied contract, and fraud, as well as a claim for age discrimination under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § § 621 *et seq.* The damages he seeks on his claim for fraud are based upon the amount of salary and benefits he claims he would have earned had Bard kept its alleged promise to employ him, rather than upon the amount he lost when, in reliance upon Bard's alleged representations, he declined to pursue alternative employment opportunities. In other words, he seeks expectation (or benefit of the bargain) damages rather than reliance (or out of pocket) damages.

Although the parties sometimes refer to promissory estoppel, express and implied contract (in fact and in law), and fraud as though they were interchangeable, each is a separate causes of action, with its own elements and measure of damages. Along the same lines, the parties sometimes confuse the question of how one characterizes a promise or an offer of employment (lifetime versus at will versus something in between, such as for a fixed term or until terminated for cause) with the distinct question of what degree of specificity is required before a promise or offer of employment can be said to have

been extended at all. With distinctions such as these in mind, I have concluded that there is sufficient evidence to proceed to trial on Engler's claim that he relied to his detriment on assurances or, at best, half-truths to the effect that Bard was prepared to give him full and fair consideration for post-acquisition employment, knowing all the time that a longstanding Bard policy, or, at least, a "strong practice" effectively precluded it from doing so. Since none of Bard's representations rises to the level of a specific promise or offer of employment, however, Engler's claims for promissory estoppel and breach of implied contract fail, as does his claim for expectation damages for the alleged fraud. Engler's ADEA claim also fails, although for different reasons.

*(b) Summary Judgment Standard*

The standard for summary judgment is familiar. Summary judgment must be granted if the summary judgment record reveals that no material fact is genuinely in dispute and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Summary judgment may be granted when state of mind is in issue, but only with " 'great circumspection.' " *Metropolitan Life Ins. Co. v. Ditmore,* 729 F.2d 1, 5 (1st Cir.1984) (quoting *Hahn v. Sargent,* 523 F.2d 461, 468 (1st Cir.1975), *cert. denied* 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976)). In deciding a motion for summary judgment, the court must view the evidence "in the light most favorable to the nonmovant, and all doubts and reasonable inferences must be resolved in the nonmovant's favor.... If the facts permit more than one reasonable inference, the court on summary judgment may not adopt the inference least favorable to the nonmovant." *Casas Office Machines, Inc., v. Mita Copystar America, Inc.,* 42 F.3d 668, 684 (1st Cir.1994) (citations omitted). *See also In re Varrasso,* 37 F.3d 760, 764 (1st Cir.1994) (declaring that "when facts, though undisputed, are capable of supporting conflicting yet plausible inferences--inferences that are capable of leading a rational factfinder to different outcomes in a litigated matter depending on which of them the factfinder draws--then the choice between those inferences is not for the court on summary judgment"). If, on a motion for summary judgment, the court does not dispose of the entire case or grant all the relief requested, it may enter an order, *sua sponte,* delineating the issues that remain to be determined at trial, including an order establishing the extent to which the amount of damages is or is not genuinely in dispute. Fed.R.Civ.P. 56(d); *see, e.g., Flanders & Medeiros,*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 136249
1997 WL 136249 (D.Mass.)
(Cite as: 1997 WL 136249 (D.Mass.))

Page 5

*Inc. v. Bogosian,* 65 F.3d 198, 204 (1st Cir.1995). (affirming district court's award of partial summary judgment).

### (c) Promissory Estoppel

**\*5** Under Massachusetts law, a claim in promissory estoppel is essentially a claim for breach of contract, except that the plaintiff must prove reasonable reliance on a promise, offer, or commitment by defendant rather than the existence of consideration. *See, e.g., Rhode Island Hospital Trust Nat'l Bank v. Varadian,* 419 Mass. 841, 850, 647 N.E.2d 1174, 1179 (1995) ("The clear implication of our decision in *Loranger [Constr. Corp. v. E.F. Hauserman Co.,* 376 Mass. 757, 384 N.E.2d 176 (1978),] is that an action based on reliance is equivalent to a contract action, and the party bringing such an action must prove all the necessary elements of a contract other than consideration."). A party asserting a claim based on the doctrine of promissory estoppel must therefore establish that defendant made a promise, offer, or commitment that was sufficiently definite and specific that he or she should have anticipated that it would reasonably induce reliance on the part of the person to whom it was made. *E.g., Santoni v. Federal Deposit Ins. Corp.,* 677 F.2d 174, 179 (1st Cir.1982) (declaring that a "promise must be definite and certain so that the promisor should reasonably foresee that it will induce reliance by the promisee or a third party"); *Kiely v. Raytheon Co.,* 914 F.Supp. 708, 712 (D.Mass.1996) (stating that a "promise must not only be definite and certain in its terms, but also must be one that the promisor, expecting to be legally bound by it, intends as a firm commitment") (citation omitted); *Rhode Island Hospital Trust,* 419 Mass. at 848, 647 N.E.2d at 1178 ("An essential element under the promissory estoppel theory is that there be an unambiguous promise and that the party to whom the promise was made reasonably relied on the representation.") (internal quotations omitted). As the law in this area has developed, it has been careful to preserve the distinction between promises, offers, and commitments, on the one hand, and statements of intent, hope, or expectation, on the other. Thus, "[a] mere expression of future intention ... does not constitute a sufficiently definite promise to justify reasonable reliance thereon," *Santoni,* 677 F.2d at 179, nor does "a statement that merely gives rise to a hope or expectation on the part of the promisee," *Kiely,* 914 F.Supp. at 712.

Applying these principles, no extended discussion is required to demonstrate that the promises, offers, or commitments alleged by Engler to have been made here are, at most, vague statements of intent, hope, or expectation. Thus, they are insufficient as a matter of law to sustain a claim under the doctrine of promissory estoppel.

Engler relies first on a statement allegedly made by Tumber at a preliminary meeting in August 1992 that "the management team that had built the company to its present level of sales would stay together as a management team and continue to run the company." (Engler Dep., Vol. 2 at 44.) This statement was made in response to a general question put to Bard about "how it would work" if Bard were to acquire Solco, long before anyone knew whether there would be a deal or what form it might take. At this time, Bard barely knew the names and responsibilities of Solco HPG's managers, let alone their individual abilities. No one, let alone an experienced businessperson such as Engler, could reasonably have understood Tumber's statement to have been a firm offer or promise of employment, rather that a general statement of intent, hope, or expectation that Solco HPG's management team would remain substantially intact and be relatively autonomous if there were a deal.

**\*6** It would be even more difficult to construe Kelly's subsequent statements as anything more than vague and indefinite statements of intent, hope, or expectation. This includes Kelly's alleged statement to Cotter and Iglehart at his chance encounter with them in New Orleans in October 1992 that "the management team of Solco would be well taken care of," (*Id.* at 80-81); his alleged statement in mid-December 1992 that "he wanted the management team that had been running Solco to continue running Solco and that if and when Bard acquired Solco, [members of the management team] would all be measured by ... performance," (*Id.* at 102); his alleged statement at the January 1993 meeting that he was "look[ing] forward to working with [the Solco management team]" and that Bard felt as though it were "buying a company and the people to manage it," (*Id.* at 144); and his alleged statement to von Wattenwyl in January 1993 that "all of the management people at Solco would be taken care of," (Engler Dep., Vol. 3 at 25-26). None of these statements comes close to constituting a sufficiently firm and definite promise, offer, or commitment of employment to raise a trialworthy issue.

### (d) Implied Contract

Engler's entire argument regarding his implied contract claim consists of three sentences in a 30-

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 136249                                                                                    Page 6
1997 WL 136249 (D.Mass.)
**(Cite as: 1997 WL 136249 (D.Mass.))**

page brief. (Pls.' Mem.Law Opp.Defs.' Mot.Summ.J. at 25.)    Nowhere does he even state whether the contract he is alleging is implied in fact or in law. The brevity of his argument is indicative of the absence of any evidence to support this claim under either theory.    Construing it as one based upon an implied-in-fact contract, Engler does not even allege that a contract was formed through a non-express form of offer or acceptance, which is required to prove an implied-in-fact contract. *See, e.g. LiDonni, Inc. v. Hart,* 355 Mass. 580, 583, 246 N.E.2d 446, 449 (1969) ("In the absence of an express agreement, a contract implied in fact may be found to exist from the conduct and relations of the parties."); *see also Kirk v. United States,* 451 F.2d 690, 695 (10th Cir.1971), *cert. denied* 406 U.S. 963, 92 S.Ct. 2059, 32 L.Ed.2d 350 (1972) ("[T]he elements of an express and an implied contract are the same.    The difference between them is one of proof.    The express contract is proven by testimony showing the promise and the acceptance, whereas the implied contract is inferred from the acts of the parties and other circumstances showing an intent to contract."); 1 Arthur L. Corbin, et al., *Corbin on Contracts,* § 1.19 at 55-57 (revised ed.1993) (stating that an implied-in-fact contract requires the same terms as an express contract and those terms are determined through a process of implication and inference). Construing Engler's implied contract claim as one based upon an implied-in-law contract, Engler has not shown the necessary element of Bard's unjust enrichment.    *See, e.g. Mass. Cash Register, Inc. v. Comptrex Systems Corp.,* 901 F.Supp. 404, 423-24 (D.Mass.1995) (stating that despite the absence of an express or implied agreement between the parties, a contract will be implied in law to avoid unjust enrichment); *see generally,* 1 *Corbin on Contracts,* § 1.20 at 62-66 (discussing the requirement of unjust enrichment for implied-in-law contracts).    In fact, Engler remained a Solco HPG employee at least through the date of the acquisition and, presumably, he was paid his full salary by Solco HPG for the work he performed.    Moreover, he was given one month's salary as severance pay.    There is, in short, no basis at all for a claim for breach of implied contract.

