UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No. 04-11713-NMG

AHMAD SHREATEH, Plaintiff

vs.

FANNIE MAE, Defendant

**PLAINTIFF AHMAD SHREATEH'S MEMORANDUM IN OPPOSITION TO DEFENDANT FANNIE MAE'S MOTION TO DISMISS COMPLAINT**

## INTRODUCTION

The Plaintiff, an American citizen of Jordanian Muslim descent, has asserted causes of action for workplace discrimination under 42 U.S.C. sec. 1981 (Count I) and deprivation of civil rights under 42 U.S.C. sec. 1983 (Count II). The defendant, Fannie Mae, now moves to dismiss both counts under Fed.R.Civ.P. 12(b)(6), for failure to state a claim upon which relief may be granted. The plaintiff submits the present memorandum of law in response.

## FACTS

The facts pleaded in the First Amended Complaint are the following:

1. The Plaintiff is Ahmad Shreateh, is a resident of Salisbury, Essex County, Massachusetts, was born in Jordan, is a Muslim, and is an American Citizen for about 14 years but living in the United States as a resident for 20 years.

**2.** Fannie Mae, as it is known, is a corporation doing business in Washington, District of Columbia, and is a Defendant.

**3.** Mark Holmes (Holmes) ... is an employee of and works for Fannie Mae, as it is known, in Washington, District of Columbia.[1]

**4.** The Court has jurisdiction of this action under 42 U.S.C., Sec. 1981; 42 U.S.C. Sec. 1983; 28 U.S.C. Sec. 1331; 28 U.S.C. Sec. 1343; and 42 U.S.C. 2000(e) et seq.

**5.** On or about May 2001, the Plaintiff was engaged and hired as a computer consultant by Computer Merchants of Norwood, Massachusetts to work for one of their clients, namely, Compaq Computer.

**6.** Compaq Computer (Compaq) had an agreement with Fannie Mae to do some work.

**7.** In compliance with an agreement to perform work for Fannie Mae, Compaq sent Plaintiff to do the required and necessary work contracted for between Fannie Mae and Compaq.

**8.** The Plaintiff was at all times considered an independent contractor. He was paid by Computer Merchants from funds supplied by Fannie Mae to Computer Merchants for the work Plaintiff performed as set out in his agreement with Computer Merchants, but

---

[1] Mark Holmes was originally a defendant in this action; however, the plaintiff dismissed the complaint against him when he realized that this Court could not obtain personal jurisdiction over him.

all technical work was made and decided between Compaq, Fannie Mae and the Plaintiff.

9. Plaintiff was interviewed by both Compaq and Fannie Mae representatives to determine Plaintiff's technical competency to do the work contracted for between Compaq and Fannie Mae.

10. Plaintiff's technical ability and competency was satisfactory and approved by both Compaq and Fannie Mae. Plaintiff started his employment with Fannie Mae on or about July 30. 2001.

11. Plaintiff's job classification was "Senior Consultant in charge of GS320 Environment".

12. In addition, the plaintiff was responsible for the consulting needs related to Compaq products on site at Fannie Mae

13. The Business Manager employed at Fannie Mae, Washington, D.C., was Barbara Copper-Jones, who dealt with the Plaintiff on business issues related to the technical requirements of the GS320 environment.

14. At all times in this Complaint, the Technical Supervisor from The UNIX Group at Fannie Mae was ... Mark Holmes, of Washington, D.C.

15. Plaintiff's first month at Fannie Mae, on or about August, 2001, went without any real problems with other employees and supervisors at Fannie Mae.

16. At the end of August, 2001, Mark Holmes approached the Plaintiff and asked the Plaintiff if he would like to go and socialize with him and his boy friend.

17. Plaintiff observing Holmes' tone and body language gave Plaintiff a distinct impression that the invitation contained more than just a social get together among friends.

18. Plaintiff rejected this offer with the explanation that he was busy planning a trip to the Middle East to see his family during the Labor Day break.

19. ... Mark Holmes took Plaintiff's hand as Plaintiff attempted to walk away and said "We mostly invite some other men for more fun".

20. Plaintiff defensively pulled his hand away telling ... Holmes that he was under a misapprehension that Plaintiff was gay. Plaintiff turned and left the room and ... Holmes didn't say anything further to Plaintiff.

21. Plaintiff left the United States on or about Labor Day, 2001, to visit his family in Jordan. Plaintiff returned to the United States on or about September 17, 2001.