*(e) Fraud*

**\*7** To prove a claim for fraud or intentional misrepresentation based upon the statements of Tumber and Kelly, Engler must prove:
    the defendant[s] made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and

that the plaintiff relied upon the misrepresentation as true and acted upon it to his damage.
*Metropolitan Life Ins. Co. v. Ditmore,* 729 F.2d 1, 4 (1st Cir.1984) (quoting *Barrett Associates, Inc. v. Aronson,* 346 Mass. 150, 152, 190 N.E.2d 867, 868 (1963)).

Although Tumber's and Kelly's statements fall far short of being promises, offers, or commitments of employment, they were fairly susceptible of being understood by a senior manager in Engler's position as stating, or, at least, strongly implying, that Bard believed there was a good chance that all members of the Solco HPG management team would be asked to stay on in their existing positions following the acquisition, if there were one.    Such statements would have been false statements of present intent, however, in the case of Engler, if they were made after Bard decided not to offer Engler any position. These statements also would have been false or, at best, half-truths, in the case of Engler, even prior to such decision, because Bard knew, but did not tell Engler, that it was Bard's "strong practice," if not policy, when it acquired companies to install a Bard-trained employee into the financial slot that Engler would have expected to occupy post-acquisition. Therefore, Bard knew from the beginning that there was virtually no prospect that it would be offering a position to Engler, or a jury could so find.

False statements of present intent and half-truths are, of course, actionable, if they were made to induce reliance and they were reasonably relied upon to the plaintiff's detriment.    E.g., *Damon v. Sun Co.,* 87 F.3d 1467, 1478 (1st Cir.1996) (half truths may be actionable); *V.S.H. Realty, Inc. v. Texaco, Inc.,* 757 F.2d 411, 414-15 (1st Cir.1985) (disclosing partial information may be actionable); *Kannavos v. Annino,* 356 Mass. 42, 48-49, 247 N.E.2d 708, 711-12 (1969) (same); *Barrett,* 346 Mass. 150, 152, 190 N.E.2d 867, 868 (1963) (declaring that false statement of present intent actionable).    The question is thus presented whether there is evidence in the record from which it may be inferred that these "false representations" were made for the purpose of inducing Engler to remain at Solco HPG, arguably to facilitate the completion of Bard's due diligence.

Bard argues that Tumber and Kelly did not make the alleged statements for the purpose of inducing Engler to remain at Solco HPG to facilitate the completion of Bard's due diligence.    In fact, Bard claims that Engler was so ineffectual during the due diligence process that it wound up having to go directly to Engler's subordinates to obtain the information it

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 136249
1997 WL 136249 (D.Mass.)
(Cite as: 1997 WL 136249 (D.Mass.))

Page 7

needed. Tumber's and Kelly's intent, nevertheless, presents a genuine issue of fact, because the evidence is not so one-sided that it can be said with certainty that it would be irrational for a jury to infer from all the circumstances that Tumber and Kelly intended to induce Engler to rely on their statements. The negotiations had been drawn out and, at times, difficult. There had been times when it appeared that the deal would not get done. As ineffectual as Bard may have thought Engler was, it would not have been irrational for Tumber and Kelly to have concluded, at the time, that the deal could not withstand the shock waves that would result if word went out that Bard was going to fire Engler immediately following the closing. [FN5]

> FN5. Even if a jury could not find that Tumber and Kelly "intentionally" misled Engler, Engler may be able to prove a claim for "negligent misrepresentation" if he can demonstrate that Tumber and Kelly "supplie[d] false information for the guidance of others in their business transactions ... [and] fail[ed] to exercise reasonable care or competence in obtaining or communicating information" [concerning Engler's job prospects]. _Masso v. United Parcel Service of Am., Inc.,_ 884 F.Supp. 610, 615 (D.Mass.1995) (quoting Restatement (Second) of Torts § 552 (1977)).

*8 Finally, Engler has made a sufficient showing to avoid summary judgment regarding whether the "false representations" were material and whether he relied on them to his detriment. Engler has adduced evidence that he turned down a genuine prospect of employment at Bipore because he believed he would have a position at Bard. (Koch Dep. at 93-96. Pl.'s Appendix, Ex. 6.) This evidence is sufficient to raise a trialworthy issue about whether Engler in fact relied to his detriment. Arguably, it was naive and unreasonable for Engler to rely on the representations allegedly made by Tumber and Kelly without making specific inquiry of them, but the reasonableness of Engler's reliance presents an issue of fact; [FN6] certainly, his failure to inquire does not bar his recovery as a matter of law. _See Damon,_ 87 F.3d at 1480 (stating that "failure to investigate the veracity of statements does not, as a matter of law, bar recovery for misrepresentation," at least where the statements are not "preposterous or palpably false") (internal quotation marks omitted).

> FN6. To satisfy this requirement, Engler

must show that "a reasonable [person] would attach importance to [the statements] ... in determining his choice of action." _Bond Leather Co. v. O.T. Shoe Mfg. Co.,_ 764 F.2d 928, 936 (1985) (quoting Restatement of Torts (Second) § 538(2)(a) (1981)).

Although there is sufficient evidence of fraud to raise a trialworthy issue concerning liability, Engler should not be permitted to seek damages based on the difference between his present salary and benefits and the salary and benefits that he claims he would have received if Bard had offered him employment. Under Massachusetts law, defrauded plaintiffs are sometimes allowed to recover benefit of the bargain damages, _see Rice v. Price,_ 340 Mass. 502, 507, 164 N.E.2d 891, 894 (1960), and cases cited, as distinguished from reliance damages. As the court pointed out in _Rice,_ however, "The benefit of the bargain rule has not been rigidly followed." _Id.,_ 340 Mass. at 509, 164 N.E.2d at 895. The court then went on to endorse four principles by which there could be a "possible reconciliation of the two rules," _id.,_ 340 Mass. at 510, 164 N.E.2d at 896, as proposed in _Selman v. Shirley,_ 161 Or. 582, 85 P.2d 384 (1938), and cited with approval in Prosser's Second Edition of Torts. [FN7] The first principle, not applicable here, is that the defrauded party's recovery will be limited to what he or she has lost, if the defrauded party is content with that. Otherwise, the following principles apply:

> FN7. The reconciliation is still cited with approval in the Fifth Edition. See W. Page Keeton, et. al., _Prosser and Keeton on the Law of Torts,_ § 110 at 768-69 (5th ed.1984).

2. If the fraudulent transaction also amounted to a warranty, he may recover for loss of the bargain, because a fraud accompanied by a broken promise should cost the wrongdoer as much as the breach of promise alone.
3. Where ... the proof ... [is] so vague as to cast virtually no light upon the value of the property had it conformed to the representations, damages will be awarded equal to the loss sustained.
4. Where the damages under the benefit-of-bargain rule are proved with reasonable certainty, that rule will be employed.
_Rice,_ 340 Mass. at 510, 164 N.E.2d at 896.