22. Upon Plaintiff's returning to work ... Holmes' attitude towards the Plaintiff clearly and observably changed towards him in their working relationship.

23. At one point Holmes invited the Plaintiff into his office to discuss something on his mind. Instead of being about business matters, Holmes asked Plaintiff what he thought about "September 11th (2001)."

24. Plaintiff was caught off guard by the question. Plaintiff responded to the question that "they" were crazy, fanatic people.

25. Plaintiff wanted to drop the subject and leave the room to get back to his work.

26. Holmes said "we (Americans) have bombs the size of the Middle East that we should dump on them and kill them all."

27. Plaintiff told Holmes he understood his anger but that he still has family in the Middle East and that Plaintiff had nothing to do with what happened. Plaintiff further said to Holmes that "he should not take out his anger on him."

28. Holmes said that it did not matter because "you're all uneducated, stupid Arabs – you're savages."

29. Plaintiff turned and walked out of the office.

30. For the next few days Holmes from time to time confronted the Plaintiff while working and made similar derogatory remarks in front of another co-employee to the Plaintiff. Holmes' remarks made the Plaintiff feel embarrassed.

31. These statements were made in an aggressive, derogatory and biting manner.

32. Plaintiff did not know what to do and hoped the comments would stop.

33. Towards the end of September, 2001, Holmes again approached the Plaintiff and asked Plaintiff if he was interested in meeting with him and his boyfriend at their place. Holmes stated he and his boyfriend invite other men over for some gay activities. Plaintiff refused and told Holmes again that he was not gay. Plaintiff further told Holmes to stop asking him about this matter. Holmes said to Plaintiff it would be in Plaintiff's best interest for the Plaintiff to meet with him and his gay boy friend if the Plaintiff wanted to continue to work at Fannie Mae.

34. Plaintiff told Holmes again he would not meet with him and his boyfriend for gay social activities which Plaintiff understood to include sex between men. Plaintiff said to Holmes that he would deal with whatever happens by his refusal.

35. Plaintiff thereafter went to two Managers at Compaq and two Managers from Fannie Mae.

36. The Compaq management people did not want to get involved and referred the Plaintiff to the Fannie Mae Managers.

37. The Fannie Mae Managers told Plaintiff to deal with Holmes and try to resolve the problem.

**38.** On or about October 17, 2001, Holmes and another person invited the Plaintiff into Holmes' office. Plaintiff upon arrival was told shortly thereafter that the Plaintiff was being terminated from further employment at Fannie Mae and that Plaintiff was to have an end date of employment on or about October 19, 2001.

**39.** Plaintiff asked Holmes why he was being terminated and Holmes stated it had nothing to do with Plaintiff's qualifications or job performance.

**40.** Plaintiff pressed Holmes further for a reason of his termination and Holmes stated with joy in his voice as Plaintiff heard and understood it to be that "you're an Arab and you did not play the game right with me." Plaintiff left the office.

**41.** Plaintiff immediately contacted several Managers inside Fannie Mae trying to find other consulting work.

**42.** Holmes learned of Plaintiff's inquiries and several arranged meetings Plaintiff was to have on or about October 18, 2001 to seek other consulting work at Fannie Mae. Holmes asked Plaintiff to give him Plaintiff's badge back resulting in the fact that the Plaintiff would be prevented from attending these employment meetings on the premises. Holmes also ordered the Plaintiff to leave the building immediately. Holmes yelled at Plaintiff, "I do not want you in Fannie Mae."

**43.** Plaintiff left Fannie Mae, but afterwards a Senior Manager from Fannie Mae contacted the Plaintiff and asked Plaintiff if he would be interested in returning to work in his department. Plaintiff responded that he would like to come back and work for him at Fannie Mae.

**44.** Holmes later heard of this offer by this Manager and opposed Plaintiff's return to work at Fannie Mae. The Plaintiff was not hired.

Based upon the foregoing allegations of fact, the plaintiff brought the present action against Fannie Mae, asserting causes of action for workplace discrimination under 42 U.S.C. sec. 1981 (Count I) and deprivation of civil rights under 42 U.S.C. sec. 1983 (Count II). Contrary to the implications of the defendant's argument Count I did **not** rely exclusively, or even predominantly, upon allegations of sexual discrimination:

> 50. Holmes made **racial, religious and sexual** comments about the Plaintiff before other employees about the Plaintiff in the work place affecting and starting a **hostile work place** governance.
>
> 51. The Defendant Fannie Mae knowing or should have known of these discriminatory actions intentionally or with reckless and wanton actions failed to prevent said discriminatory acts through its employees towards the Plaintiff. In fact, Defendant refused to prevent the interference of Plaintiff's equal rights to make and benefit from an employment contract free from discrimination, even if it violated Company policy.