Applying these principles, it is clear based on the analysis set forth above concerning Engler's

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 136249                                                            Page 8
1997 WL 136249 (D.Mass.)
**(Cite as: 1997 WL 136249 (D.Mass.))**

promissory estoppel claim that Bard gave no warranty and made no promise. Therefore, the allegedly fraudulent transaction did not "also amount[ ] to a warranty." *Id.* Further, the value of Engler's potential employment is completely speculative. The employment that Engler would have had at Bard would have been at-will or, at best, until Bard had cause to terminate. Under the best of circumstances, it is extremely difficult to assign anything but a highly speculative value to such a position. *See, e.g., Treadwell v. John Hancock Mut. Life Ins. Co.,* 666 F.Supp. 278, 286 (D.Mass.1987) ("Any determination of how long plaintiff [, an at will employee,] would have remained employed would necessarily involve speculation, since he could have been terminated at any time...."). Here, it is virtually impossible to do so, because the facts that are deemed undisputed already establish that, even before the acquisition was completed, Lancellotta and Daigle had "independently concluded that Engler was not as knowledgeable as he should have been given his position at Solco HPG," (FS at 7), and Kelly, too, "was not satisfied with the quality of Engler's expertise and performance," (FS at 9). [FN8]

> FN8. Similarly, the value of any retirement package Engler might have received from Bard is speculative, because its value is tied to length of employment. Engler admits that Bard had no obligation to pay him retirement benefits under the Solco Early Retirement Plan. (Engler Dep., Vol. 3 at 143.) Instead, he claims that Bard represented he would be covered under a comparable plan offered to Bard executives. Assuming, arguendo, this is true, it is not possible to put a dollar value on such a retirement package offered by Bard, because an employee was required to stay at least two years to be eligible for benefits. (Kelly Dep., Vol. 2 at 155-56.)

*9 Because Bard made no warranty or promise, and because Engler cannot possibly establish with reasonable certainty what the value of his employment with Bard would have been, this is not an appropriate case for recovery of expectation damages. [FN9]

> FN9. Because I am recommending that an order enter pursuant to Fed.R.Civ.P. 56(d) limiting the proof at trial to the value of any alternative employment opportunities Engler might have had, relative to the value of Engler's present position, there is no need

for me to consider Bard's alternative argument that Engler's damage claim is preempted by ERISA, to the extent it is based on his assumed participation in Bard's retirement benefit plan.

*(f) ADEA*

The facts relating to Engler's ADEA claim appear not to be seriously in dispute. Bard did not hire Engler, a 60-year old employee of Solco HPG, after it purchased Solco HPG's assets. [FN10] To the extent the functions Engler was performing at Solco HPG before the acquisition continued to be performed by Bard following the acquisition, those functions were absorbed by three existing Davol, Inc. vice presidents (ranging in age from 42 to 53) who were already performing similar functions with respect to Davol, Inc.'s existing product lines before the acquisition. (Defs.' Response to Interrogatory number 4, Pls.' Appendix, Ex. 32; Engler Aff. ¶ 43.) Davol, Inc. did not seek out, advertise for, or hire any new employees to assume those functions for the simple reason that there was no need for it to do so.

> FN10. Presumably, Solco HPG terminated Engler's employment contemporaneously with the closing of the acquisition, although the record does not so state.

According to facts set forth in Bard's Statement of Undisputed Facts and not effectively disputed by Engler, there were two reasons why Bard did not hire Engler. The first is the one just given: "[T]he combination of functions that Engler had performed at Solco HPG was redundant of functions already performed by various Davol management employees, and Engler's responsibilities, to the extent that they continued to be performed after the acquisition, were easily absorbed by existing Davol employees." (Defs.' Mem.Law Supp.Summ.J. at 9.) The second is that, based on his own observations of Engler's performance during the due diligence process and the observations of other Bard personnel, "Kelly was not satisfied with the quality of Engler's expertise and performance," particularly in the financial area. (*Id. see also* Kelly Dep., Vol. 2 at 138 (discussing Kelly's belief that someone with more knowledge of financial issues would be taking over Engler's position; Kelly Dep., Vol. 2 at 221 (discussing Kelly's belief that Engler was not performing his job in a satisfactory manner)).

The framework for analysis of Engler's ADEA claim is familiar. Where, as here, there is no direct

evidence of age animus, plaintiff must rely on the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See, e.g., Woods v. Friction Materials, Inc.*, 30 F.3d 255, 259 (1st Cir.1994) (stating that plaintiff may rely on *McDonnell Douglas* burden-shifting in ADEA claim). Under that framework, where there has been a failure to hire, as distinguished from an outright dismissal, plaintiff establishes a prima facie case of employment discrimination by showing:

(i) that he belongs to a [protected class]; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

**\*10** *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824 (footnote omitted).

There is no dispute that Engler, aged 60, is a member of a protected class and that he was rejected for employment. Thus he satisfies the first and third requirements. He does not, however, satisfy the second or fourth requirement, because Bard never sought applicants for the position Engler sought. In fact, such position did not exist at Bard, because functions of the type Engler performed at Solco HPG were distributed among three existing positions at Davol, Inc. Engler has not cited, and I have been unable to find, any employment discrimination case in which a company that purchased the assets of a second company was required to create a new position, let alone one that would have been redundant of existing positions, so that a former employee of the company whose assets were acquired could remain employed. Further, it would appear to be contrary to the rationale underlying the *McDonnell Douglas* framework, as explained and restated in *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1013 (1st Cir.1979), to place a burden on an employer to articulate a non-discriminatory reason for not hiring someone to fill a non-existent position for which it never sought applicants. [FN11]

FN11. [T]he prima facie case ... described [in *McDonnell Douglas* ] is based on the notion that, by ruling out the more obvious job-related reasons for not hiring him, a Title VII complainant can create an inference of some tainted reason, *i.e.*, some discriminatory reason, sufficient to require the employer to articulate a legitimate reason for the complainant's rejection. It is

because of this logic that the prima facie case in *McDonnell Douglas* included, *in addition to proof that the plaintiff belonged [in a protected class] and was rejected for a job for which he applied, proof that there actually was a job opening and that plaintiff was qualified for it.*
*Loeb v. Textron, Inc.*, 600 F.2d at 1013 (emphasis added).

The foregoing discussion is academic, however, because, even if Engler were able to get past this hurdle, he would merely have established his prima facie case, thereby triggering the second stage of the *McDonnell Douglas* framework. In that stage, the defendant-employer must articulate some non-discriminatory reason for the adverse employment action. If it does so, the presumption of illegality vanishes, and the third stage, in which the plaintiff-employee must prove that the stated reason was a pretext for unlawful discrimination, is triggered. *See Woods*, 30 F.3d at 260 ("To meet th[e third stage] burden, the claimant must prove *both* that the employer's articulated reason is false, and that discrimination was the actual reason for its employment action."). Further, where, as here, the question of discriminatory pretext arises in the context of a motion for summary judgment, the employee "must show evidence sufficient for the factfinder reasonably to conclude that the employer's decision to discharge him or her was wrongfully based on age." *Id.* (quoting *LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 843 (1st Cir.1993), *cert. denied*, 511 U.S. 1018, 114 S.Ct. 1398, 128 L.Ed.2d 72 (1994)). For three independent reasons, Engler cannot satisfy this standard.

First, because Engler failed to include in his opposition "a concise statement of the material facts of record as to which it is contended that there exists a genuine issue to be tried," the material facts set forth in Bard's Statement of Undisputed Facts must be deemed admitted. D.Mass.Local R. 56.1. Bard gave two reasons in its Statement of Undisputed Facts for not hiring Kelly: there was no position for him and, in any event, Kelly and his subordinates were not satisfied with Engler's abilities, as they observed them during the due diligence process. Deeming these facts admitted, Bard failed to hire Engler for legitimate, non-discriminatory reasons.

**\*11** Second, even if the facts set forth in Bard's Statement of Undisputed Facts are not deemed admitted, the reasons given in such statement satisfy the requirement that Bard articulate a legitimate, non-

1997 WL 136249                                                                    Page 10
1997 WL 136249 (D.Mass.)
**(Cite as: 1997 WL 136249 (D.Mass.))**

discriminatory reasons for its action. This shifts the burden back to Engler to demonstrate both that the reasons given were pretexts and that they were pretexts for discrimination. Engler attempts to make such showing, but he is unsuccessful.

His effort consists of contending that the two reasons Bard now gives for not hiring Engler (i.e., that Engler's position was redundant and Engler himself was perceived to be only marginally qualified) are different than the one Kelly gave Engler on the day of the closing. (P.'s Mem.Law Opp.Defs.' Mot.Summ.J. at 29.) It is undisputed that, on the day of the closing, Kelly told Engler that it was Bard's regular practice to entrust financial functions to someone who was familiar with Bard's financial control systems. This is not necessarily inconsistent, however, with the reasons Bard now gives. As Kelly put it at his deposition:

> I told [Engler] that we would be able to absorb the responsibilities that he was doing in other functions, and that Bard had strong financial controls, and that as was typical with many Bard acquisitions, that we would have somebody with better knowledge of our financial systems in place, and that we would not be continuing him in that role.

(Kelly Dep., Vol. 2 at 138.) It is true that Kelly did not make a point of explicitly telling Engler on this occasion that Engler simply did not make the grade, but there was no apparent reason for Kelly to rub salt into Engler's wounds. More to the point, Kelly's failure to do so hardly provides a rational basis for inferring that the reasons that Kelly did give were pretexts.