(Emphasis added.)

**ARGUMENT**

**Preliminary: Standard of Review**

When considering a Rule 12(b)(6) motion, the Court is limited to the allegations in the complaint. *Nicholson v. Moran*, 961 F.2d 996, 998 (1st Cir. 1992). The court must accept all facts pleaded as true, view them in the light most favorable to the party bringing the claim, and draw any reasonable inference from them in that party's favor. *Garita Hotel Ltd Partnership v. Ponce Fed. Bank*, 958 F.2d 15, 17 (1st Cir. 1992). The motion will be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). A motion under Rule 12(b)(6) will not lie where the pleadings are merely inartful or indefinite. *Garita Hotel Ltd. Partnership v. Ponce Fed. Bank*, 958 F.2d 15, 17-18 (1st Cir. 1992); *Sisbarro v. Warden*, 592 F.2d 1, 2 (1st Cir. 1979).

**I. THE PLAINTIFF'S ACTION UNDER 42 U.S.C. SEC. 1981**

**1. The plaintiff's First Amended Complaint states a cause of action under 42 U.S.C. sec. 1981 where on the facts pleaded therein the plaintiff may be considered to have been the "borrowed servant" of the defendant, Fannie Mae.**

The defendant's first argument, designated II.A., and appearing on pp. 3-5 of its memorandum, essentially posits that the plaintiff cannot state a viable claim under 42 U.S.C. sec. 1981 where he had no contract of employment with the defendant, Fannie Mae. However, the facts pleaded in the First Amended Complaint, especially those

9

at paragraphs 5-15, 35-37, 43 and 44 clearly indicate that the plaintiff was, in law and in fact, the "borrowed servant" of Fannie Mae; and as a "borrowed servant" of Fannie Mae, he had a sufficient employment relationship to bring his 1981 action.

In *Standard Oil Co. v. Anderson*, 212 U.S. 215, 221-222 (1909), the Supreme Court stated that to determine whether a given employee is a borrowed servant, "we must inquire whose is the work being performed, a question which is usually answered by ascertaining who has the power to control and direct the servants in the performance of their work." More recently, the First Circuit Court of Appeals has noted that "(t)he prime requisite for invoking the borrowed servant doctrine is some sort of control by the borrower over the loaned employee(s)." Accord: *Raymond v. I/S Carinia*, 626 F.2d 203, 205 (1st.Cir. 1980); *Kukias v. Chandris Lines, Inc.*, 839 F.2d 860, 862 (1st.Cir. 1988).

At bar, according to the factual allegations in the First Amended Complaint, the plaintiff was engaged by Computer Merchants and sent to work for Compaq. Compaq, in turn, sent him to work for Fannie Mae, pursuant to a contract between Compaq and Fannie Mae. Fannie Mae, as well as Compaq, interviewed the plaintiff, in order to determine his qualifications prior to putting him to work. Although the plaintiff was paid by Computer Merchants, the funds came from Fannie Mae. Fannie Mae gave the plaintiff his job classification: "Senior Consultant in charge of GS320 Environment." All of the work was done on site at Fannie Mae.

Fannie Mae's Business Manager, Barbara Copper-Jones, dealt with the plaintiff on business issues related to the technical requirements of the "GS320 environment." Plaintiff was under the supervision of Fannie Mae's "Technical Supervisor," Mark Holmes. At the very least, these facts are susceptible of an interpretation that would make the plaintiff the "borrowed servant" of Fannie Mae. And that is all that is required, at this stage, to repel a Rule 12(b)(6) motion to dismiss. Indeed, it has been said that the determination of whether or not a person was a "borrowed employee" is a mixed question of law and fact best left to the fact-finder for resolution. *Wilson v. Nooter Corp.*, 475 F.2d 497, 501 (1st. Cir.), *cert. denied*, 414 U.S. 865 (1973). Accord: *U.S. v. Rule Industries, Inc.*, 878 F.2d 535, 541 (1st.Cir. 1989); *Kassell v. Gannett Co.*, 875 F.2d 935, 942 (1st. Cir. 1989).