Finally, even if there were grounds for the factfinder to disbelieve the reasons given by Bard for not hiring Kelly, there is no evidence at all that those reasons were pretexts for discrimination. On this issue, Engler does little more, essentially, than repeat the elements of his prima facie case. (Pl.'s Mem.Law Opp.Defs.' Mot.Summ.J. at 29-30.) His only new point is as follows: "The fact that Kelly and Tumber have been contradicted so many times regarding the promises they made to the Solco HPG 'key' managers regarding employment ... raises issues of fact concerning their credibility (or lack of it)...." *Id.* But, as noted, Kelly and Tumber did not make any "promises;" more to the point, the issue now is not whether Kelly and Tumber are credible witnesses in general, but whether they lied in this instance for the specific purpose of concealing a discriminatory animus. There is no evidence that they did. Therefore, summary judgment is appropriate for this

reason as well.

## C. Conclusion

For all the foregoing reasons, I recommend that Bard's motion be DENIED with respect to Engler's misrepresentation claim, to the extent such claim seeks reliance (also known as "out-of-pocket") damages, but that it otherwise be ALLOWED.

## II. SOLCO'S MOTION AGAINST BARD

**\*12** When Bard acquired the assets of Solco HPG, the parties entered into a Purchase Agreement dated March 31, 1996 (the "Purchase Agreement"). (Exhibits to Bard and Davol's Opp.Third Party Defs.' Mot.Summ.J., Ex. 1, Docket no. 55.) [FN12] Article VI of the Purchase Agreement concerns indemnification and provides, in pertinent part, that Solco HPG will:

> FN12. Actually, Bard entered into two agreements at the closing--one with Solco HPG and a second with Solco AG. Since the two agreements contain a virtually identical indemnification provision, I will refer only to the former.

defend, indemnify and hold [Bard] harmless from and against any loss, liability, damage or expense suffered, incurred or paid by [Bard]:
....
(ii) as a result of any claim, action or proceeding asserted or brought against [Bard] ... that arises, in whole or in part, out of or in connection with [Solco HPG's] conduct of its business before or after the Closing Date, including, without limitation, any claim, action or proceeding relating to the termination of any sales representative, agent, dealer or distributor....

(Purchase Agreement, Article VI, § 6.1.) Bard asserts a claim under this provision, on the theory that Engler's claim, at least in part, arises "out of or in connection with" Solco HPG's "conduct of its business before ... the Closing Date."

Bard's theory is straightforward. It points out that Engler has made it clear that his belief that he would be hired by Bard is based in part on statements allegedly made by Kelly to von Wattenwyl and others that were later communicated to him by the persons to whom they were made. For example, Engler asserts in his Affidavit that Kelly told von Wattenwyl at a private dinner meeting in January 1993 "that Bard intended to hire the entire Solco

1997 WL 136249
1997 WL 136249 (D.Mass.)
**(Cite as: 1997 WL 136249 (D.Mass.))**

Page 11

HPG 'key' management team, and provide us with permanent employment, subject to termination 'for cause' only." (Engler Aff. ¶ 29.) Engler further contends that von Wattenwyl, in turn, conveyed that information to him and that:

I believed that [von Wattenwyl] was communicating Kelly's commitment to provide me with a permanent job after the acquisition. Kelly knew, or should have known, that Dr. von Wattenwyl would relay to me Bard's alleged promises to hire me, and that it would be reasonable for me to rely on that promise. I relied on Kelly's promise of employment made through Dr. von Wattenwyl, because had I known that I would *not* have a job with Bard after the acquisiion [sic], I would have immediately started to look for a[sic] another job.

(Engler Aff. ¶ 31.) [FN13] Bard claims that Kelly did not in fact make the statements attributed to him by von Wattenwyl and the others at Solco to whom they were allegedly made and that part of the reason it is now being sued by Engler is that von Wattenwyl and the others communicated false information to Engler about what he, Kelly, had said. Thus, according to Bard, it is entitled to indemnification because Engler's claims "arise[ ] ... in part ... out of or in connection with [Solco's] conduct of its business." (Purchase Agreement, Article VI, § 6.1.)

> FN13. As previously stated, Engler's Affidavit is largely ineffective against Bard, because it does not meet the requirements of Fed.R.Civ.P. 56(e). Nevertheless, it does effectively convey, at least in part, Engler's theories of liability and his reasons for filing suit against Bard, to the extent those theories and reasons have a bearing on whether Engler's claims are covered by the indemnification agreement between Bard and Solco.

Solco makes essentially two arguments in support of its motion for summary judgment. Neither is persuasive. First, Solco argues that the "conduct of its business," as that phrase is used in Article VI, unambiguously includes only Solco's production and sale of medical devices and, conversely, not Solco's wholesale transfer of corporate assets or the communication of information to key managers about what might happen to them after such transfer.

**\*13** Under Massachusetts law, the question of whether a contract is ambiguous is one of law. *Nasco, Inc. v. Public Storage, Inc.,* 29 F.3d 28, 32 (1st Cir.1994); *Jefferson Ins. Co. of New York v. City*

*of Holyoke,* 23 Mass.App.Ct. 472, 475 n. 4, 503 N.E.2d 474, 476 n. 4, *rev. denied,* 399 Mass. 1104, 506 N.E.2d 146 (1987). Further, a contract is ambiguous as a matter of law if it is susceptible to more than one plausible meaning. *Nasco,* 29 F.3d at 33. Applying this standard, I cannot agree that the indemnification provision of the Purchase Agreement is unambiguous.

Solco bases its argument primarily on the Purchase Agreement's two "Whereas" clauses. The first "Whereas" clause recites that Solco "is in the business of manufacturing, producing, marketing, distributing, and selling autotransfusion and other medical devices." (Purchase Agreement at 1.) This clause does not unambiguously establish that the wholesale transfer of the means of "manufacturing, producing, marketing, distributing, and selling autotransfusion and other medical devices" and the furnishing of information to key managers about the status of such transfer is not part of Solco's business. Indeed, evidence found elsewhere in the Purchase Agreement is to the contrary. Thus, Section 4.2, in the "COVENANTS" article, is entitled "Conduct of Business," and it clearly provides that Solco "shall *conduct its business* only in the ordinary course and shall use its best efforts ... to keep available the services of its present officers, agents and employees (*Id.,* Article IV, § 4.2.) (emphasis added). This provision at least suggests that the "conduct of Solco's business" in the "ordinary course" includes taking appropriate steps to prevent the defection of key managers prior to the closing of the acquisition, which in turn suggests that von Wattenwyl and the others were indeed engaged in the conduct of Solco's ordinary business when they communicated upbeat messages to Engler about his prospects for employment at Bard. [FN14] This construction may not be the only plausible one, but a rational jury could certainly interpret the Purchase Agreement in this manner.

> FN14. Of course, the fact that Solco had an affirmative duty to take reasonable steps to retain the services of key managers does not mean that Solco had a right to give key managers false reports regarding what Bard had said concerning their prospects for post-acquisition employment.

The second "Whereas" clause does not change this conclusion. It provides, in pertinent part, that Bard "wishes to purchase from [Solco], and [Solco] wishes to sell to [Bard], the business and substantially all of the assets of Seller (the 'Business')." (*Id.* at 1.) This

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 136249
1997 WL 136249 (D.Mass.)
**(Cite as: 1997 WL 136249 (D.Mass.))**

Page 12

clause sheds no additional light on the meaning of the word "business," with a lower case "b". [FN15] It certainly does not render unambiguous a term that is otherwise subject to more than one plausible construction.

> FN15. The word "business," as it appears in both the Indemnification article, Article VI, and the Covenants article, Article IV, is spelled with a lower case "b."

Solco's second argument is that the law does not permit a party to be indemnified for its own intentional wrongdoing, at least not where the contract under which indemnification is sought does not clearly and explicitly provide that it shall be. There is no need to consider the validity and scope of the principle urged by Solco because it is simply too early to say that it has any application here.

*14 Bard denies any wrongdoing, and, at least with respect to three of Engler's four charges, I have already recommended that Bard should prevail. With respect to the fourth charge, misrepresentation, it is quite possible that a jury will find that there was no wrongdoing here by Bard either. The jury might find, for example, that Engler did not in fact understand Bard's alleged statements to mean what he now says he understood them to mean, or, if he did, that no reasonable person in Engler's position could reasonably have interpreted them in such manner or have relied upon them without making further inquiry. Indeed, it is even conceivable that a jury will find that Engler did not rely on statements made directly to him by Tumber and Kelly, but he did rely on erroneous reports from von Wattenwyl and others about what Kelly said to them about Engler's prospects for employment. In any of these cases, Bard would not be seeking to be indemnified for its own intentional wrongdoing, but merely for the costs of defending against charges of wrongdoing that were ultimately rejected by the jury. Moreover, a jury might find that Bard was, at worst, negligent. If the jury were to so find, Solco's argument that there is no indemnification for intentional wrongdoing would not apply. For these reasons, it is premature to say that there are no circumstances under which Bard may be entitled to indemnification.