Unfortunately, no decision has been found specifically addressing the issue of whether a borrowed employee may bring a 1981 action against the borrowing employer. However, there is authority which strongly argues in the affirmative.

The statute, itself, provides as follows:

> (a) Statement of equal rights
>
> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to **make and enforce contracts**, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to

no other.

(b) "Make and enforce contracts" defined

For purposes of this section, the term "make and enforce contracts" includes the making, **performance**, modification, and termination of contracts, and the **enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship**.

(c) Protection against impairment
The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

(Emphasis added.)

In *Danco, Inc. v. Wal-Mart Stores, Inc.*, 178 F.3d 8 (1st.Cir. 1999), the Court rejected an argument that only an employee had standing to bring an action under sec. 1981. The Court observed that "(t)here is nothing in the legislative history to suggest that Congress had any objection to providing similar benefits to independent contractors, and the language it used in its amendment applies as readily to the one as to the other." Id., at 14. However, the Court rejected the claim that a mere employee of a contracting party had standing under sec. 1981 to sue the other contracting party, because "(n)othing in section 1981 provides a personal claim, so far as its language is concerned, to one who is **merely affiliated** – as an owner or employee – with a contracting party that is discriminated against by the company that made the contract." Id., at 14 (emphasis added).

Never addressed by *Danco* was the question of whether a **borrowed employee** of an offending employer has standing to sue under sec. 1981. However, it is clear that a borrowed servant **does** have standing to prosecute an action under the analogous Title VII, 42 U.S.C. sec. 2000e:

> In determining whether both KDOC and PHS were Zinn's employers, we must consider related common law doctrines under which a worker may be employed by more than one employer. Generally, a person may be the employee of two employers, "at one time as to one act, if the service to one does not involve abandonment of the service to the other." Restatement (Second) of Agency sec. 226 (1958). Title VII case law recognizes that two separate entities may be a worker's employer if they share or codetermine matters governing the essential terms and conditions of the worker's employment. When a worker is formally employed by one organization, but important aspects of his work are subject to control by another organization, both organizations are employers of the worker. **An independent entity with sufficient control over the terms and conditions of the employment of a worker formally employed by another is a joint employer within the scope of Title VII.** See, e.g., *Graves v. Lowery*, 117 F.3d 723, 727 (3d Cir. 1997); *Virgo v. Riviera Beach Assocs.*, 30 F.3d 1350, 1360 (11th Cir. 1994). Here, Zinn's work at the KDOC facility did not involve abandonment of service to PHS. Her job with PHS was to provide health care services to inmates under KDOC's charge.
>
> [33] Similarly, under the loaned servant doctrine, a "servant directed or permitted by his master to perform services for another may become the servant of such other in performing the services. He may become the other's servant as to some acts and not as to others." Restatement (Second) of Agency sec. 227. **Title VII case law recognizes that under the loaned servant doctrine, a worker formally employed by a temporary employment agency and assigned to work under the control and supervision of a client of the agency is an employee of both the agency and the client.** See *Amarnare v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 611 F. Supp. 344, 349 (S.D. N.Y. 1984), aff'd 770 F.2d 157 (2d Cir. 1985).

*Zinn v. McKune*, 143 F.3d 1353, 1361 (10th Cir. 1998) (Briscoe, Circuit Judge, concurring). Accord: *Magnuson v. Peak Tech Services, Inc.*, 808 F.Supp. 500, 508-511 (E.D.Va. 1992) (genuine issues of material fact as to whether three persons/entities, **in addition to plaintiff's undoubted primary employer**, could have been plaintiff's "employers" for Title VII purposes precluded entry of summary judgment); *Amarnare v. Merrill Lynch*, 611 F.Supp. 344 (S.D.N.Y. 1984) (holding that temporary services agency **and** company that contracted with temporary services agency both to be "employers" of a temporary employee for purposes of Title VII).

Note that sec. 1981, as amended in 1991, provides a remedy coextensive in its breadth with Title VII. *Danco, Inc v. Wal-Mart Stores, Inc.*, 178 F.3d 8, 13 (1st.Cir. 1999):

> In 1991, Congress amended section 1981 specifically to overrule the *Patterson* decision. See H.R. Rep. No. 102-40(I), at 141 (1991), reprinted in 1991 U.S.C.C.A.N. 549, 670. New language defines the phrase "make and enforce contracts" to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. sec. 1981(b). **This language tracks language of Title VII prohibiting discrimination with respect to "compensation, terms, conditions, or privileges of employment." 42 U.S.C. sec. 2000e-2(a)(1). Thus, hostile work environment claims may now be pursued by employees under both Title VII and section 1981.**

(Emphasis added.)