I therefore recommend that Solco's motion for summary judgment against Bard be DENIED.

*III. SUMMARY*

To summarize, I recommend:

1. that Bard's motion for summary judgment against Engler be DENIED with respect to Engler's misrepresentation claim, to the extent such claim seeks reliance (also known as "out-of-pocket") damages, but that it otherwise be ALLOWED; and,

2. that Solco's motion for summary judgment against Bard be DENIED.

*IV. IMPORTANT NOTICE OF RIGHT TO OBJECT AND WAIVER OF RIGHT TO APPEAL FOR FAILURE TO DO SO WITHIN TEN DAYS*

The parties are hereby advised that under the provisions of Rule 3(b) of the Rules for United States Magistrates in the United States District Court for the District of Massachusetts, any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court WITHIN 10 DAYS of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has indicated that failure to comply with this rule shall preclude further appellate review by the Court of Appeals of the District Court's order entered pursuant to this Report and Recommendation. *See United States v. Valencia-Copete,* 792 F.2d 4 (1st Cir.1986); *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603 (1st Cir.1980); *United States v. Vega,* 678 F.2d 376 (1st Cir.1982); *Scott v. Schweiker,* 702 F.2d 13 (1st Cir.1983); *see also Thomas v. Ar,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).

1997 WL 136249 (D.Mass.)

**Motions, Pleadings and Filings (Back to top)**
•           1:94CV10602           (Docket)
(Mar. 29, 1994)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit E

Westlaw.

1999 WL 1319194                                                    Page 1
1999 WL 1319194 (Mass.Super.)
**(Cite as: 1999 WL 1319194 (Mass.Super.))**

**H**
Only the Westlaw citation is currently available.


Superior Court of Massachusetts.

Kimberly BARTHELMES et al., [FN1]

FN1. Karen LaMagdeliene.

v.

Paula MARTINEAU et al. [FN2]

FN2. Olympus Health Care Group, Inc.

**No. 982378.**

April 27, 1999.


MEMORANDUM AND ORDER ON
DEFENDANTS' MOTION TO DISMISS

FECTEAU.

### INTRODUCTION

*1 This action arises out of the termination of
plaintiffs Kimberly Barthelmes and Karen
LaMagdeliene ("plaintiffs") by defendant Olympus
Health Care Group, Inc. ("Olympus") after a co-
employee, defendant Paula Martineau ("Martineau"),
made a complaint against them for sexual
harassment. Plaintiffs have filed the following
claims: a claim against Olympus for a violation of the
Massachusetts Civil Rights Act, G.L.c. 12, § 11I
(Count I); a claim against Martineau for defamation
(Count III); and claims against Olympus and
Martineau for intentional or negligent infliction of
emotional distress (Count II), and wrongful
termination (Count IV). Defendants have filed a
motion to dismiss under Rule 12(b)(6), seeking to
dismiss Counts I, II and IV. For the reasons discussed
below, the defendants' motion is allowed in part and
denied in part.

### BACKGROUND

The facts, as taken from the complaint, are as
follows. Olympus employed Kimberly Barthelmes
("Barthelmes") as a Clinical Supervisor in
occupational therapy from March 18, 1996 until

August 18, 1998, and employed Karen LaMagdeliene
("LaMagdeliene") as a Rehab Technician from April
1, 1996 until August 18, 1998. Throughout this
period, the quality and quantity of their work
consistently met or exceeded the requirements of
their jobs. As a Clinical Supervisor, Barthelmes
provided a positive working environment, which was
sensitive to the needs of the employees and
organization, and she worked effectively with all
individuals in a nondiscriminating manner.

On or about August 13, 1998, Hollyanne Peck
("Peck"), a Building Rehab Team Leader for
Olympus, told Barthelmes that Martineau had called
Peck at home. Martineau told Peck that Martineau
had overheard a private conversation behind closed
doors between Peck, LaMagdeliene and Barthelmes,
in which Martineau was being discussed. In the
conversation overheard by Martineau, Peck, who is
admittedly of homosexual orientation, made
reference to Martineau's sexual orientation, who is
allegedly of homosexual orientation. [FN3]

FN3. Barthelmes and LaMagdeliene are of
heterosexual orientation.

On or about August 14, 1998, a meeting was held
between LaMagdeliene and Linda Rahm, Regional
Director of Operations for Olympus, in which
LaMagdeliene was asked about the conversation
between Peck, Barthelmes and LaMagdeliene.
LaMagdeliene told Rahm what she knew of the
conversation. Rahm then informed LaMagdeliene
that Martineau had filed a sexual harassment
complaint, and that she was named in the complaint.
Barthelmes was, presumably, also named in the
complaint.

On or about August 17, 1998, Rahm told
LaMagdeliene and Barthelmes that they were being
suspended during the investigation process of the
sexual harassment complaint. Peck, however, was not
suspended, On or about August 18, 1998, Rahm told
LaMagdeliene and Barthelmes over the telephone
that they were being terminated because Olympus's
attorney said that they were a liability due to the
sexual harassment complaint.

### DISCUSSION

When evaluating the sufficiency of a complaint

pursuant to Mass.R.Civ.P. 12(b)(6), the Court must accept as true the factual allegations of the complaint, as well as any reasonable inferences to be drawn from them in the plaintiff's favor. See *Eyal v. Helen Broadcasting Corp.*, 411 Mass. 426, 429, 583 N.E.2d 228 (1991), and cases cited. "[T]he complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Nader v. Citron*, 372 Mass. 96, 98, 360 N.E.2d 870 (1977) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)); see also *Charbonnier v. Amico*, 367 Mass. 146, 152, 324 N.E.2d 895 (1975); *Whitinsville Plaza, Inc. v. Kotseas*, 378 Mass. 85, 89, 390 N.E.2d 243 (1979). "A complaint is not subject to dismissal if it would support relief on *any* theory of law." *Whitinsville Plaza, Inc.*, 378 Mass. at 89, 390 N.E.2d 243.

### I. Count I--Violation of the Massachusetts Civil Rights Act

**\*2** In Count I, the plaintiffs allege that Olympus terminated them in violation of the Massachusetts Civil Rights Act ("MCRA"), G.L.c. 12, § 11I, "by interfering with their exercise or enjoyment of rights secured by the constitution of the United States, or of rights secured by the constitution or laws of the Commonwealth." (Complaint, par. 19.) According to the complaint, Olympus violated the MCRA because the plaintiffs' termination "was based on unreliable, unfounded evidence." (*Id.*, par. 20.) Additionally, the termination "was carried out in violation of personnel procedure[,]" and was a pretext to disguise the real motivation behind their termination, i.e., "to protect the company from an alleged, unfounded sexual harassment complaint." (*Id.*)

To state a claim under the MCRA, the plaintiff must allege "(1) that her 'exercise or enjoyment of rights secured by the constitution or laws of the United States, or rights secured by the constitution or laws of the commonwealth, has been interfered with, or attempted to be interfered with,' and (2) that the interference or attempted interference was by 'threats, intimidation or coercion.' " *Appleton v. Hudson*, 397 Mass. 812, 817, 494 N.E.2d 10 (1986) (quoting G.L.c. 12, § § 11H, 11I).

A "threat" "involves the intentional exertion of pressure to make another fearful or apprehensive of injury or harm." *Planned Parenthood League of Mass., Inc. v. Blake*, 417 Mass. 467, 474, 631 N.E.2d 985 (1994) (citations omitted), cert. denied, 513 U.S.

868, 115 S.Ct. 188, 130 L.Ed.2d 122 (1994). " 'Intimidation' involves putting in fear for the purpose of compelling or deterring conduct." *Id.* "Coercion" involves "the application to another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done." *Id.* (quoting Websters' New International Dictionary at 519 (2d. ed.1959) (citation omitted)).

### A. Failure to Allege Threats, Intimidation, or Coercion

Olympus argues that the complaint fails to state a claim under the MCRA because it is devoid of allegations that Olympus, or its employees, engaged in threats, intimidation or coercion. The Court agrees. The complaint does not allege any conduct by Olympus, or its employees, that would constitute threats, intimidation, or coercion. Accordingly, the complaint fails to state a claim under the MCRA. See *Appleton*, 397 Mass. at 817, 494 N.E.2d 10 (concluding that a claim was properly dismissed because the complaint did not allege "any conduct by anybody that [could] be considered a 'threat, intimidation or coercion' " (citation omitted)); *Rosenfeld v. Board of Health of Chilmark*, 27 Mass.App.Ct. 621, 627, 541 N.E.2d 375 (1989) ("Since the complaint fails to allege any conduct by anyone that could be considered a 'threat, intimidation or coercion,' it fails to state a claim under the Massachusetts Civil Rights Act").