Thus, if a "borrowed employee" would have standing to bring an action under Title VII, it should follow that he has equivalent standing to bring an action under sec. 1981.

14

Moreover, an employer owes no less of a duty to a borrowed employee than to any other employee to provide a reasonable work environment. Causing, permitting or suffering a hostile work environment to afflict a borrowed employee certainly deprives the victim of **both** the "benefits, privileges, terms, and conditions of the contractual relationship" which he undoubtedly has with the "lending" employer (at bar, Computer Merchants) **and** the "benefits, privileges, terms, and conditions" of the quasi-contractual relationship he has with the "borrowing" employer (at bar, Fannie Mae). Regarding the "contractual" nature of the relationship between the "borrowed employee" and the borrowing employer" see *Vanterpool v. Hess Oil V.I. Corp.*, 766 F.2d 117, 122 (3d Cir. 1985), in which the Court justified application of the "borrowed servant" rule to immunize a borrowing employer from liability in tort to an injured borrowed employee (thus leaving the latter to his exclusive workers' compensation remedy) by observing that "(t)he application of the borrowed employee doctrine in the workers' compensation setting is neither unfair nor unreasonable when it is remembered that compensation liability cannot exist in the absence of **some express or implied contract of hire between the borrowed employee and the borrowing employer.**" (Emphasis added.)

Withal, a borrowed employee is hardly a "mere affiliate" of the lending employer, with whom the borrowing employer has a contract. The borrowed employee, himself, has at least a quasi- or implied contractual relationship with the borrowing employer. Thus, the

rule of *Danco* should not bar one in the position of the plaintiff from seeking redress under sec. 1981 against a borrowing employer who causes, permits or suffers a hostile work environment to exist, to the plaintiff's detriment.

Additional support, by analogy, exists in another line of authority which by itself also affords the plaintiff a second basis for standing to being a 1981 claim against Fannie Mae. This line of authority endows with standing another class of plaintiffs whose relationship with the offending employer is more "indirect" than a forthright employer-employee arrangement:

**2. The plaintiff's First Amended Complaint states a cause of action under 42 U.S.C. sec. 1981 where on the facts pleaded therein the plaintiff may be considered to have been a "third party beneficiary" of the contract between Compaq and Fannie Mae.**

In *Jones v. Local 520, International Union of Operating Engineers*, 603 F.2d 664, 665 (7th Cir.), cert. denied, 444 U.S. 1017 (1980), the Seventh Circuit Court of Appeals held that a third party beneficiary to a contract had standing to sue under 42 U.S.C. sec. 1981. Specifically, that decision held that appellants' claim alleging deprivation of beneficiary rights of black engineers as gained through a preferential hiring agreement was sufficient to maintain an action under sec. 1981. Accord: *Smith v. Chicago Archdiocese*, No. 02-C-2261 (N.D. Ill. 2004), at 17 ("(t)he making and enforcement of a contract right under Section 1981 also includes third-party beneficiaries of a contract") and *Brant Construction Co., Inc. v. Lumen Construction, Inc.*, 515 N.E.2d

868, 873 (Ind.App. 1987), both decisions citing *Jones v. Local 520, supra*.

At bar, the plaintiff was certainly a third-party beneficiary of the contract between Compaq and Fannie Mae. Both Compaq and Fannie Mae selected the plaintiff to fulfill their contract, and the plaintiff stood to obtain advantageous employment as a result. Thus, as a third-party beneficiary of the contract between Compaq and Fannie Mae, the plaintiff undoubtedly has standing to bring a 1981 action to redress Fannie Mae's violation of that contract. Note that the third-party beneficiary issue was never raised or addressed in *Danco*.

**3. The plaintiff's First Amended Complaint states a cause of action under 42 U.S.C. sec. 1981 where on the facts pleaded therein the plaintiff may be considered to have been a victim of racial-ethnic-religious discrimination.**

The defendant's second argument, designated II.B., and appearing on pp. 5-6 of its memorandum, posits that even if the plaintiff does have standing to prosecute a 1981 action against Fannie Mae, nonetheless, the complaint fails to state a claim upon which relief may be granted for the reason that sec. 1981 does not provide relief from religious and sexual discrimination. The defendant is correct that sec. 1981 does not provide relief from sexual discrimination. It is less clear, however, that sec. 1981 does not provide relief from religious discrimination -- at least where such discrimination is mixed up with racial or ethnic discrimination, and it is beyond all dispute that sec. 1981 does

*17*

provide relief from racial and ethnic discrimination.