### B. Failure to allege Interference With a Secured Right

**\*3** Additionally, Olympus argues that the complaint also fails to identify a secured right that was interfered with in violation of the MCRA. The complaint simply restates, in a conclusory fashion, that Olympus has interfered with their constitutional or statutory rights. Such conclusory allegations fail to state a claim under the MCRA. See *Hobson v. McLean Hosp. Corp.* 402 Mass. 413, 417-18, 522 N.E.2d 975 (1988) (deciding that the plaintiff failed to state a claim under the MCRA because she failed to identify what rights were at issue, and made "conclusory allegations, amounting to a summarization of G.L.c. 12, § § 11H-11I" (citation omitted)).

Furthermore, to the extent that the plaintiffs allege interference with their employment, this interference is not actionable under the MCRA. Because the plaintiffs have not alleged that they had an express or implied contract for a definite period of employment,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

or that they had a contract based on a personnel manual, they were employees "at will." See *Jackson v. Action for Boston Community Dev., Inc.,* 403 Mass. 8, 9, 13-15, 525 N.E.2d 411 (1988). "Employment at will is terminable by either the employee or the employer without notice, for almost any reason or for no reason at all." *Id.* (citations omitted). Thus, at-will employees do not have a secured right to employment, and, accordingly, Olympus's termination of the plaintiffs is not actionable conduct under the MCRA. See *Webster v. Motorola, Inc.,* 418 Mass. 425, 430, 637 N.E.2d 203 (1994).

## II. Count II--Intentional or Negligent Infliction of Emotional Distress

In Count II, the plaintiffs allege that Olympus and Martineau "intentionally or negligently and without justification inflicted severe emotional distress" upon the plaintiffs "by extreme and outrageous behavior ..." (Complaint, par. 23). As a result, the plaintiffs allege that they "suffered loss of income and employment benefits, loss of business and personal reputation, other financial losses, and mental and emotional distress." (*Id.,* par. 24.) Although the complaint is unclear, these claims are presumably based on Martineau's filing of a sexual harassment complaint against the plaintiffs, and Olympus' subsequent termination of the plaintiffs.

### A. Exclusivity Provision of the Workers' Compensation Act

Defendants argue that these claims are barred under the exclusivity provisions of the Massachusetts Workers' Compensation Act, G.L.c. 152, § 24, and therefore fail to state a claim upon which relief can be granted. General Laws c. 152, § 24 (1999 ed.) of the Workers' Compensation Act provides, in relevant part, that "[a]n employee shall be held to have waived [her] right of action at common law ... in respect to an injury that is compensable under this chapter, to recover damages for personal injuries, if [she] shall not have given [her] employer, at the time of [her] contract of hire, written notice that [she] claimed such right ..." There is no allegation within the complaint that such notice was given by the plaintiffs, so the issue is whether the Act's exclusivity provision applies to their claims.

### 1. Olympus

**\*4** When the complaint is read in the plaintiffs' favor, it alleges that Olympus intentionally or negligently caused them emotional distress by terminating them based on unreliable, unfounded evidence. Common law actions against employers are barred by the exclusivity provisions of the Workers' Compensation Act when "(1) the plaintiff is shown to be an employee; (2) her condition is shown to be a personal injury within the meaning of the workers' compensation act; and (3) the injury is shown to have arisen out of and in the course of her employment." *Brown v. Nutter, McClennen & Fish,* 45 Mass.App.Ct. 212, 215, 696 N.E.2d 953 (1998) (citation omitted); see also *Foley v. Polaroid Corp.,* 381 Mass. 545, 548-49, 413 N.E.2d 711 (1980) *(Foley I)* (quoting G.L.c. 152, § 26).

All three of these criteria are met with regard to the plaintiffs' claims for intentional and negligent infliction of emotional distress against Olympus. First, although they were suspended, the plaintiffs were employees of Olympus at the time of the termination. Second, their condition is a "personal injury" within the meaning of the Workers' Compensation Act. See *Green v. Wyman-Gordon Co.,* 422 Mass. 551, 560-61, 664 N.E.2d 808 (1996) (claims for negligent infliction of emotional distress are barred by the exclusivity provisions of G.L.c. 152 whether they are the result of a bona fide personnel action or not); *Foley,* 381 Mass. at 549-50, 413 N.E.2d 711 (claims for intentional infliction of emotional distress covered by the Workers' Compensation Act); G.L.c. 152, § 1(7A) (1999 ed.).

Third, the plaintiffs' emotional injuries, which resulted from their termination, arose out of and in the course of their employment. See *Simmons v. Merchants Mut. Ins. Co.,* 394 Mass. 1007, 1007-08, 476 N.E.2d 221 (1985) (holding that the plaintiff's claim of intentional infliction of emotional distress against his employer as a result of the employer's bad faith termination of his employment was barred by the exclusivity provision of the Workers' Compensation Act). [FN4] Accordingly, the plaintiffs' claims for negligent and intentional infliction of emotional distress against Olympus are dismissed.

> FN4. See also *Bertrand v. Quincy Market Cold Storage & Warehouse Co.,* 728 F.2d 568, 572 (1st Cir.1984) (determining that the plaintiff's emotional distress claim, which arose out of his termination by means of a letter, arose out of and in the course of his employment); *Hamilton v. Baystate Medical Educ. and Russian Found., Inc.,* 866 F.Supp. 51, 56 (D.Mass.1994) (stating that the

exclusivity bar of the Massachusetts workers' compensation law "applies even where the allegedly injurious actions occur in the course of termination" (citation omitted)), aff'd, 66 F.3d 306 (1995); *Lennon v. Walsh*, 798 F.Supp. 845, 848 (D.Mass.1992) ("It appears well settled that claims for personal injury including emotional distress resulting from employment termination, wrongful or otherwise, are precluded by [the] exclusivity provision" of the Massachusetts Workers' Compensation Act) (quoting *Parisi v. Trustees of Hampshire College*, 711 F.Supp. 57, 63 (D.Mass.1989)).

### 2. Martineau

The Workers' Compensation Act "also provides the exclusive remedy against coemployees who engage in tortious conduct within the course of their employment and in furtherance of the employer's interest." *Brown*, 45 Mass.App.Ct. at 216, 696 N.E.2d 953 (citations omitted). However, coemployees themselves "are not immunized from suit by the Workers' Compensation Act for tortious acts which they commit outside the scope of their employment, which are unrelated to the interest of the employer." *Id.* (Citation omitted.)

When reasonable inferences are drawn in the plaintiffs' favor, the complaint alleges that Martineau knowingly or negligently filed a meritless claim of sexual harassment against the plaintiffs, which caused them severe emotional distress. It is not in Olympus's interest for an employee to make a meritless sexual harassment claim. Accordingly, the plaintiffs' emotional distress claims against Martineau fall outside of the exclusivity provision of the Workers' Compensation Act. The next issue, therefore, is whether the complaint, with regard to Martineau, states sufficient facts to satisfy the elements of intentional and negligent infliction of emotional distress.

#### a. Intentional Infliction of Emotional Distress

*5 In order to state a claim for intentional infliction of emotional distress, plaintiffs must allege: (1) that Martineau intended to inflict emotional distress or knew or should have known that emotional distress was the likely result of her conduct; (2) that the conduct was extreme and outrageous, beyond all possible bounds of decency and utterly intolerable in a civilized society; (3) that these actions caused the

plaintiffs' distress; and (4) that the plaintiffs' distress was severe and of such a nature that no reasonable person could be expected to endure it. See *Tetrault v. Mahoney, Hawkes & Goldings*, 425 Mass. 456, 466, 681 N.E.2d 1189 (1997); *Agis v. Howard Johnson Co.*, 371 Mass. 140, 144-45, 355 N.E.2d 315 (1976).

Defendants argue that the plaintiffs have failed to allege conduct that rises to the level of extreme and outrageous behavior. Because reasonable jurors could differ with regard to whether a co-employee's act of knowingly filing a meritless sexual harassment claim constitutes extreme and outrageous conduct, the plaintiffs' claim for intentional infliction of emotional distress against Martineau survives a motion to dismiss. See *Agis*, 371 Mass. at 145, 355 N.E.2d 315.

#### b. Negligent Infliction of Emotional Distress

In order to state a claim for negligent infliction of emotional distress, the plaintiff must allege "(1) negligence; (2) emotional distress; (3) causation; (4) physical harm manifested by objective symptomatology; and (5) that a reasonable person would have suffered emotional distress under the circumstances." *Payton v. Abbott Labs*, 386 Mass. 540, 557, 437 N.E.2d 171 (1982). The plaintiffs' complaint fails to state a claim for negligent infliction of emotional distress because they do not allege physical harm anywhere in the complaint. Accordingly, the plaintiffs' claim for negligent infliction of emotional distress against Martineau is dismissed.