Indeed, since the United States Supreme Court's decision in *Saint Francis College v. Al-Khazraji,* 481 U.S. 604, 609-613 (1987), it has been settled that discrimination against persons of Arab descent is actionable under sec. 1981.

> Based on the history of sec. 1981, we have little trouble in concluding that Congress intended to protect from discrimination identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics. Such discrimination is racial discrimination that Congress intended sec. 1981 to forbid, whether or not it would be classified as racial in terms of modern scientific theory .... The Court of Appeals was thus quite right in holding that sec. 1981, "at a minimum," reaches discrimination against an individual "because he or she is genetically part of an ethnically and physiognomically distinctive subgrouping of *homo sapiens.*" It is clear from our holding, however, that a distinctive physiognomy is not essential to qualify for sec. 1981 protection. **If respondent on remand can prove that he was subjected to intentional discrimination based on the fact that he was born an Arab, rather than solely on the place or nation of his origin, or his religion, he will have made out a case under sec. 1981.**

Id., at 613 (footnote omitted, emphasis added).

Accord: *U.S. v. Nelson,* 277 F.3d 164, 177-178 (2nd Cir. 2002) (acknowledging the holding in *Saint Francis College v. Al-Khazraji, supra,* and extending its protection to members of the Jewish "race"); *Tyson v. Damore,* No. 03-5297 (E.D.Pa. 2004), at 27 (observing that plaintiff, a black man and a Muslim, was a member of a racial and religious minority entitled to sue under sec. 1981).

18

At bar, the factual allegations in the complaint are certainly sufficient to support an action under sec. 1981 grounded in unlawful discrimination based upon the plaintiff's Arab/Muslim ancestry; see especially paragraphs 1, 18, 21, 23, 24, 26, 27, 28, 30. That this discrimination sometimes took the form of unwanted sexual advances does not *per se* detract from its racial-ethnic-religious origin. At most, it suggests **mixed motives**, some of which are clearly actionable under sec. 1981. Moreover, the acts of Holmes are not the only factual predicates alleged in the complaint upon which to ground the plaintiff's 1981 action. According to paragraphs 35 and 37, when the plaintiff sought relief from Holmes' mistreatment from two of Fannie Mae's managers, the latter in effect brushed him off without making any effort to remedy the problem. Such inaction is, itself, an adequate and independent ground for the plaintiff's 1981 action. *Smith v. Sheahan*, 189 F.3d 529, 533 (7th Cir. 1999) (employer liable under Title VII if upon learning of unlawful workplace discrimination it fails to take remedial steps); *Williams v. Cloverleaf Farms Dairy, Inc.*, 78 F.Supp.2d 479, 485-486 (D.Md. 1999) (vicarious liability of employer under sec. 1981).

For all of the foregoing reasons, the defendant's motion to dismiss Count I of the plaintiff's First Amended Complaint must be denied.

## II. THE PLAINTIFF'S ACTION UNDER 42 U.S.C. SEC. 1983

The plaintiff concedes that he does not have a viable claim against Fannie Mae under 42 U.S.C. sec. 1983 for the reason that Fannie Mae is now a private, for-profit entity.

## CONCLUSION

WHEREFORE, the plaintiff prays that the defendant's motion to dismiss, at least as applied to Count One (42 U.S.C. sec. 1981), be denied.

Respectfully submitted,
AHMAD SHREATEH, Plaintiff,
By His Attorney,

_____
Thornton E. Lallier, Esq.
Lallier Law Office
159 Main Street
P.O. Box 689
Amesbury, MA 01913
Tel: 978.388.9500
BBO # 283680

## CERTIFICATE OF SERVICE

I, Thornton E. Lallier, hereby certify that on January 5, 2005 I mailed, postage prepaid, a copy of the foregoing document to: C. Tama Donovan, Esq., Wilmer Cutler Pickering Hale and Dorr LLP, 60 State Street, Boston, MA 02109.

Signed under penalty of perjury.

_____
Thornton E. Lallier, Esq.