### III. Wrongful Termination

In Count IV, the plaintiffs filed a claim for wrongful termination, alleging that the defendants acted negligently with regard to the plaintiffs' termination. (See Complaint, pars. 28-30.)

The plaintiffs have not alleged that they had an express or implied contract for a definite period of employment, or that they had a contract based on a personnel manual. As such, they were employees "at will." See *Jackson*, 403 Mass. at 9, 13-15, 525 N.E.2d 411. "Employment at will is terminable by either the employee or the employer without notice, for almost any reason or for no reason at all." *Id.* at 9, 525 N.E.2d 411 (citations omitted).

Massachusetts has "recognized exceptions to [this] general rule, however, when employment is terminated contrary to a well-defined public policy." *Wright v. Shriners Hosp. For Crippled Children*, 412

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1999 WL 1319194                                                          Page 5
1999 WL 1319194 (Mass.Super.)
**(Cite as: 1999 WL 1319194 (Mass.Super.))**

Mass. 469, 472, 589 N.E.2d 1241 (1992). "Redress is
available for employees who are terminated for
asserting a legally guaranteed right (e.g., filing
workers' compensation claim), for doing what the law
requires (e.g., serving on a jury), or for refusing to do
that which the law forbids (e.g., committing
perjury)." *Smith-Pfeffer v. Superintendent of the
Walter E. Fernald State School,* 404 Mass. 145, 149-
50, 533 N.E.2d 1368 (1989) (citations omitted).
Another recognized exception to the employment-at-
will rule is when an employer breaches the implied
covenant of good faith and fair dealing by
discharging an employee in order to prevent the
employee from receiving earned commissions, or
similar compensation due for past services. See *Gram
v. Liberty Mut. Ins. Co.,* 384 Mass. 659, 671-72, 429
N.E.2d 21 (1981); *Fortune v. National Cash Register
Co.,* 373 Mass. 96, 102- 06, 364 N.E.2d 1251 (1977).

**\*6** The plaintiffs have not alleged any facts within
their complaint that would make out a claim under
any of these exceptions to the employment-at-will
doctrine. Accordingly, Count IV is dismissed.

### ORDER

For the foregoing reasons, the defendant's motion to
dismiss is ALLOWED as to Counts I and IV, and is
DENIED as to Count II to the extent that it alleges
intentional infliction of emotional distress against
defendant Martineau. In all other respects, the
defendants' motion to dismiss is ALLOWED as to
Count II.

1999 WL 1319194 (Mass.Super.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit F

Westlaw.

1997 WL 1294367                                                      Page 1
1997 WL 1294367 (Mass.Super.)
**(Cite as: 1997 WL 1294367 (Mass.Super.))**

C
Only the Westlaw citation is currently available.

Superior Court of Massachusetts.

Gare THOMPSON
v.
SUNDANCE PUBLISHING, & another. [FN1]

FN1. Frederic S. Johnson.

**No. 950274B.**

Dec. 15, 1997.

Memorandum of Decision and Order on Defendants'
Motion for Summary Judgment

TRAVERS.

### INTRODUCTION

*1 On November 7, 1997, the parties appeared
before this Court for a hearing on Defendants' Motion
for Summary Judgment. In support of the motion, the
Defendants, Sundance Publishing (Sundance) and
Frederic S. Johnson (Johnson) claim that there was
no express or implied employment contract, and the
Plaintiff was terminated for cause. Lastly, the
Defendants argue that the implied covenant of good
faith and fair dealing was breached when the Plaintiff
was terminated.

The Plaintiff, Gare Thompson (Thompson) opposed
the motion, alleging numerous genuine issues of
material fact in dispute. For the following reasons,
the Defendants' motion is allowed in part and denied
in part.

### BACKGROUND

The undisputed facts, as gathered from the summary
judgment record, are as follows. Beginning in 1993,
Thompson was an employee of Sundance. At first
Thompson was hired by Sundance to act as a
consultant. His full-time employment with Sundance
was the result of numerous meetings and discussions
between himself and Johnson. At these meetings,
Sundance's goal of earning $25 million in sales

within five years was presented to Thompson.
Thompson's role in reaching that goal was discussed.
An employment agreement was reached, and Johnson
delivered to Thompson a letter denoting the terms of
employment.

The letter set forth Thompson's salary and
compensation plans, as well as Thompson's ability to
earn up to 1.5% equity interest in the business. The
first 0.5% of the equity investment would vest after
the first 12 months of employment on February 1,
1995. Thompson was subject to an annual review to
determine salary changes. In addition, the letter
indicates that Thompson will terminate his then-
current employment and relocate with his family to
the Boston area. Prior to his employment with
Sundance, Thompson was residing and working in
New York.

In accordance with the terms of the letter, Thompson
began working as a full time employee on February
1, 1994. Thompson was the head of the production
department, and reported only to Johnson. He had
other teams which he managed, including an editorial
team, and an art and production team.

In late December 1994, Johnson met with
Thompson. The purpose of this meeting was to
terminate Thompson's current position with Sundance
as the director of publishing. At that time, Johnson
informed Thompson that he was being terminated for
economic reasons, but perhaps an alternate
arrangement could be worked out, such as remaining
a consultant to Sundance. At that meeting, Johnson
did not set forth any other reasons for Thompson's
termination, although Johnson alleges that
Thompson's performance was poor in many areas.

Thompson's employment with Sundance ended
officially in January 1995, less than one month before
his first equity interest in Sundance would have
vested. The parties have stipulated that the only
damages Thompson is seeking to recover from this
action is his 0.5% equity interest in Sundance.
Thompson filed this action for breach of contract
(express and implied) and breach of the covenant of
good faith and fair dealing on February 3, 1995.

### DISCUSSION
I. Summary Judgment Standard

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 1294367
1997 WL 1294367 (Mass.Super.)
(Cite as: 1997 WL 1294367 (Mass.Super.))

Page 2

**\*2** Summary judgment will be granted where there are no genuine issues of material fact and where the record presented entitles the moving party to judgment as a matter of law. See _Cassesso v. Comm'r of Correction_, 390 Mass. 419, 422, 456 N.E.2d 1123 (1983); _Community Nat'l Bank v. Dawes_, 369 Mass. 550, 553, 340 N.E.2d 877 (1976); Mass.R.Civ.P. 56(c) (1997). The moving party bears "the burden of demonstrating that there is no genuine issue of material fact on every relevant issue." _Pederson v. Time, Inc._, 404 Mass. 14, 17, 532 N.E.2d 1211 (1989). "[A] party moving for summary judgment in a case in which the opposing party will have the burden of proof at trial is entitled to summary judgment if he demonstrates, by reference to material described in rule 56(c), unmet by countervailing materials, that the party opposing the motion has no reasonable expectation of proving an essential element of that party's case." _Kourouvacilis v. General Motors Corp._, 410 Mass. 706, 716, 575 N.E.2d 734 (1991). Once the moving party "establishes the absence of a triable issue, the party opposing the motion must respond and allege specific facts which would establish the existence of a genuine issue of material fact." _Pederson_, 404 Mass. at 17, 532 N.E.2d 1211.

## II. The Plaintiff's Complaint

Thompson alleges in his Complaint that the Defendants breached an express or implied contract for employment and breached the duty of good faith and fair dealing. To decide the present motion, the Court must first determine whether a contract for employment existed, and if so, was it express or implied.

### A. Was there an Express or Implied Contract of Employment?

Whether the Defendants violated an express or implied contract when they terminated Thompson depends upon whether Thompson was an employee under contract or an employee at will. Thompson and the Defendants point to the employment letter to support their arguments.

Thompson alleges that the terms of the letter which set forth the five-year equity participation schedule is sufficient to demonstrate that a definite term of employment for five years was intended by the parties. In support, Thompson cites numerous conversations during which Johnson expressed to other individuals Sundance's intention to employ Thompson for five years.

The Defendants, on the other hand, point to the noticeable absence of any specific language tending to demonstrate that a term of five years was intended by the parties. The Defendants bolster their argument by the deposition testimony of Thompson himself in which he claims that he was aware that Sundance could terminate his employment. The Defendants point to Thompson's opinion that the notion that his employment could be terminated by either party if they were dissatisfied was "an assumption that you go into with any job," and Thompson assumed that risk with his position at Sundance.

### The Employment Letter

**\*3** Contract interpretation is a question of law, left to the sound discretion of the court. See, _Lexington Ins. Co. v. All Regions Chemical Labs., Inc._, 419 Mass. 712, 713, 647 N.E.2d 399 (1995), citing _Allstate Ins. Co. v. Bearce_, 412 Mass. 442, 446-47, 589 N.E.2d 1235 (1992). Thus, whether the letter of employment was sufficient to create an employment under contract is a question of law for this Court.

The contract's essential terms must be "sufficiently definite so that the nature and extent of the obligations of the parties can be ascertained. [Citation omitted.] However, a contract is not to be held unenforceable 'if, when applied to the transaction and construed in the light of the attending circumstances,' the meaning can be ascertained with reasonable certainty." _Simons v. American Dry Ginger Ale Co._, 335 Mass. 521, 523, 140 N.E.2d 649 (1957), quoting _Cygan v. Megathlin_, 326 Mass. 732, 734, 96 N.E.2d 702 (1951). See also _Hastings Assoc. Inc. v. Local 369 Bldg. Fund, Inc._, 42 Mass.App.Ct. 162, 170, 675 N.E.2d 403, review denied 424 Mass. 1108, 678 N.E.2d 1334 (1997) (relying on same language).

Thompson requests that the Court view the reference to the equity participation as establishing a five-year employment contract. In addition, Thompson asks this Court to view the instances where Johnson referred to Thompson as an employee with a five year commitment to Sundance as support for his argument. The terms of the letter of employment are not vague or unascertainable. The letter sets forth a compensation plan and salary commitment. The letter does not, however, rise to the level of establishing a five-year written employment contract. With reference to a five-year term, the letter is noticeably barren of such a commitment by Sundance, and even appears to be intentionally open-ended. Because the Court does not view the equity participation as sufficient to raise an issue of ambiguity in the letter,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 1294367                                                                  Page 3
1997 WL 1294367 (Mass.Super.)
**(Cite as: 1997 WL 1294367 (Mass.Super.))**

the parol evidence rule prevents introduction of prior statements made by Johnson regarding any long-term employment commitment of Sundance to contradict the plain language of the letter. See *Affiliated FM Ins. Co. v. Constitution Reinsurance Corp.,* 416 Mass. 839, 842, 626 N.E.2d 878 (1994) (where the contract terms are ambiguous, evidence regarding prior negotiations is admissible to explain or elucidate the terms of the contract; however, such evidence is not admissible to contradict the terms of the contract). Contrast, *Kravetz v. Merchanges Distributors, Inc.,* 387 Mass. 457, 460-61, 440 N.E.2d 1278 (1982) (court found an implied contract for definite term, where writing referred to salary, additional compensation, and a non-competition period of five years).

Reliance on the use of the word "salary" to import a five-year contract is misplaced. Although the word "salary" may infer that the term of employment was for a definite period or permanent duration, see *Mahoney v. Hildreth & Rogers Co.,* 332 Mass. 496, 499, 125 N.E.2d 788 (1955), the term as used in Thompson's employment letter contained the provisio that Thompson was subject to an annual review. This detracts from any implication that the term "salary" refers to a definite term of employment for five years.

**\*4** The conclusion that the letter does not rise to the level of an employment contract for five years is supported by Thompson's own deposition testimony that he was aware and assumed that either party could terminate the employment relationship if that person was dissatisfied. Thompson's testimony does not comport with the argument that the letter established a definite term of employment under a contract, as personal dissatisfaction alone is not a justification for termination of a contract. See *Rooney v. Weeks,* 290 Mass. 18, 17 (1935) (absent a term of personal satisfaction, unless a reasonable person would be dissatisfied with the work performance, the promisor cannot seek to discharge the contract if he was only personally dissatisfied).

For the foregoing reasons, the letter of employment signed by Johnson as president of Sundance was a letter outlining the terms of Thompson's salary and compensation and not a contract for a term of employment for five years. Likewise, the employment relationship does not give rise to an implied-in-fact contract. "An implied-in-fact contract comes into being when, notwithstanding the absence of a written agreement or verbal agreement expressing mutual obligations, the conduct or relations of the parties imply the existence of a contract." *Popponesset Beach Ass'n v. Marchillo,* 39 Mass.App.Ct. 586, 592, 658 N.E.2d 983, review denied 422 Mass. 1104, 661 N.E.2d 935 (1996), citing *LiDonni v. Hart,* 355 Mass. 580, 583, 246 N.E.2d 446 (1969).

In the present case, there is a written agreement memorializing the terms of the employment relationship insofar as salary and compensation. The circumstances surrounding the employment relationship, i.e. conversations with third parties, do not give rise to an implied-in-fact contract for employment. The employment relationship was one of an at-will nature, and the summary judgment record does not support the recharacterization of the relationship as something other than an at-will employment.

Finally, the absence of a writing setting forth the essential terms of the employment agreement, specifically the length of employment, violates the statute of frauds. See G.L.c. 259, § 1 (1996), see also *Irving v. Goodimate Co.,* 320 Mass. 454, 458-59, 70 N.E.2d 414 (1946). The letter is not a contract of employment for any specific length of time, and as such, Thompson was an employee at will. Employees at will are terminable with or without cause. See *Jackson v. Action for Boston Community Dev., Inc.,* 403 Mass. 8, 9, 525 N.E.2d 411 (1988); *Fortune v. National Cash Register Co.,* 373 Mass. 96, 100, 364 N.E.2d 1251 (1977). Because Thompson was an employee at will, his termination was not subject to a demonstration of cause or justification.

B. Was the Implied Covenant of Good Faith and Fair Dealing Breached?

**\*5** Thompson argues that even if the employment was at-will, his termination was a breach of the covenant of good faith and fair dealing. This covenant seeks to prevent employers from firing employees in bad faith. See *Fortune,* 373 Mass. at 104, 364 N.E.2d 1251. If the employee's termination is a necessary business decision, the covenant is not breached. See *id.*

In *Fortune v. National Cash Register Co., supra,* the Supreme Judicial Court agreed with the plaintiff's contention that even if he was an employee at will at the time of his termination, he was "entitled to a jury determination on NCR's motives in terminating his services under the [written salesman's] contract and finally discharging him." *Id.* at 101, 364 N.E.2d 1251. The salesman's contract set forth the plaintiff's salary and compensation or bonus payments. See *id.*

1997 WL 1294367
1997 WL 1294367 (Mass.Super.)
**(Cite as: 1997 WL 1294367 (Mass.Super.))**

Page 4

at 97-98, 364 N.E.2d 1251. The plaintiff, after twenty-five years of service with NCR, was terminated and did not receive the bonuses he was due on a prior sale of machines to a large client. See _id._ at 99-100, 364 N.E.2d 1251. The plaintiff argued that his termination was an effort to avoid paying the plaintiff his commissions, and therefore done in breach of the implied covenant of good faith and fair dealing. See _id._

Balancing the employer's need to control the work force and make legitimate business decisions with the employer's duty to exercise good faith in each of its decisions, the Court concluded that firing the plaintiff to avoid paying the plaintiff's commissions was a breach of the implied covenant of good faith and fair dealing. See _id._ at 105, 364 N.E.2d 1251. "Courts have often applied this rule to prevent overreaching by employers and the forfeiture by employees of benefits almost earned by the rendering of substantial services." _Id._

Although the plaintiff in the _Fortune_ case had already earned his commission at the time of his termination, this is insufficient to allow summary judgment for the Defendants. To determine whether the implied covenant of good faith and fair dealing was breached, the _Fortune_ case requires the Court to examine the motivation of Sundance and Johnson in their decision to terminate Thompson. If done in bad faith or through malice, the covenant is breached.

Thompson was not be eligible to earn his equity participation until February 1, 1995. Because he was terminated in January 1995, he was prevented from obtaining his interest in Sundance. Thompson alleges that the impetus for firing him one month before his interest in Sundance vested was the Defendants' unwillingness to allow him to hold that equity interest. In support of his contention, Thompson points to Johnson's memoranda to himself and deposition testimony, indicating that Johnson had in mind a replacement for Thompson as early as November 1994. In addition, Johnson indicated that Thompson was being terminated solely for economic reasons. By his own admission, Johnson did not explain to Thompson that he was being terminated for poor work performance.

**\*6** The allegations set forth by Thompson are sufficient to survive the motion for summary judgment. Thompson places in dispute the true motivations of Johnson and Sundance in terminating him as director of publishing. See _Kourouvacilis,_ 410 Mass. at 716, 575 N.E.2d 734; _Pederson,_ 404 Mass.

at 17, 532 N.E.2d 1211. As the Court in _Fortune_ decided, so this Court decides that Thompson is entitled to a jury determination as to whether the Defendants' actions were in bad faith.

### ORDER

For the foregoing reasons, it is hereby ORDERED that the Defendants' Motion for Summary Judgment is ALLOWED as to the allegations of breach of an express or implied contract.

It is further ORDERED that the Defendants' Motion for Summary Judgment is DENIED as to the allegation that the Defendants breached the implied covenant of good faith and fair dealing.

1997 WL 1294367 (Mass.Super.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.